1    **WO**

2

3

4

5

6

7                 **IN THE UNITED STATES DISTRICT COURT**

8                      **FOR THE DISTRICT OF ARIZONA**

9

10   Eugene Allen Doerr,                )   No. CV-02-582-PHX-PGR
                                        )
11              Petitioner,             )   <u>DEATH PENALTY CASE</u>
                                        )
12   vs.                                )
                                        )   **MEMORANDUM OF DECISION**
13   Charles L. Ryan, et al.,[1]        )          **AND ORDER**
                                        )
14              Respondents.            )
                                        )
15   _____    )

16
            Petitioner Eugene Allen Doerr is a state prisoner under sentence of death.  Pursuant to
17
     the Court's general procedures governing resolution of capital habeas proceedings, the
18
     parties have completed briefing of both the procedural status and the merits of Petitioner's
19
     habeas claims.  Before the Court is Petitioner's First Amended Petition, which raises thirty-
20
     five claims for habeas relief.  (Dkt. 82.)[2]  In a previous Order, the Court denied Petitioner's
21
     motions for discovery, evidentiary hearing, and expansion of the record, and further denied
22
     a number of claims.  (*See* Dkt. 132.)  This Order resolves Petitioner's remaining claims and
23
     concludes that Petitioner is not entitled to relief.
24

25
     _____
26
            [1]       Charles L. Ryan is substituted for Dora B. Schriro, as Director, Arizona
27   Department of Corrections.  Fed. R. Civ. P. 25(d)(1).

28          [2]       "Dkt." refers to the documents in this Court's file.

# FACTUAL AND PROCEDURAL BACKGROUND

The Arizona Supreme Court summarized the facts surrounding the crime and Petitioner's arrest and conviction as follows:

At approximately 10:00 a.m. on September 24, 1994, two Phoenix police officers responded to a "check welfare" dispatch following a 911 call. Upon arriving at a bungalow-style apartment, they found the front door ajar and a disheveled Eugene Doerr sitting on the coffee table in the living room. He wore only shorts and was covered with blood.

When asked what had occurred, Doerr replied: "I don't know. I woke up with this — with a dead body back there." In a bedroom doorway, Officer Wirth found a naked woman lying in a pool of blood. Detecting no pulse, he instructed his partner to radio the fire department. Doerr responded, "[Y]ou don't need fire because she's dead." He told the officers that he had awakened, gone to the bathroom, and found the body on the floor. He denied knowing the victim's identity.

The four-room apartment showed signs of a violent struggle, with blood in every room. At trial, the medical examiner testified that the victim, 39-year-old Karen Bohl, died of multiple blunt force trauma. She suffered numerous injuries to the head, including a fractured nose, abrasions, cuts, bruises, and a two-inch laceration that exposed her skull. Her left hand was swollen and red. Her right hand was clenched in a fist holding hairs consistent with her own. Her left nipple and areola had been cut off, and above her right nipple were small lacerations. The body was covered in blood and fecal matter. Blood also formed a V-shaped pattern down her back from saturated hair.

The victim had been assaulted vaginally and rectally with an instrument of some kind. The doctor testified that the wall between her rectum and cervix had been destroyed. A bloody pipe, apparently part of a broken lampstand, and a bloody broom handle were found nearby – objects that the medical examiner said could have produced the injuries. Because of significant blood loss, swelling, and bruising, the doctor concluded that the injuries likely occurred prior to or during the victim's death. There were twenty-six other areas of injury to her body. Her blood alcohol level tested at .25, but no other drugs were detected. Tests for semen were negative.

Defendant Doerr was also injured. His right hand was swollen, and he had minor cuts on his forearm, above his wrist, and on his left foot. His chest, stomach, pubic area, and hands were smeared and caked with blood.

Investigators performed enzyme tests on the blood collected at the scene. The state's criminalist testified that Karen Bohl's PGM subtype was 1+2+ and Eugene Doerr's was 1+1+. He found blood consistent with only those two subtypes on numerous objects throughout the apartment. The pipe was saturated in blood of both subtypes, and the broom handle showed 1+1+ on the base and 1+2+ at the other end. The victim's bloody footprint was found on a bathtub. Bloody fingerprints belonging to both Bohl and Doerr were recovered from various locations around the apartment.

Defendant, a construction worker, had dined with his boss the evening before the murder. Around 8:30 p.m., he left in a company truck to purchase supplies for the next day's job. A receipt showed that he paid for the materials, including thirty-six bags of Redimix cement, at 9:05 p.m. He told the investigating officers that he then went to a bar and later stopped at the house of someone named Jeff. Finally, he went home. The next morning he awoke to find Bohl's body in his apartment and called 911 from the truck's mobile phone.

Defendant first claimed that he had no idea how the woman got there. Later, as officers waited for a search warrant, he told them that he thought her purse and ID were in the bathroom "because I remember seeing a purse and I don't own a purse." He also said the white car parked out front belonged to the victim. "That is her car she said . . . I think." One of the officers testified that Doerr hesitated before adding the "I think."

Doerr voluntarily went to the police station. During questioning, he asked one of the officers if he thought a judge would give him life for the murder. He also said, "[S]he must have really made me mad for me to do something to her like this." The police did not test Doerr for drugs or alcohol until about 3:00 p.m., five hours after the 911 call. The tests were negative.

Tina Allgeir last saw her sister, Karen Bohl, at about 4:30 p.m. on the previous day, when Karen dropped off her 7-year-old daughter before going to work. Bohl had just started a new job as a manager trainee at a fast food restaurant. Her supervisor reported that she had called to say she would be late. However, she never arrived at work. When she later failed to pick up her daughter, Allgeir and other family members went to Bohl's apartment. They found her work uniform there, and food was still on the stove. Police investigators were unable to determine where or when Bohl and the defendant met on the day of the murder. They also did not find any indication that the two had been previously acquainted.

While in custody, the defendant initially told his cellmate, Victor Rosales, that he did not remember anything about the incident. However, a few weeks later he recalled picking up Bohl, going on a "partying binge," and arguing with her. Rosales testified that Doerr "flew off the handle" because descriptions contained in police reports were not "the way it happened." For instance, the defendant told Rosales that he struck the victim with a pipe when she started screaming, and not with a lamp as a police report indicated.

According to Rosales, Doerr wanted to have sex with Bohl, but she refused. Defendant reportedly stated, "[U]sually when you go pick out a woman, pick up a broad at a bar and take her partying, she knows what is expected." Rosales further testified that Doerr said "he should have buried the bitch in the back yard" with the cement he had purchased. Rosales claimed that he distanced himself from Doerr after the latter described the sensation he experienced from playing with the victim's blood.

At trial, defense counsel suggested that a third party could have entered the apartment, murdered the victim, and injured the defendant. Investigators, however, testified that the apartment windows were locked. Some, in fact, were painted shut. The front door was open when police arrived, but the back door was locked. No blood was found outside the apartment, except for a smear on the driver's side of the defendant's truck. Its location was consistent with the

defendant's account of using the truck's mobile phone to call 911.

> A jury convicted Doerr of premeditated first degree murder, felony murder, sexual assault, and kidnapping. Following a presentence hearing, the trial judge found the heinous, cruel, or depraved aggravator, A.R.S. § 13-703(F)(6), and insufficient mitigation to warrant leniency. He sentenced the defendant to death.

*State v. Doerr*, 193 Ariz. 56, 59-61, 969 P.2d 1168, 1171-73 (1998). On direct appeal, the Arizona Supreme Court affirmed, *id.* at 72, 969 P.2d at 1184, and the United States Supreme Court denied a petition for writ of certiorari, *Doerr v. Arizona*, 526 U.S. 1073 (1999).

In March 2000, the Arizona Supreme Court issued the mandate in Petitioner's case and appointed post-conviction relief ("PCR") counsel for Petitioner. (ROA-PCR 1-4.)[3] Counsel filed a PCR petition. (*Id.* 7.) The trial court denied relief without holding an evidentiary hearing, and the Arizona Supreme Court denied a discretionary petition for review. (*Id.* 18; Dkt. 100, Ex. R.) Petitioner then commenced these habeas proceedings.

Petitioner prepared and submitted an amended habeas petition. (Dkt. 82.) The parties briefed the procedural status and merits of the claims, and Petitioner moved for discovery, an evidentiary hearing, and expansion of the record on a number of claims. (Dkts. 113, 115.) The Court denied Petitioner's motions and dismissed Claims 1 (in part), 8, 13, 28, 29, and 33-35. (Dkt. 132.) The Court now addresses Petitioner's remaining claims.

## PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT

A writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest

---

[3] "ROA" refers to the three-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-96-0679-AP). "RT" refers to the reporter's transcripts of Petitioner's trial and sentencing proceedings. "ME" refers to the minute entries of the trial court. "ROA-PCR" refers to the three-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-01-0308-PC). A certified copy of the state court record was provided to this Court by the Arizona Supreme Court on June 28, 2005. (*See* Dkt. 131.)

court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). If a habeas claim includes new factual allegations not presented to the state court, it may be considered unexhausted if the new facts "fundamentally alter" the legal claim presented and considered in state court. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

Exhaustion requires that a petitioner clearly alert the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004); *see also Gray v. Netherland*, 518 U.S. 152, 163 (1996) (general appeal to due process not sufficient to present substance of federal claim); *Lyons v. Crawford*, 232 F.3d 666, 669-70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (general reference to insufficiency of evidence, right to be tried by impartial jury, and ineffective assistance of counsel lacked specificity and explicitness required); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("The mere similarity between a claim of state and federal error is insufficient to establish exhaustion."). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases that plainly analyze the federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court

but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. The procedural bar relied on by the state court must be independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). A state ruling of procedural default is not independent if, for example, it depends upon a federal constitutional ruling. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam). A state procedural bar is not adequate unless it was firmly established and regularly followed at the time of the purported default. *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-62.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

## AEDPA STANDARD FOR RELIEF

Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the

execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy,* 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529

U.S. at 381; *see Musladin*, 549 U.S. at 77; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *see Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v.*

*Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I,* 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853. Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed *de novo*, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

# DISCUSSION

## Claim 1

Petitioner alleges that the trial court violated his federal constitutional rights when it allowed a police officer to testify that Petitioner was being untruthful while undergoing investigative questioning regarding the murder. (Dkt. 82 at 42-47.) The Court previously determined that Petitioner exhausted the Sixth and Fourteenth Amendment aspects of this claim. (Dkt. 132 at 8-9.)

### Background

At trial, Officer Charles Gregory testified that Petitioner informed him during an investigative interview that he did not know how the murder occurred, that his bloody condition was the result of defensive injuries, and that a third person entered his apartment and killed the victim. (RT 4/11/96 (P.M.) at 65-84.) The defense cross-examined Officer Gregory about his assertion that Petitioner was not being truthful when he denied knowing what had happened:

> Q.   He basically said, "Her purse is in there, and I think her ID is in there because I remember seeing a purse and I don't own a purse."
>
> A.   Yes sir.
>
> Q.   Basically he assumed it was hers because he doesn't own a purse.
>
> A.   Correct.
>
> Q.   Correct. And he did say on the video, "That is her car she said, I think," right?
>
> A.   Yeah. But I think there was a hesitation between "I think" and "she said."
>
> Q.   Okay. But immediately following that, he said, "That is the only person I think it could be."
>
> A.   Yes.
>
> Q.   Because there is a strange car parked right out in front of the front door, right?
>
> A.   Yes.
>
> Q.   And then, detective, you basically told Mr. Doerr, that you simply did

not believe him, right?

> A. Yes.

(*Id.* at 97-98.) On redirect, the trial court overruled a defense objection and allowed the officer to explain why he believed Petitioner had been untruthful about not knowing how the murder occurred:

> Q. You stated on cross-examination that you felt that the defendant was being untruthful with you. Can you tell us why you believe that?
>
> [DEFENSE COUNSEL]: Objection. Relevance, speculation.
>
> [PROSECUTOR]: I believe the door was opened, Judge.
>
> [COURT]: Overruled.
>
> . . . .
>
> [WITNESS]: The injuries that he had. When he slipped and told me that she said it was her car, and then changed it around real quick. The comments he made to me in the basement about whether or not he thought the judge would give him life in prison, and that she must have made him made [sic] for him to do what happened to her.

(*Id.* at 109-10.)

In denying this claim on the merits, the Arizona Supreme Court stated:

> Lay witnesses may give opinion testimony, even as to the ultimate issue, when it is "rationally based on the perception of the witness and . . . helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Ariz. R. Evid. 701; *see also State v. Koch*, 138 Ariz. 99, 102, 673 P.2d 297, 300 (1983); *State v. Ayala*, 178 Ariz. 385, 387, 873 P.2d 1307, 1309 (App. 1994). One witness may not, however, state an opinion as to the credibility of another. *See State v. Lindsey*, 149 Ariz. 472, 475, 720 P.2d 73, 76 (1986); *State v. Moran*, 151 Ariz. 378, 382, 728 P.2d 248, 252 (1986); *State v. Reimer*, 189 Ariz. 239, 241, 941 P.2d 912, 914 (App. 1997); *State v. Schroeder*, 167 Ariz. 47, 50-51, 804 P.2d 776, 779-80 (App. 1990). Here, Officer Gregory's opinion was not intended as a comment on the defendant's credibility as a witness. Indeed, Doerr did not testify at the trial. Moreover, the detective was not speaking as an expert witness on truthfulness. He was merely stating his reasons for not believing the defendant's story.
>
> In any event, the defense opened the door to this testimony. One cannot "complain about a result he caused." Morris K. Udall et al., *Law of Evidence* § 11, at 11 (3d ed. 1991). The rule of invited error applies when a party elicits evidence or comments that "make otherwise irrelevant evidence highly relevant or require some response or rebuttal." *Pool v. Superior Court*, 139 Ariz. 98, 103, 677 P.2d 261, 266 (1984); *see also State v. Wilson*, 185 Ariz. 254, 259, 914 P.2d 1346, 1351 (App. 1996) (observing that the response must be "pertinent").

Here, the overall tone of the cross-examination suggested that Officer Gregory had deliberately expressed disbelief regarding the defendant's story as a ploy to induce, by intimidation or otherwise, a confession or a material inconsistency. The cross-examination also implied that the police had improperly failed to look for an assailant other than the defendant. Officer Gregory's testimony on redirect explained why the police did not believe the defendant and did not do more to pursue another perpetrator. Under the circumstances, these reasons became relevant, and the state was entitled to explore them.

*Doerr*, 193 Ariz. at 63, 969 P.2d at 1175.

<u>Analysis</u>

Petitioner contends that the officer's testimony about his credibility was tantamount to expert testimony on the issue of his guilt or innocence and its admission violated his rights under the Sixth and Fourteenth Amendments. (Dkt. 82 at 46.)

It is not the province of a federal habeas court to reexamine the trial court's ruling on a state law evidentiary matter. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). This is true even if the state evidentiary ruling is incorrect. *Id.* at 71-72. A state court's evidentiary ruling may be grounds for relief only if it renders the state proceeding so fundamentally unfair as to violate due process. *Estelle*, 502 U.S. at 70; *Bueno v. Hallahan*, 988 F.2d 86, 87 (9th Cir. 1993) (trial court's admission of police officer testimony not so central to the state's proof that it rendered petitioner's trial fundamentally unfair). In *Estelle*, the Supreme Court held that the admission of evidence did not violate due process because the evidence was relevant to the charges filed against the defendant. *Estelle*, 502 U.S. at 68-69. Here, the officer's testimony about Petitioner's statements was clearly relevant, both to the charge of first degree murder and to Petitioner's defense that a third party committed the crime. Therefore, its admission did not render Petitioner's trial fundamentally unfair. *See id.*

Petitioner also argues that, by commenting on Petitioner's credibility, Officer Gregory encroached upon the province of the jury to determine guilt or innocence. (Dkt. 82 at 44.) Petitioner relies on the following statement in *Baldwin v. New York*, 399 U.S. 66, 72 (1970): "[T]he jury interposes between the accused and his accuser the judgment of laymen who are less tutored perhaps than a judge or panel of judges, but who at the same time are less likely to function or appear as but another arm of the Government that has proceeded against him."

(*Id.*) Petitioner also cites *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975), for the proposition that he was denied the opportunity of an impartial jury to serve as a necessary hedge against the allegedly biased response of the judge. (Dkt. 82 at 46-47.) Neither case supports Petitioner's argument. The *Baldwin* Court determined the circumstances under which a defendant is entitled to trial by a jury, not a judge. 399 U.S. at 70-72. The *Taylor* Court determined that women were systematically excluded from jury service, in violation of the defendant's right to a jury comprised of a fair cross-section of the community. 419 U.S. at 531-32.

Petitioner does not rely on any other Supreme Court precedent to establish that Officer Gregory's testimony encroached upon the province of the jury. (Dkt. 82 at 42-47; Dkt. 105 at 38-42.) Therefore, he has failed to satisfy the requirements of 28 U.S.C. § 2254(d)(1). *See Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc) (conducting review under the AEDPA and concluding that petitioner failed to establish a violation under controlling Supreme Court precedent). Moreover, the officer's testimony did not invade the province of the jury because he did not express a direct opinion about Petitioner's guilt or innocence. *See United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990). The jury was left to determine on its own whether Petitioner murdered the victim. *Id.* For all of these reasons, Petitioner is not entitled to relief on Claim 1.

## **Claim 2**

On his own motion and over defense objection, the trial judge excused for cause five teachers from Petitioner's prospective juror panel, explaining that a week-long absence from the classroom would cause a substantial hardship. (RT 4/9/96 at 3-7.) On appeal, the Arizona Supreme Court affirmed:

> The Sixth Amendment guarantees a fair and impartial jury, but not one having a specific makeup. *See State v. Arnett*, 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978); *see also Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S. Ct. 692, 702, 42 L.Ed.2d 690 (1975) ("Defendants are not entitled to a jury of any particular composition."). Arizona law permits a discharge from jury service for "[a]ny person whose absence from his regular place of employment would, in the judgment of the court, tend materially and adversely to affect the public safety, health, welfare or interest," and anyone who would suffer "undue hardship."

A.R.S. § 21-202. We have noted that a trial judge may issue a blanket excuse to teachers and students for hardship reasons. *See State v. Ortiz*, 131 Ariz. 195, 200, 639 P.2d 1020, 1025 (1981), *overruled on other grounds by State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983); *see also United States v. Ross*, 468 F.2d 1213, 1219 (9th Cir.1972); *Rawlins v. Georgia*, 201 U.S. 638, 640, 26 S. Ct. 560, 561, 50 L.Ed. 899 (1906) (Fourteenth Amendment does not prevent excluding certain classes from jury duty for the good of the community). In this case, the trial judge substantiated a finding of hardship through his questioning of prospective jurors. We see no merit in the defendant's argument. *See Arnett*, 119 Ariz. at 50, 579 P.2d at 554 (excusing jurors falls within "sound discretion" of trial judge).

*Doerr*, 193 Ariz. at 65, 969 P.2d at 1177.

In his amended petition, Petitioner alleges that the trial court's action denied him the opportunity to draw a petit jury from a fair cross-section of his community. (Dkt. 82 at 47-57.) He further alleges that the teachers were erroneously dismissed because *voir dire* did not establish that serving on the jury would constitute an undue hardship.[4] (*Id.*) Respondents concede that Claim 2 is properly exhausted. (Dkt. 99 at 28.)

Fair Cross-Section

---

[4] Petitioner also alleges violations of the Fifth Amendment Due Process Clause and his right under the Eighth Amendment not to be subject to cruel and unusual punishment. (Dkt. 82 at 56-57.)

It is the Fourteenth Amendment, not the Fifth Amendment, that protects a person against deprivations of due process by a state. *See* U.S. Const. amend. XIV, § 1 ("nor shall any state deprive any person of life, liberty, or property without due process of law"); *Castillo v. McFadden*, 399 F.3d 993, 1002 n.5 (9th Cir. 2005) ("The Fifth Amendment prohibits the federal government from depriving persons of due process, while the Fourteenth Amendment explicitly prohibits deprivations without due process by the several States."). Because the Fifth Amendment Due Process Clause does not provide a cognizable ground for relief regarding Petitioner's state court conviction, such allegations are dismissed and will not be further discussed with respect to Petitioner's individual claims.

Under the Eighth Amendment, the right to be free of cruel and unusual punishment, by definition, is a protection related to the imposition or carrying out of a sentence. In other words, the protection afforded by the Eighth Amendment does not attach until a person is convicted and subject to punishment by the state. *See Ingraham v. Wright*, 430 U.S. 651, 664, 667, 671 n.40 (1977) (Eighth Amendment circumscribes only the type of punishment imposable on those convicted, punishment grossly disproportionate to the crime and what can be criminalized and punished); *Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979) (Eighth Amendment has no application to pretrial detainees). Because the Eighth Amendment does not provide a cognizable ground for claims relating to Petitioner's trial, such allegations are dismissed and will not be further discussed with respect to Petitioner's individual claims.

- 14 -

"The selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor*, 419 U.S. at 528. However, a violation of the fair cross-section requirement cannot be premised on proof of under-representation in a single jury. *See United States v. Mitchell*, 502 F.3d 931, 950 (9th Cir. 2007). Although the jury venire must be drawn from a source that fairly represents the community, *see Taylor*, 419 U.S. at 533, the ultimate composition of the petit jury need not mirror that of the community, *Mitchell*, 502 F.3d at 950. Because Petitioner's argument rests on the court's use of for-cause challenges to prospective jurors on his petit jury, it necessarily fails to establish a Sixth Amendment violation. *See Holland v. Illinois*, 493 U.S. 474, 482-83 (1990) ("We have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.") (quoting *Lockhart v. McCree*, 476 U.S. 162, 173 (1986)).

To the extent Petitioner is asserting a Sixth Amendment violation premised on the composition of the venire panel generally (as opposed to the petit jury drawn for his case), Petitioner's claim also fails. To establish a *prima facie* violation of the fair cross-section requirement, a petitioner must show that (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this under-representation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Petitioner has made no effort to establish any of these prerequisites. *See United States v. Goodlow*, 597 F.2d 159, 162 (9th Cir. 1979) (burden is on challenger to offer evidence demonstrating fair cross-section violation under *Duren*); *see also Sweet v. United States*, 449 A.2d 315 (D.C. App. 1982) (attorneys, teachers, clergy, physicians, dentists, and nurses are not cognizable groups); *State v. Machia*, 449 A.2d 1043 (Conn. 1979) (automatic exclusion of teachers, clergy, and students did not violate fair cross-section requirement). The Arizona Supreme

Court's rejection of Petitioner's fair cross-section argument was not contrary to or an unreasonable application of controlling Supreme Court law.

Due Process

It is not the province of a federal habeas court to reexamine a state court's ruling on state law issues. *See Estelle*, 502 U.S. 67-68. A state court's ruling may be grounds for relief only if it renders the state proceeding so fundamentally unfair as to violate due process. *Estelle*, 502 U.S. at 70. Construing A.R.S. § 21-202 (West 1996), the Arizona Supreme Court held that teachers and students are granted a blanket exclusion from jury service for hardship reasons. *See Doerr*, 193 Ariz. at 65, 969 P.2d at 1177 (citing *State v. Ortiz*, 131 Ariz. 195, 200, 639 P.2d 1020, 1025 (1981), *overruled on other grounds*, *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983)).

The Supreme Court in *Rawlins v. Georgia*, 201 U.S. 638, 640 (1906), specifically held that the Due Process Clause of the Fourteenth Amendment does not prevent States from excluding certain classes from jury duty for the good of the community. *See also Taylor*, 419 U.S. at 534 ("States are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare."). Petitioner does not cite any controlling federal law to the contrary. (Dkt. 82 at 47-57; Dkt. 105 at 42-44.) Thus, the Arizona Supreme Court's decision upholding the trial court's exclusion of teachers on the ground of undue hardship is neither contrary to nor an unreasonable application of Supreme Court precedent.

**Claim 3**

Petitioner contends that remarks by two prospective jurors during *voir dire* biased the entire jury panel against him in violation of his right to an impartial jury. (Dkt. 82 at 57; *see also* RT 4/8/96 at 43, 56-57.) As explained by the Arizona Supreme Court:

> The first, Joe Collier, had once directed the Phoenix Crime Lab. Collier indicated that he could not be fair and impartial because he knew several of the state's witnesses. He identified by name Detective Dennis Olson, who was seated at the prosecutor's table and had been previously introduced to the jury panel.

When asked by the court about his ability to sit as a juror, Collier said: "I don't think it would be fair to the defense, Your Honor, because of – I am aware of the integrity and I highly respect a number of the people that would be witnesses."

The second prospective juror, Jose Martinez, was a prison guard in the federal system. He volunteered that during his four and one half years on the job, he had encountered only three inmates who were not guilty. The judge excused both Collier and Martinez for cause.

*Doerr* 193 Ariz. at 61, 969 P.2d at 1173. The following day, defense counsel moved for a mistrial, arguing that these remarks tainted the entire panel. (RT 4/9/96 at 8-12.) The trial court disagreed:

The motion for mistrial is denied. As to Mr. Martinez, just for the record, I felt that his demeanor in answering the questions was questionable, and I don't think that other jurors would have much stock into the manner in which he made the statement, and I don't think that it prejudices the panel for them to have heard what he said.

As to Mr. Collier, while he gave gratuitous comments regarding the Phoenix Police Department and Detective Olson, the Court will be instructing the jury on expert witness' testimony as well as the credibility of witnesses in general, that the jurors are only to consider the evidence that is presented at trial.

Do counsel want me to do an admonition to the jurors that are ultimately selected, prior to beginning of testimony regarding Mr. Collier's testimony? I would do so upon request, unless you feel that is going to remind the jury about what the statements were before, but based on all of that, it is ordered denying the motion for mistrial.

(*Id.* at 12-13.) Petitioner elected not to have the jurors admonished. (*Id.* at 13.)

After the completion of *voir dire*, Petitioner's counsel passed the final panel without objection for cause. (*Id.* at 61-69.) Peremptory challenges were then exercised, and the jury was seated. (*Id.* at 69-71.) As part of its preliminary instructions, the court admonished the jurors not to allow bias to influence their determination of the facts:

As far as your job of determining the facts is concerned, you must do this only from the evidence that is produced here in court. You are not to guess about any fact. You are not allowed to let sympathy or bias enter into your determination of the facts. If you think that I have some opinion about the facts, what the facts are, you should disregard it because you are the sole judges of the facts in this case.

The evidence in this trial consists of the testimony of witnesses and exhibits, which are tangible objects which may be received in evidence, and you will see some of those in this case. You will see some pictures. You will see other items of physical evidence.

(*Id.* at 74-75.)  After presentation of the evidence, the court again reminded the jurors that facts must be determined based on the evidence produced in court:

> I am now going to tell you the rules you should follow to decide this case. It is your duty to follow these instructions.  It is also your duty to determine the facts.  "Facts" mean what actually happened.  You determine the facts only from the evidence produced in court.
>
> You should not guess about any fact.  You must not be influenced by sympathy or prejudice.  You must not be concerned with any opinion you may feel I have about the facts.  You are the sole judges of what happened.

(RT 4/15/96 at 22-23.)

On direct appeal, the Arizona Supreme Court upheld the trial court's refusal to grant Petitioner's motion for mistrial:

> The issue before us, then, is whether the court should have granted the formal mistrial motion because the remarks of these two panelists tainted the remaining jurors.  Defendant merely speculates that this contamination occurred.  We will not, however, indulge in such guesswork.
>
> . . . .
>
> . . . A review of the voir dire transcript reveals nothing suggesting that others were prejudiced.  Collier merely acknowledged his own bias.  His statements cannot reasonably be considered inflammatory, and he did not comment on the defendant's guilt or innocence.
>
> Although Collier identified Detective Olson by name, nothing indicates that the jurors permitted his remark to affect their deliberations in any way.  The same may be said of Martinez' statements, which clearly exhibited a personal and biased viewpoint.
>
> . . . .
>
> . . . Collier's comments were brief and isolated in a lengthy voir dire involving seventy-five individuals over two days.  The judge was in the best position to assess their impact on the jurors.  We see no error in his refusal to declare a mistrial and replace the entire panel.

*Doerr*, 193 Ariz. at 61-62, 969 P.2d at 1173-74 (internal citations omitted).  Respondents concede that this claim is properly exhausted.  (Dkt. 99 at 38-39.)

<u>Analysis</u>

A criminal defendant is entitled to a fair trial by "a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  A claim that a jury was not impartial, based on remarks made by potential jurors during *voir dire*, must focus on the jurors who

ultimately sat on the trial jury, not the jury panel. *See Ross v. Oklahoma*, 487 U.S. 81, 86 (1988). "The Constitution presupposes that a jury selected from a cross-section of the community is impartial . . . so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Lockhart*, 476 U.S. at 184.

To be qualified, a juror does not need to be totally ignorant of the facts and issues involved in the case. *See Murphy v. Florida*, 421 U.S. 794, 799-800 (1975). The presumption of impartiality is not rebutted by a juror holding a preconceived notion of the guilt or innocence of the accused. *Id.* "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 800 (internal quotation omitted). Petitioner has the burden of rebutting the presumption of impartiality. *Id.* Further, jurors are presumed to follow the trial court's instructions. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001).

Petitioner argues that the statements made by Collier and Martinez during *voir dire* were inherently prejudicial and constituted structural error. (Dkt. 82 at 57-58.) As support for application of a structural error standard, Petitioner relies on the Ninth Circuit's decision in *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1998). (Dkt. 82 at 58.) In that pre-AEDPA case, the petitioner was convicted in state court of sexual abuse of a minor. During *voir dire*, a prospective juror stated that, during her career as a social worker, she had never been involved in a case in which a child had lied about being sexually assaulted. She repeated this assertion on four different occasions before being removed for cause. Following her removal, the trial court did not question the remaining jurors to determine the impact of her remarks. On federal habeas review, the Ninth Circuit noted that the case rested on the believability of the child's testimony and thus the potential juror's statements had to have had an impact on the jury's verdict. 137 F.3d at 634. Although opining that the error was likely structural, the court declined to reach this issue because reversal was required under the harmless-error standard. *Id.*

As necessitated by 28 U.S.C. § 2254(d)(1), the only Supreme Court authority identified by Petitioner is *Irvin v. Dowd*, 366 U.S. 717 (1961), and *Smith v. Phillips*, 455 U.S. 209 (1982), both referenced by the court in *Mach*. (*Id.* at 58.) However, Petitioner does not explain how either case is relevant to his structural error argument. In *Irvin*, the Court addressed actual bias based on adverse pretrial publicity. 366 U.S. at 727-28. In *Smith*, the Court reiterated that allegations of juror partiality warrant a hearing to establish actual bias. 455 U.S. at 215-17. Neither case stands for the proposition that remarks by venirepersons during the *voir dire* process may so bias an entire panel that prejudice to the remaining jurors must be presumed.

If the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, relief is not available. *See Williams*, 529 U.S. at 381; *Casey*, 386 F.3d at 907 ("Although lower federal court and state court precedent may be relevant when that precedent illuminates the application of clearly established federal law as determined by the United States Supreme Court, if it does not do so, it is of no moment."); *see also Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006) (circuit precedent derived from an extension of a Supreme Court decision is not clearly established law). The Supreme Court has only presumed prejudice relating to a jury panel in the context of pretrial publicity, where the setting of the trial was inherently prejudicial. *See Daubert v. Florida*, 432 U.S. 282, 303 (1977) (stating that a court presumes prejudice only in the face of a "trial atmosphere utterly corrupted by press coverage"); *Harris v. Pulley*, 885 F.2d 1354, 1362 (9th Cir. 1989) (discussing presumed prejudice cases). The Supreme Court has not extended the presumed prejudice principle to the context sought by Petitioner in this claim. Therefore, Petitioner's claim is not supported by "clearly established" law. *See Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004) ("Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law."). The Arizona Supreme Court's failure to find structural error based on the comments by Collier and Martinez was neither contrary to nor an unreasonable application of

controlling federal law.

As already noted, the trial judge determined that the trial jurors were not biased. (RT 4/9/96 at 12-13, 61-69.) The Arizona Supreme Court agreed, acknowledging that the trial court was in the best position to assess the impact of the remarks upon the jury panel and whether there was actual bias against Petitioner. *Doerr*, 193 Ariz. at 62, 969 P.2d at 1174. The state court's finding as to lack of bias is a finding of fact entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *Casey*, 386 F.3d at 910. Petitioner has not attempted to rebut the presumption by demonstrating that one of the trial jurors was actually biased against him. *See* 28 U.S.C. § 2254(e)(1).

In affirming the trial's finding that no jurors were biased by the remarks, the state supreme court observed that Collier merely acknowledged his own personal bias, that he acknowledged knowing Detective Olson from his previous work with the Phoenix Police Department, and that he did not expressly or impliedly comment on the defendant's guilt or innocence. *Id.* The court further noted that Collier's statements were not inflammatory. *Id.* Regarding Martinez, the supreme court found that, given his demeanor during *voir dire*, the jury panel would not have put much stock in his opinions regarding prisoners. *Id.* Moreover, Collier's and Martinez's remarks were brief and isolated in a lengthy *voir dire* involving seventy-five individuals over two days. *Id.*

After extensive review of the record, this Court agrees with the findings of the state courts that the comments did not result in a jury panel that was actually biased against Petitioner. Simply put, this is not a case where the potential juror's remarks were so presumptively prejudicial towards the guilt of the defendant that they had the effect of actually biasing the jurors. *See, e.g.*, *Irvin*, 366 U.S. at 727-28 (petitioner established that as a result of pretrial publicity, two-thirds of his trial jury were actually biased because they had formed an opinion that he was guilty and that they acknowledged familiarity with the material facts and circumstances of the case); *see also Daniels v. Woodford*, 428 F.3d 1181,

1211 (9th Cir. 2005) (stating that to demonstrate actual bias, petitioner must show that the
trial jurors demonstrated actual partiality or hostility that could not be laid aside).

Finally, Petitioner contends that Collier's remarks constituted prosecutorial vouching.
(Dkt. 82 at 60-61.)   Vouching occurs when the prosecutor places the prestige of the
government behind a witness through personal assurances of the witness's veracity or
suggests that information not presented to the jury supports the witness's testimony. *See
United States v. Young*, 470 U.S. 1, 18-19 (1985). Mr. Collier was not a prosecutor and there
are no Supreme Court cases extending the doctrine of prosecutorial vouching to potential
jurors.   The Arizona Supreme Court held that Collier's remarks did not constitute
impermissible vouching because he was neither a prosecutor nor a witness. *Doerr*, 193 Ariz.
at 62, 969 P.2d at 1174.   This decision was neither contrary to nor an unreasonable
application of controlling Supreme Court precedent.   Petitioner is not entitled to relief on
Claim 3.

**Claim 4**

Petitioner argues that the trial court committed reversible error by admitting gruesome
photographs, a diagram, and an enlarged photograph of the victim taken before the crime.
(Dkt. 82 at 65.)   Respondents contend that Petitioner did not fairly present the federal
constitutional basis of Claim 4 in state court.  (Dkt. 99 at 45-46.)  Petitioner acknowledges
lack of fair presentation, but nevertheless argues that the Arizona Supreme Court, as part of
its independent review, exhausted Claim 4.  (Dkt. 105 at 47.)

Exhaustion requires a petitioner to clearly alert the state court that he is alleging a
specific federal constitutional violation. *See Casey*, 386 F.3d at 913.  The United States
Supreme Court has emphasized that:

> If state courts are to be given the opportunity to correct alleged violations of
> prisoners' federal rights, they must surely be alerted to the fact that the prisoners
> are asserting claims under the United States Constitution.  If a habeas petitioner
> wishes to claim that an evidentiary ruling at a state court trial denied him the due
> process of law guaranteed by the Fourteenth Amendment, he must say so, not only
> in federal court, but in state court.

*Duncan v. Henry*, 513 U.S. 364, 365-66 (1995).

On direct appeal, Petitioner asserted that the trial court abused its discretion in admitting the evidence; however, he did not further assert that this amounted to a federal due process violation. (*See* Opening Br. at 23-28.) Consequently, the Arizona Supreme Court only addressed whether the trial court had properly admitted the evidence under state law. *See Doerr*, 193 Ariz. at 63-64, 65-66, 969 P.2d 1175-76, 1177-78. They did not consider whether admission of the evidence denied Petitioner due process of law under the Fourteenth Amendment. *Id.* On independent review, *id.* at 67-72, 969 P.2d 1179-84, the Arizona Supreme Court considered only whether the death penalty was properly imposed based on a review of the aggravating and mitigating circumstances; it did not consider whether the admission of the evidence described in Claim 4 violated federal due process. *See Moormann v. Schriro*, 426 F.3d 1044, 1057-58 (9th Cir. 2005).

The Court concludes that Claim 4 is technically exhausted but procedurally defaulted because it does not allege facts or law which would exempt it from preclusion and untimeliness pursuant to Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure were Petitioner to return to state court now. *See* Ariz. R. Crim. P. 32.2(b), 32.1(d)-(h); *Coleman*, 501 U.S. at 732, 735 n.1. Because Petitioner does not allege cause and prejudice or a miscarriage of justice, Claim 4 is procedurally barred.

**Claims 5 and 7**

In Claim 5, Petitioner alleges that the trial court violated his constitutional rights by refusing to give a "mere presence" jury instruction. (Dkt. 82 at 71-76.) In Claim 7, he alleges that the trial court violated his rights by refusing to instruct the jury that it could take into consideration his cooperation with police. (*Id.* at 87-89.) Respondents concede that these claims are properly exhausted. (Dkt. 99 at 55, 67.)

Petitioner's defense at trial was that a third person entered his apartment and murdered the victim. Petitioner requested that the trial court provide the following instruction:

> Guilt cannot be established by the defendant's mere presence at a crime scene or mere association with another person at a crime scene. The fact the defendant may have been present does not, in and of itself, make the defendant guilty of the crime charged.

(ROA 95, 96.) He further requested that the court instruct the jury to take into consideration his absence of flight from the crime scene: "Remaining at a crime scene and calling the police does not in itself prove innocence. You may consider any evidence of the defendant's remaining at the crime scene and calling police together with all the other evidence." (*Id.* 97.)

The trial court refused the requested instructions. (RT 4/15/96 at 9-10.) On appeal, the Arizona Supreme Court affirmed, concluding that there was insufficient evidence to give Petitioner's "mere presence" instruction because

> [b]lood matching the defendant's type and a hair similar to his were found on the victim's body. Moreover, Bohl's blood type was found in the defendant's pubic area. This and other physical evidence plainly indicated that the defendant was more than a passive observer of this crime. At the same time, nothing in the record supports the presence of another person at the scene. In fact, the overwhelming weight of the evidence is to the contrary.

*Doerr*, 193 Ariz. at 65, 969 P.2d at 1177. With regard to the "absence of flight" instruction, the court held:

> Counsel claimed that if Doerr had fled, the state would have requested a "flight or concealment of evidence" instruction, but because he remained at the scene and called the police, the jury should be instructed on "just the opposite." We are unpersuaded by this reasoning. The instructions, as a whole, were sufficient.

*Id.* at 67, 969 P.2d at 1179.

Analysis

"The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993) (internal quotation omitted). The opportunity to present a complete defense may be violated either by excluding defense evidence or by excluding the testimony of defense witnesses. *Id.* A defendant is also entitled to a jury instruction for any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. *See Matthews v. United States*, 485 U.S. 58, 63 (1988); *see also Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004). Because an omitted or incomplete instruction is less likely to be prejudicial than a misstatement of the law, Petitioner's burden is weighty. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977);

*Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006). The significance of an omitted instruction is evaluated by comparison with the instructions that were given. *See Kibbe*, 431 U.S. at 156; *see also United States v. Govan*, 152 F.3d 1088, 1093 (9th Cir. 1988) (proposed "innocent explanation" instruction was properly rejected where other instructions adequately covered defense theory).

The Court concludes that the jury instructions as a whole adequately covered Petitioner's defense theory. The instructions requested by Petitioner and rejected by the trial court amounted to nothing more than the unremarkable assertion that Petitioner is presumed innocent until proven guilty beyond a reasonable doubt. The jury instructions provided by the trial court required the prosecution to prove beyond a reasonable doubt that Petitioner committed each of the elements of the charged offenses, and the jury was properly advised that Petitioner was presumed innocent. (RT 4/15/96 at 22-33.) Moreover, as noted by the Arizona Supreme Court, the evidence did not support Petitioner's "mere presence" theory or establish the presence of a third person in his apartment. *Doerr*, 193 Ariz. at 67, 969 P.2d at 1179. The court's failure to provide the requested instructions did not render Petitioner's trial fundamentally unfair, and the Arizona Supreme Court's rejection of Claims 5 and 7 was neither contrary to nor an unreasonable application of controlling Supreme Court law.

**Claim 6**

Petitioner contends that the trial court violated his Sixth Amendment right to confrontation by refusing to allow discovery of professional complaints filed against the prosecution's mental health expert. (Dkt. 82 at 77-87.) Respondents concede that this claim is properly exhausted. (Dkt. 99 at 62.)

At sentencing, Petitioner obtained experts to evaluate and opine about his mental health. (ROA 118, 130, 134.) Based on these evaluations, Petitioner then sought to establish the "diminished capacity" statutory mitigating factor set forth in A.R.S. § 13-703(G)(1).[5] In

---

[5] A.R.S. § 13-703(G)(1) (West 1996) (transferred and renumbered as A.R.S. § 13-751 in 2009) provides:

response, the prosecution obtained its own mental health expert, Dr. James Youngjohn. Prior to the aggravation/mitigation presentence hearing, two of Petitioner's mental health experts, Drs. Daniel Blackwood and Marc Walter registered professional complaints against Dr. Youngjohn. (*See* RT 11/21/96.) The trial court inspected the complaints *in camera*, allowed cross-examination regarding them, but denied disclosure of the actual documents after concluding they were irrelevant to the sentencing proceedings. (RT 11/18/96 at 3, 25-26; ME 11/18/96; *see also* Dkt. 136 (sealed copies of the complaints filed with this Court).) On appeal, the Arizona Supreme Court held that the trial court did not deprive Petitioner of his ability to impeach Dr. Youngjohn's credibility as an expert witness:

> Defendant contends that efforts to establish [A.R.S. § 13-703(G)(1)] were irreparably harmed by the court's refusal to permit his examination of professional complaints filed against the state's expert witness, Dr. Youngjohn. The record reflects, however, that after inspecting those complaints *in camera*, the judge allowed defense counsel to question Dr. Youngjohn freely about the number and nature of them. The defense elicited that (1) nine complaints had been filed with the state licensing board against Dr. Youngjohn; (2) the complaints were registered before Dr. Youngjohn's participation in this case; (3) defense experts Dr. Blackwood and Dr. Walter were two of the complainants; (4) a common component of these complaints was Dr. Youngjohn's frequent findings of malingering; (5) no hearings had yet been conducted and the matters were still pending; and (6) investigation could lead to an outright dismissal of the complaints or the loss of Dr. Youngjohn's professional license. Thus, it does not appear that the defendant was deprived in any significant way of an opportunity to attack Dr. Youngjohn's credibility as an expert witness.

*Doerr*, 193 Ariz. at 68-69, 969 P.2d at 1180-81.

Analysis

The Confrontation Clause of the Sixth and Fourteenth Amendment guarantees the right

---

G. Mitigating circumstances shall be any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

of a criminal defendant "to be confronted with the witnesses against him." Claims raised pursuant to the Confrontation Clause generally fall into two categories: those involving the admission of out-of-court statements and those involving restrictions on the scope of cross-examination. *See Delaware v. Fensterer*, 474 U.S. 15, 18 (1985). The instant claim falls into the second category, which reflects the recognition that "'[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" *Davis v. Alaska*, 415 U.S. 308, 315-316 (1974) (quoting 5 J. Wigmore, *Evidence* § 1395, p. 123 (3d ed. 1940)).

Impeachment of a witness's credibility and exposure of witness bias and possible motive in testifying are two purposes served by the right of cross-examination. *See Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (per curiam); *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986); *Davis*, 415 U.S. at 316. However, "[t]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20. "[J]udges retain wide latitude insofar as the Confrontation Clause is concerned" and may impose limitations on cross-examination that are "reasonable" and are not "arbitrary or disproportionate to the purposes they are designed to serve." *Van Arsdall*, 475 U.S. at 679. Consequently, a Confrontation Clause violation occurs only when the defendant is prevented from investigating "a prototypical form of bias" and "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." *Id.* at 680; *see United States v. Jenkins*, 884 F.2d 433, 436 (9th Cir. 1989) (Sixth Amendment violation will normally be found only if the jury was "denied sufficient information to appraise the biases and motivations of the witness").

Citing *United States v. Lindstrom*, 698 F.2d 1154 (11th Cir. 1983), Petitioner argues that his confrontation rights were violated because he was denied access to and therefore

could not introduce extrinsic evidence related to Dr. Youngjohn's bias as a witness. (Dkt. 105 at 55.) In *Lindstrom,* the trial judge limited questioning of the government's chief witness and denied the defense access to medical records which suggested that the government's witness suffered from psychiatric illnesses, including delusions. *Id.* at 1159-60 (observing that "a psychotic's veracity may be impaired by lack of capacity to observe, correlate or recollect actual events").

The facts in *Lindstrom* are easily distinguishable. First, although it is technically accurate that Petitioner was restricted from introducing the actual complaints at sentencing, he had access to two of the complainants and learned through them the basis of the complaints. Second, in contrast to *Lindstrom*, there was no limitation placed on counsel's questioning of the witness. Indeed, Petitioner's counsel questioned Dr. Youngjohn about receiving notice from his licensing board of nine complaints filed against him, elicited that the complaints involved numerous findings he had made concerning patient malingering, and asked him to explain the complaint investigative process, including the fact he could lose his professional license as a result of the pending inquiry. (RT 11/18/96 at 34-35.) Thus, Petitioner had a full and fair opportunity to question Dr. Youngjohn about any possible bias or improper motive for his testimony despite the restriction on disclosure. *See Bright v. Shimoda*, 819 F.2d 227, 229 (9th Cir.1987) (finding no constitutional violation where defendant allowed to cross examine a witness at length and examination restricted solely as to a collateral matter). The Arizona Supreme Court's failure to find a Confrontation Clause violation was neither contrary to nor an unreasonable application of clearly established federal law.

**Claims 9-12**

These claims involve allegations concerning the trial court's consideration of Petitioner's proffered mitigating evidence. Claim 9 alleges that the trial court erred in rejecting lack of criminal history as a non-statutory mitigating circumstance. (Dkt. 82 at 92-94.) Claim 10 alleges that the trial court erred by requiring a causal connection between

Petitioner's abusive family history and his criminal actions as a factor in assessing the mitigating weight of the abuse. (*Id.* at 95-99.) Claim 11 alleges that the trial court erred by not giving enough mitigating weight to Petitioner's alcoholism and not finding that Petitioner was intoxicated at the time of the crime. (*Id.* at 100-03.) Claim 12 alleges that the trial court erred by requiring a causal connection between Petitioner's low IQ and his criminal actions. Respondents concede that Petitioner exhausted these allegations of trial court error on direct appeal. (Dkt. 99 at 72-74, 77, 80.)

In a capital sentencing proceeding, the sentencer must not be precluded, whether by statute, case law, or any other legal barrier, from considering constitutionally relevant mitigating evidence. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). Constitutionally relevant mitigating evidence consists of "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. However, while the sentencer must not be foreclosed from considering relevant mitigating information, the Constitution does not require that a capital sentencer be instructed in how to weigh any particular fact in the capital sentencing decision. *See Tuilaepa v. California*, 512 U.S. 967, 979 (1994). Nor does the Constitution require that a specific weight be given to any particular mitigating factor. *See Harris v. Alabama*, 513 U.S. 504, 512 (1995); *Eddings*, 455 at 114-15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence"); *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998) (stating that the sentencer is free to assess how much weight to assign mitigating evidence). Once a defendant is found eligible for the death penalty, it is not unconstitutional to give the sentencer unbridled discretion to determine whether the death penalty should be imposed. *Tuilaepa*, 512 U.S. at 980.

In *LaGrand v. Stewart*, 133 F.3d 1253, 1263 (9th Cir. 1998), the Ninth Circuit discussed the role of the habeas court in addressing whether the state court properly weighed mitigation evidence at sentencing:

> [F]ederal courts do not review the imposition of the sentence *de novo*. Here, as in the state courts' finding of the existence of an aggravating factor, we must use the rational fact-finder test of *Lewis v. Jeffers*, [497 U.S. 764, 780-82 (1990)]. That is, considering the aggravating and mitigating circumstances, could a rational fact-finder have imposed the death penalty?

*Id.* Thus, this Court reviews the sentencing record to ensure that the state court allowed the presentation of and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc). "The trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant.'" *Moormann*, 426 F.3d at 1055 (quoting *Clark v. Ricketts*, 958 F.2d 851, 858 (9th Cir. 1991)); *see also Parker v. Dugger*, 498 U.S. 308, 314-15, 318 (1991) (sentencing court properly considered all mitigation, including nonstatutory mitigation, where the court stated that it considered all the evidence and found no mitigating circumstances that outweighed the aggravating circumstances); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1044 (9th Cir. 1997) (same).

Claim 9

Petitioner does not assert that the trial court failed to *consider* proffered mitigating evidence at sentencing. Rather, the core of his complaint is that it failed to find his lack of a criminal record to be *proven* as a mitigating factor. The trial judge considered whether Petitioner had established lack of criminal history as a non-statutory mitigating circumstance. (ROA 147 at 9-10.) In his special verdict, the judge found that Petitioner had failed to establish this mitigating factor by a preponderance of the evidence due to a previous felony theft conviction and numerous misdemeanor convictions, including thefts, DUIs, criminal damage, assault, and disorderly intoxication. (*Id.*)

As stated above, a sentencer is not required to find proffered evidence mitigating, nor must the sentencer accord the evidence the weight which a defendant believes is appropriate. Applying the rule of *Lockett* and its progeny to the case at bar, it is clear that the sentencing court evaluated the evidence proffered in mitigation but found it wanting as a matter of fact, not as a matter of law. *See Eddings*, 455 U.S. at 113. The trial court was in no way

precluded from considering the proffered evidence of petitioner's non-violent past; thus, this evidence was not placed "beyond the effective reach of the sentencer." *Graham v. Collins*, 506 U.S. 461, 475 (1993). Petitioner is not entitled to relief on Claim 9.

Claim 10

Petitioner asserts that the trial court refused to give his abusive family history proper mitigating weight because it found no causal connection between his abusive family history and the crime. (Dkt. 82 at 95.) Citing *Williams v. Taylor*, 529 U.S. 362 (2000), and *Eddings v. Oklahoma*, Petitioner argues that the minimal mitigating weight given this evidence due to the lack of a causal connection between this mitigation and the crime has no basis in clearly established Supreme Court jurisprudence. (*Id.* at 96-98.)

In Arizona, although an abusive family history is generally afforded some weight as mitigation, it is entitled to *significant* mitigating weight only when there is a showing that it affected a defendant's ability to perceive, comprehend, or control his actions. *See State v. Hurles*, 185 Ariz. 199, 207, 914 P.2d 1291, 1299 (1996). In its special verdict, the sentencing judge stated:

> Despite his parents' denials, the court finds defendant came from a seriously dysfunctional unloving family and had a very abusive father. Defendant was clearly an abused child, but he left home in his early teens when he went to live in the Soldiers and Sailors Home. Therefore, defendant had virtually no contact with his parents for over twenty years. While a mitigating circumstance, the court gives it little weight, since there has been no causal connection or nexus shown between defendant's family history and the murder of Karen Bohl. Over twenty years elapsed between the defendant's abuse and neglect from his father and the murder.

(ROA 147 at 10.)

Citing *Tennard v. Dretke*, 542 U.S. 274 (2004), Petitioner argues that the trial court's application of a causal connection requirement was unconstitutional. (Dkt. 105 at 64-70.) In *Tennard*, the Supreme Court rejected the notion that mitigation evidence must pass through a threshold screening test before it may be *considered* as mitigation at sentencing. 542 U.S. at 283-84. The Court specifically held it is improper to screen out mitigating evidence on the basis that it did not have a causal connection with the crime. *Id.* at 287.

Following *Lockett* and *Eddings*, the *Tennard* Court focused on the requirement that courts must consider relevant mitigation evidence at sentencing. *Id.* at 286-87. Thus, even if the mitigation presented at sentencing does not have a causal connection to the crime, it still must be considered as mitigation. *Id.* However, the *Tennard* Court did not prescribe a certain *weight* that states must give to mitigating evidence. *See Harris*, 513 U.S. at 512 (holding that the Constitution does not require that a specific weight be given to any particular mitigating factor). Thus, under *Tennard*, the sentencer is not prohibited from determining the weight it will assign to mitigating evidence so long as the sentencer considers and gives effect to the mitigating evidence.

Under Arizona law, while mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, the lack of a causal (explanatory) connection may be taken into account when assessing the weight of the evidence. *State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006); *see, e.g., State v. Hampton*, 213 Ariz. 167, 185, 140 P.3d 950, 968 (2006) (finding horrendous childhood less weighty and not sufficiently substantial to call for leniency, in part, because not tied to the offense). The Ninth Circuit recently held that "the use of [a] nexus test in this manner is not unconstitutional because state courts are free to assess the weight to be given to particular mitigating evidence." *Schad v. Ryan*, No. 07-99005, 2009 WL 2902084 at *16 (9th Cir. Sept. 11, 2009) (citing *Eddings*, 455 U.S. at 114-15.)

It is clear from this record that the trial judge did not improperly exclude from its consideration or refuse to consider the evidence of Petitioner's childhood abuse; rather, the record shows that the judge considered the evidence but gave it little weight. (ROA 147 at 10.) The Constitution requires nothing more. *Harris*, 513 U.S. at 512; *Tuilaepa*, 512 U.S. at 980; *see also Schad*, 2009 WL 2902084 at *16 (finding no constitutional error where sentencing judge considered evidence of childhood abuse but found it was not "a persuasive mitigating circumstance in this case"). Petitioner is not entitled to relief on Claim 10.

Claim 11

- 32 -

Petitioner asserts that the trial court refused to give proper mitigating weight to his history of alcoholism and intoxication at the time of the crime. (Dkt. 82 at 100-03.)

In Arizona, alcohol impairment at the time of the crime may constitute a non-statutory mitigating circumstance when considered together with a history of alcohol abuse. *See State v. Murray*, 184 Ariz. 9, 45, 906 P.2d 542, 578 (1995); *State v. Stokley*, 182 Ariz. 505, 523, 892 P.2d 454, 472 (1995). At sentencing, the court found that Petitioner had proven by a preponderance of the evidence that he was an alcoholic but found it not mitigating under the circumstances of the case in light of the fact that when he drank, "he usually just passed out according to his employer and friend." (ROA 147 at 10.) Alternatively, the sentencing court further found,

> In fact, even if this court were to consider [this evidence as a non-statutory mitigating circumstance], when balanced against the especially cruel, heinous, or depraved manner in which defendant murdered Karen Bohl, [this mitigating evidence], given minimal weight, would not be sufficiently substantial to call for leniency.

(*Id.* at 12.)

The court also considered Petitioner's claim that he was intoxicated at the time of the crime, but gave it little mitigating weight because Petitioner "was able to make conscious decisions during the violent attack on Karen Bohl." (*Id.* at 10.) In addition, the court noted that the claim of alcohol impairment was based solely on Petitioner's self-report; there was no objective evidence to establish that he had been impaired by alcohol at the time of the crime.[6] (*Id.* at 10-11.)

The record here shows that the trial court complied with its federal constitutional duties by considering in a thorough manner Petitioner's alcohol-related mitigating evidence.

---

[6] Under the AEDPA, 28 U.S.C. § 2254(e)(1), a presumption of correctness applies to the credibility determinations made by state courts. The trial court rejected Petitioner's self-report of intoxication because there was no corroboration of Petitioner drinking the night before the crime, his blood alcohol level tested at zero hours after being taken into custody, and every police officer who interacted with Petitioner at the crime scene and at the police station reported that he was coherent and did not smell of alcohol. (RT 11/27/96 at 9.)

*Eddings*, 455 U.S. at 113.  The court specifically stated that it gave some mitigating weight to Petitioner's claim that he was impaired by alcohol at the time of the crime.  That it found the Petitioner's history of alcoholism evidence lacking is not problematic in light of the settled principle that a sentencer is not required to find proffered evidence mitigating, nor must it accord the evidence the weight which a defendant believes is appropriate.  *Harris*, 513 U.S. at 512.  Moreover, the trial court ruled alternatively that even if it were to give some mitigating weight to Petitioner's history of alcoholism, it nonetheless found such mitigation insufficient to call for leniency.  *See Tuilaepa*, 512 U.S. at 980.  Petitioner is not entitled to relief on Claim 11.

Claim 12

Petitioner contends that the trial court improperly rejected his low intelligence as a non-statutory mitigating factor because it found no causal connection between his low intelligence and the crime.  (Dkt. 82 at 103.)

In Arizona, low intelligence may be considered a non-statutory mitigating circumstance.  *See State v. Bishop*, 127 Ariz. 531, 535, 622 P.2d 478, 482 (1981).  The sentencing court acknowledged Petitioner's low intelligence but found it not mitigating in light of the lack of a causal connection to the crime and the fact that Petitioner "was a functioning member of society who held a decent job and worked hard."  (ROA 147 at 11.)  As previously noted, in determining sentence, the court alternatively stated that "even if this court were to consider every one of the factors proposed by defendant as a mitigating circumstances [sic], when balanced against the especially cruel, heinous, or depraved manner in which defendant murdered Karen Bohl, those mitigating circumstances, given minimal weight, would not be sufficiently substantial to call for leniency."  (*Id.* at 12.)

The record here shows that the sentencing court did not improperly exclude from its consideration or refuse to consider the evidence of Petitioner's low intelligence as a matter of law.  *Eddings*, 455 U.S. at 113.  Rather, it found that the evidence was simply not mitigating in this case.  Absent a clear indication in the record that the state court applied the

wrong standard, Petitioner is not entitled to relief. *Schad v. Ryan*, 2009 WL 2902084 at *16. Moreover, the trial court here ruled alternatively that even if it were to give some mitigating weight to all of Petitioner's proffered mitigating factors, it nonetheless found the mitigation insufficient to call for leniency. *See Tuilaepa*, 512 U.S. at 980. Claim 12 is denied.

**Claim 14**

Petitioner asserts that the trial court erred in determining that the murder was especially cruel under A.R.S. § 13-703(F)(6). (Dkt. 82 at 115-118.) Respondents concede that this claim is properly exhausted. (Dkt. 99 at 86.)

Whether a state court correctly applied an aggravating factor to the facts in a specific case is a question of state law. *See Lewis*, 497 U.S. at 780. Therefore, federal habeas review is limited to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. *Id.* A state court's finding of an aggravating factor is arbitrary or capricious only if no reasonable sentencer could have concluded that the factor existed. *Id.* at 783. The "rational factfinder" standard is used to determine whether there is sufficient evidence to support a state court's finding of an aggravating factor. *Id.* at 781-83. The question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact" could have made the finding beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A habeas court faced with a record of historical facts which supports conflicting inferences must presume (even if it does not appear in the record) that the trier of fact resolved any such conflicts in favor of the prosecution. *Id.* at 326.

In this case, the (F)(6) aggravating circumstance is satisfied by a finding either that the murder was committed in an especially cruel manner or that it was committed in an especially heinous and depraved manner. The trial court and the Arizona Supreme Court each concluded that the murder was both especially cruel and especially heinous and depraved. *See Doerr*, 193 Ariz. at 67-68, 969 P.2d at 1179-80. A finding of cruelty requires conclusive evidence that the victim was conscious during the infliction of violence. *See State*

*v. Towery*, 186 Ariz. 168, 188, 920 P.2d 290, 310 (1996). In finding cruelty, the state court

relied on the following:

> While the medical examiners could neither pinpoint the sequence of Karen Bohl's injuries nor determine precisely when she lost consciousness, the physical evidence indicated that she experienced pain and extreme mental anguish. The doctors found bruising and swelling on her hands and arms consistent with defensive actions, and hair was clenched in her fist. Her nasal bones were fractured. She had cuts under her lip. Extensive bleeding from the vaginal and rectal wounds indicated that they occurred prior to or during death. In addition, she had twenty-six other injuries to various parts of her body. These must have been inflicted over a period of time.
>
> Even more persuasive is the crime scene evidence. Bohl's bloody footprint was found on the bathtub, and bloody hair swipes consistent with her PGM subtype were found on walls and other surfaces. Similar findings throughout the apartment suggested a pursuit and struggle. A neighbor testified that she heard "blood-curdling" screams of "No, no!" from a female at about 3:30 that morning, but did not call the police. Bohl's body was found in the hallway, sprawled partially through the opening into a bedroom. Such evidence of a violent, moving confrontation leaves little doubt that the victim feared for her life during the attack. Sufficient proof exists to conclude, beyond a reasonable doubt, that she suffered pain and extreme mental anguish. The trial court properly found cruelty.

*Doerr*, 193 Ariz. at 67, 969 P.2d at 1179.

The terms heinous and depraved focus on a defendant's state of mind at the time of the

murder as reflected by his words or his actions. *Beaty*, 158 Ariz at 242, 762 P.2d at 529. The

Arizona Supreme Court evaluates five factors to determine whether a defendant's state of

mind was heinous or depraved at the time of the murder: relishing of the murder; infliction

of gratuitous violence upon the victim; mutilation of the victim's body; senselessness of the

crime; and helplessness of the victim. *Id.* at 242-43, 762 P.2d at 529-30. Both the trial judge

and the Arizona Supreme Court found conclusive evidence of three factors in support of its

heinous/depravity finding: (1) relishing, (2) mutilation, and (3) gratuitous violence. *Doerr*,

193 Ariz. at 67-68, 969 P.2d at 1179-80.

> Relishing requires "that the defendant say or do something, other than the commission of the crime itself, to show he savored the murder," thus evidencing debasement or perversion. *State v. Roscoe*, 184 Ariz. 484, 500, 910 P.2d 635, 651 (1996), *cert. denied*, 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996). Victor Rosales, the defendant's cellmate, testified at trial that Doerr described "playing with [Bohl's] blood." This testimony is sufficient to support a finding of relishing.
>
> Mutilation is an act distinct from the killing itself that includes the purposeful severing of body parts. *See State v. Richmond*, 180 Ariz. 573, 580, 886 P.2d 1329,

1336 (1994). Karen Bohl's left nipple was cut off with a sharp-edged instrument, and marks above the right nipple suggested an attempt to amputate it as well. Mutilation is present here.

Gratuitous violence exceeds that which is necessary to kill. . . .

In this case, medical examiner Dr. Owl-Smith testified that Karen Bohl died of multiple blunt force trauma. Evidence indicated that she was sodomized with both a metal pipe and a broom handle found at the scene. Her rectal and vaginal cavities were ruptured by the force of these objects, causing massive blood loss. Her nose was fractured by blows to the face. The resulting swelling and lacerations so altered facial features that her family could not identify her. One laceration was deep enough to expose her skull. She had knife slashes to her breasts and numerous bruises and injuries to many parts of her body. We uphold the gratuitous violence finding.

*Doerr*, 193 Ariz. at 67-68, 969 P.2d at 1179-80.

Based upon the record and the facts as discussed by the Arizona Supreme Court, the Court concludes that there was sufficient evidence to support a finding that the murders were especially cruel as well as especially heinous or depraved. In light of such evidence, the Arizona Supreme Court's determination that the evidence was sufficient to support the (F)(6) aggravating circumstance was not contrary to or an unreasonable application of clearly established federal law.

**Claims 15-27**

Petitioner raises numerous constitutional challenges to Arizona's capital sentencing scheme. (Dkt. 82 at 118-61.) Each was exhausted and summarily denied by the Arizona Supreme Court on direct appeal. *Doerr*, 193 Ariz. at 71-72, 969 P.2d at 1183-84. As set forth below, the Court concludes that the state court's rejection of these claims was neither contrary to nor an unreasonable application of controlling Supreme Court law.

In Claim 15, Petitioner argues that Arizona's death penalty statutory scheme constitutes *per se* cruel and unusual punishment. Clearly established federal law holds otherwise. *See Gregg v Georgia*, 428 U.S. 153, 169 (1976); *see also Roper v. Simmons*, 543 U.S. 551, 568-69 (2005) (noting that the death penalty is constitutional when applied to a narrow category of crimes and offenders). In *Walton v. Arizona*, 497 U.S. 639, 647-56 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002), the Supreme Court considered

Arizona's death penalty statute and did not find it in violation of the Eighth Amendment.

In Claim 16, Petitioner contends that Arizona's capital statutory scheme is impermissibly mandatory and establishes a presumption of death because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. The Court rejected this claim in *Walton*, 497 U.S. at 651-52. *See also Kansas v. Marsh,* 548 U.S. 163, 172-73 (2006) (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (summarily rejecting challenges to the mandatory nature of Arizona's death penalty statute).

In Claim 17, Petitioner argues that he had a right to voir dire the sentencing judge regarding his views on the death penalty. Petitioner cites no authority in support. Although the Constitution requires that a defendant receive a fair trial before a fair and impartial judge with no bias or interest in the outcome, *see Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997), trial judges, like other public officials, operate under a presumption that they properly discharge their official duties. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also State v. Perkins*, 141 Ariz. 278, 286, 686 P.2d 1248, 1256 (1984) (trial judge is presumed to be free of bias and prejudice). The presumption of regularity applies to trial judges, absent clear evidence to the contrary. *See Armstrong*, 517 U.S. at 464; *see also State v. Rossi*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987) (mere possibility of bias or prejudice does not entitle a criminal defendant to voir dire the trial judge at sentencing). Petitioner made no allegation of bias or prejudice when he raised this issue before the Arizona Supreme Court. (*See* Opening Br. at 47.)

In Claim 18, Petitioner asserts that Arizona's sentencing scheme fails to provide appropriate guidance to the sentencing court, and in Claim 21, he argues that it does not sufficiently narrow those eligible for the death penalty or properly channel the sentencer's discretion. Arizona's capital sentencing statute allows only certain statutorily-defined

aggravating circumstances to be considered in determining eligibility for the death penalty. A.R.S. § 13-703(F) (transferred and renumbered as A.R.S. § 13-751 in 2009). "The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencer]." *Blystone*, 494 U.S. at 306-07. Not only does Arizona's sentencing scheme generally narrow the class of death-eligible persons, the aggravating factors delineated in § 13-703(F) do so specifically. Rulings of the United States Supreme Court and the Ninth Circuit have upheld Arizona's death penalty statute against challenges that particular aggravating factors do not adequately narrow the sentencer's discretion. *See Lewis*, 497 U.S. at 774-77; *Walton*, 497 U.S. at 655-56; *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996). The Ninth Circuit has explicitly rejected the argument that Arizona's death penalty statute is unconstitutional because "it does not properly narrow the class of death penalty recipients." *Smith*, 140 F.3d at 1272.

In addition to narrowing the class of death-eligible defendants, the Supreme Court has imposed a separate requirement for the selection decision, "where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa*, 512 U.S. at 972. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983). Accordingly, a statute that "provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage" will ordinarily satisfy Eighth Amendment and Due Process concerns, *id.*, so long as the state ensures "that the process is neutral and principled so as to guard against bias or caprice." *Tuilaepa*, 512 U.S. at 973. Furthermore, the Constitution does not require that a capital sentencer be instructed in how to weigh any particular fact in the capital sentencing decision. *Id.* at 979. Rather, the state sentencer has broad discretion to determine whether death is appropriate once a defendant is found eligible for the death penalty. *Id.* Thus, Arizona's death penalty statute need not enunciate specific

standards to guide the sentencer's consideration of aggravating and mitigating circumstances. *See id.*; *see also Smith,* 140 F.3d at 1272 (summarily rejecting the challenge that the statute does not give the sentencer appropriate guidance).

In Claim 19, Petitioner contends that the statute impermissibly requires defendants to establish that their lives should be spared. In *Walton,* 497 U.S. at 651, the Court indicated that Arizona's allocation of the burdens of proof in a capital sentencing proceeding does not violate the Constitution. *See also Delo v. Lashley*, 507 U.S. 272, 275-76 (1993) (referring to *Walton* and stating that the Court had "made clear that a State may require the defendant 'to bear the risk of nonpersuasion as to the existence of mitigating circumstances'").

In Claim 20, Petitioner alleges that Arizona's sentencing scheme fails to require that multiple mitigating factors be considered on a cumulative basis. Petitioner's factual contention that the sentencing judge did not properly consider or cumulatively weigh his mitigation is refuted by the record. *See supra* Claims 9-12. The sentencing judge stated that it considered "nonstatutory mitigating circumstances, including 'any aspect of the Defendant's character, propensities or record and any of the circumstances of the offense.'" (RT 11/27/96 at 12.) Subsequently, the judge stated that he assessed the mitigation both individually *and* collectively in determining whether it was sufficiently substantial to call for leniency. (*Id.* at 8-17.)

Second, there is no law to support Petitioner's request for relief based on how the trial court weighed the aggravation and mitigation. The Supreme Court holds that once a court determines that a person is eligible for the death penalty, the sentencer must then consider relevant mitigating evidence, allowing for "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa*, 512 U.S. at 972. If these two criteria are met – i.e., there is a rational criteria for eligibility and no limitation on consideration of relevant circumstances that could mitigate against a death sentence – "the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." *Romano v. Oklahoma*, 512 U.S. 1, 7 (2004)

(quoting *Blystone*, 494 U.S. at 309). Once eligibility for the death penalty is determined, the sentencer "may be given 'unbridled discretion in determining whether the death penalty should be imposed.'" *Tuilaepa*, 512 U.S. at 979 (quoting *Zant*, 462 U.S. at 875). In sum, giving a sentencer "discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not unconstitutional. *Id.* (quoting *McCleskey v. Kemp*, 481 U.S. 279, 315 n.37 (1987)).

In Claim 22, Petitioner argues that Arizona's capital sentencing statute fails to require the prosecution to prove that death is appropriate. As already indicated, the Supreme Court in *Walton* held that

> so long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

*Walton*, 497 U.S. at 650. Ultimately, it is up to the sentencer to determine whether a death sentence is appropriate. *See Tuilaepa*, 512 U.S. at 979 (stating that the sentencer has unbridled discretion in determining whether the death penalty should be imposed). Thus, Arizona's death penalty statute is not constitutionally defective because it fails to require that the prosecution prove that death is the appropriate sentence.

In Claim 23, Petitioner alleges that the cruel, heinous, or depraved aggravating circumstance is unconstitutionally vague. In *Walton*, the Supreme Court rejected the argument that the (F)(6) aggravating factor, as applied by Arizona courts, is unconstitutionally vague. 497 U.S. at 654 (1990) (Arizona Supreme Court has given substance to the operative terms in the statute and its construction meets constitutional requirements).

In Claim 24, Petitioner contends that Arizona's statute unconstitutionally restricts the ability of the sentencing court to consider mitigating evidence. The Supreme Court has specifically rejected Petitioner's argument that States may not constitutionally require defendants to prove the existence of mitigating evidence by a preponderance of the evidence.

In *Walton,* 497 U.S. at 651, the Court held that Arizona's allocation of the burdens of proof in a capital sentencing proceeding does not violate the Constitution. *See also Delo*, 507 U.S. at 275-76.

As to Petitioner's other argument– that the statute unlawfully restricts consideration of mitigation because Arizona courts first evaluate whether evidence established at sentencing is mitigating – the Court rejected this argument in *Lockett v. Ohio*, 438 U.S. 586 (1978). In *Lockett*, the Court held that in capital sentencing proceedings, the sentencer must not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigation evidence. *See* 438 U.S. at 604. However, the *Lockett* Court went on to explain:

> Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or circumstances of the offense.

438 U.S. at 604 n.2.

In Claim 25, Petitioner asserts that Arizona's capital sentencing statute impermissibly allows the prosecutor unfettered discretion in determining whether to seek the death penalty. Prosecutors have wide discretion in making the decision whether to seek the death penalty. *See McCleskey*, 481 U.S. at 296-97; *Gregg*, 428 U.S. at 199 (pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional). In *Smith*, the Ninth Circuit rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." 140 F.3d at 1272.

In Claim 26, Petitioner alleges that at the time of his sentencing, the death penalty statute was applied in a way that discriminated against poor male defendants in violation of the Fourteenth Amendment. Clearly established federal law holds that "a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). Therefore, to prevail under the Equal Protection Clause, Petitioner

"must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* Petitioner does not attempt to meet this burden. This claim fails because he offers no evidence specific to his case that would support an inference that his gender or economic status impacted his sentence. *See Jeffers*, 38 F.3d at 419 (finding no evidence that race or gender creates a "constitutionally significant risk of impermissible bias" in Arizona capital sentencing).

In Claim 27, Petitioner argues that the death penalty statute is arbitrary and capricious because the state court did not conduct a proportionality review of his sentence. There is no federal constitutional right to proportionality review of a death sentence, *McCleskey*, 481 U.S. at 306 (citing *Pulley v. Harris*, 465 U.S. 37, 43-44 (1984)), and Arizona discontinued the practice in 1992. *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992). The Ninth Circuit has explained that the interest implicated by proportionality review – the "substantive right to be free from a disproportionate sentence" – is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996).

**Claim 30**

Petitioner was convicted of both premeditated and felony first degree murder. The felony murder count was based upon sexual assault and kidnapping as the predicate felonies. *See* A.R.S. § 13-1105 (first degree murder); § 13-1406 (sexual assault); § 13-1304 (kidnapping). Petitioner alleges that trial and appellate counsel performed deficiently by failing to challenge the sufficiency of the evidence in support of felony murder and the underlying predicate felonies. (Dkt. 82 at 195-96.)

Petitioner raised these claims in his PCR petition. (ROA-PCR 7 at 23-31.) In denying relief, the PCR court found that any challenge to the sufficiency of evidence for sexual assault and kidnapping would have failed:

> [Even if trial counsel had so moved] it would have been denied, as there was substantial, in fact, overwhelming evidence of both crimes. Even the defendant admits that the state proved sexual assault beyond a reasonable doubt. (Defendant's petition at page 24, lines 12-14.) There was more than substantial

> evidence for the jury to have believed that Karen Bohl's murder was in furtherance of the defendant's sexual assault on her. In fact, the evidence was overwhelming.
>
> As to the kidnapping charge, the evidence of a violent struggle as well as the defendant's own admissions to his cellmate, Victor Rosales, was clearly enough to overcome a directed verdict as to the kidnapping count or as to kidnapping as a predicate to the homicide. The evidence was overwhelming that the defendant's intent in restraining the victim was to sexually assault her.

(ROA-PCR 18 at 2-3.) In these proceedings, Petitioner again concedes that the prosecution proved beyond a reasonable doubt that he sexually assaulted the victim. (Dkt. 82 at 197-98.) Thus, his claim rests on trial and appellate counsel's failure to challenge sufficiency of the evidence for kidnapping and felony murder. (*Id.* at 195-203.)

Analysis

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687-88. A reviewing court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Id.* at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").

At the outset, the Court notes that because Petitioner concedes there was sufficient evidence to establish his sexual assault conviction, it is difficult to conceive that he could be prejudiced by counsel's failure to challenge the sufficiency of evidence concerning kidnapping. The sexual assault alone was sufficient to serve as the predicate felony for Petitioner's felony murder conviction. Similarly, all of the allegations contained in this claim involve counsel's conduct with respect to the felony murder count; however, Petitioner was separately convicted by a unanimous jury of premeditated murder. (*See* ROA 105.) Thus, the Court again questions how, even if counsel's performance was deficient with respect to the felony murder count, Petitioner could establish prejudice. In the interest of completeness,

the Court will also address the specific allegations presented in Claim 30.

Petitioner argues that the prosecution never proved that he actually restrained the victim. (Dkt. 82 at 201.) Under A.R.S. § 13-1304 (West 1996), "a person commits kidnapping by knowingly restraining another person with the intent to . . . (3) inflict death, physical injury or a sexual offense on the victim." Under A.R.S. § 13-1301 (West 1996), "restrain means to restrict a person's movements without consent, without legal authority, and in a manner which interferes substantially with such person's liberty . . . by confining such person."

At trial, Victor Rosales testified that Petitioner had told him, while both men were incarcerated at the county jail, that the victim had upset Petitioner because she refused sex and wanted to leave his apartment. (RT 4/11/96 (A.M.) at 60.) Evidence at trial further established that there had been a violent struggle; blood was in every room of the apartment. (*See* RT 4/10/96 at 18-54, 103-05, 163-65; RT 4/11/96 (P.M.), at 19-20, 35-40, 47-48.) This evidence was clearly enough to overcome a directed verdict on the kidnapping count. Therefore, trial and appellate counsel's failure to challenge the sufficiency of evidence on the kidnapping count was not ineffective.

Petitioner also contends that there was insufficient evidence to support his felony murder conviction because the predicate felonies – sexual assault and kidnapping – were not accomplished in the course of and in furtherance of the victim's death. (Dkt. 82 at 195-203.) Arizona's felony murder statute provides in relevant part: "A person commits first degree murder if . . . such person commits . . . sexual assault under § 13-1406 . . . kidnapping under § 13-1304 . . . and in the course of and in furtherance of such offense . . . such person . . . causes the death of any person." A.R.S. § 13-1105(A)(2) (West 1996). A death is in furtherance of an underlying felony if the death resulted from an action taken to facilitate accomplishment of the felony. *State v. Jones*, 188 Ariz. 388, 397-98, 937 P.2d 310, 319-20 (1997).

In *Jones*, the court considered whether the victim's death was in furtherance of a sexual

assault.  *Id.*  The court found that the victim's defensive struggle – to shield herself from the blows that caused her death – occurred at the proximate time as the sexual assault.  *Id.* at 398, 937 P.2d at 320.  The court concluded that substantial evidence supported the defendant's felony murder conviction based upon the underlying sexual assault.  *Id.*

Here, the medical examiner similarly concluded that the injuries the victim sustained during the sexual assault (e.g., Petitioner forcefully pushing a pipe into the victim's vagina), occurred before or during her death.  (RT 4/11/96 (P.M.) at 35-37.)  Thus, there was sufficient evidence from which the jury could conclude that the murder occurred in the course of and in furtherance of the sexual assault, and counsel were not ineffective for failing to raise this argument at trial or on appeal.

Petitioner further argues that the kidnapping and premeditated murder convictions merged and therefore kidnapping could not support a felony murder conviction.  (Dkt. 82 at 201.)  The Court disagrees.  Under Arizona law, kidnapping and felony murder are separate counts that do not necessarily merge.  *See State v. Salazar*, 177 Ariz. 399, 410, 844 P.2d 566, 577 (1992) (stating that kidnapping and premeditated murder are not conceptually identical; it is possible to commit murder without kidnapping); *State v. Lewis*, 169 Ariz. 4, 6, 816 P.2d 263, 265 (App. 1991) (although defendant's infliction of physical injury would not itself support a felony murder, one who knowingly restrains a victim with intent to inflict such injury commits kidnapping, an offense supporting felony murder); *see also State v. Villafuerte*, 142 Ariz. 323, 327, 690 P.2d 42, 46 (1984) (when victim was restrained with the intent to commit sexual assault and victim died as a result, court held that "[w]ith substantial evidence as to the kidnapping charge, a finding of guilt on the felony murder charge could directly follow.")

As already noted, there was sufficient evidence to support the kidnapping count.  In addition to that evidence, the medical examiner further testified that the victim suffered head, neck, nose, and mouth injuries, some of which had already started showing a bruising coloration, before she suffered fatal head and vaginal/rectal injuries.  (RT 4/11/96 (P.M.) at

31, 33, 41-42, 45, 47-48.)  Such testimony further supports the separate kidnapping charge; it did not merge with the premeditated murder charge.

Furthermore, the victim's death resulted from Petitioner's restraining actions, including the wounds he inflicted on the crown of her head and forehead, which were so deep that the victim's skull bone was exposed.  *See Jones*, 188 Ariz. at 397-98, 937 P.2d at 319-20; (RT 4/11/96 (P.M.) at 30-33, 41-42.)  The medical examiner testified that these were fatal wounds.  (*Id.* at 47-48.)  This was sufficient to establish that the victim's death occurred in the course of and in furtherance of the kidnapping, and counsel were not ineffective for failing to raise this argument at trial or on appeal.

In sum, the PCR court's ruling denying Petitioner's trial and appellate ineffectiveness claims based on counsels' failure to challenge sufficiency of the evidence for felony murder was neither contrary to nor an unreasonable application of *Strickland*.  Petitioner is not entitled to relief on Claim 30.

**Claim 31**

Petitioner alleges that Arizona's statutory death penalty scheme is unconstitutional because it allowed a judge, not a jury, to find the aggravating circumstances that rendered him death-eligible, and because it failed to require the state to provide notice of aggravating circumstances in his indictment.  (Dkt. 82 at 203-05.)  Respondents contend that this claim is unexhausted.  (Dkt. 99 at 130.)  Regardless of exhaustion, the Court will address the claim because it is plainly meritless.  *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277.

Claim 31 is premised primarily upon *Ring v. Arizona*, 536 U.S. 584, 609 (2002), which found that Arizona's aggravating factors are an element of the offense of capital murder and therefore must be found by a jury.  However, subsequently, in *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Court held that *Ring* does not apply retroactively to cases already final on direct review.  Because direct review of Petitioner's case was final prior to *Ring*, he is not entitled to federal habeas relief premised on that ruling.

With regard to his indictment claim, the Supreme Court has held that facts constituting

the elements of an offense rather than just a sentencing enhancement must be charged in a *federal* indictment. *See Jones v. United States*, 526 U.S. 227, 252 (1999). However, the Fifth Amendment Due Process Clause does not incorporate the same requirements upon state criminal prosecutions by virtue of the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972). Therefore, states are not required by the Constitution to empanel grand juries for purposes of indictment. *Id.* Based on these same principles, Petitioner's argument was rejected by the Arizona Supreme Court, which held that the federal constitution does not require that aggravating factors be alleged in an indictment and supported by probable cause. *See McKaney v. Foreman*, 209 Ariz. 268, 270, 100 P.3d 18, 20 (2004). This Court agrees. Claim 31 is without merit.

**Claim 32**

Petitioner contends that death by lethal injection constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendment. (Dkt. 82 at 205.) Respondents concede that Petitioner exhausted this argument on direct appeal. (Dkt. 99 at 132.)

Petitioner cites no Supreme Court precedent to support his assertion that execution by lethal injection is inherently cruel and unusual punishment, or that the lethal injection method practiced in Arizona violates the United States Constitution. In *LaGrand v. Stewart*, 133 F.3d 1253, 1265 (9th Cir. 1998), the Ninth Circuit rejected a claim that Arizona's method of lethal injection was unconstitutional. More recently, under 42 U.S.C. § 1983, in *Baze v. Rees*, ___ U.S. ___, 128 S. Ct. 1520 (2008), the Supreme Court upheld the constitutionality of lethal injection and Kentucky's method of execution by lethal injection.[7] The decision by

---

[7] This Court is aware that under 42 U.S.C. § 1983, several Arizona death row prisoners challenged Arizona's method of execution by lethal injection in federal court and that the same issue is also being litigated in state court in *State v. Landrigan*, Maricopa County Superior Court, No. CR-90-00066. The court in *Dickens v. Brewer*, No. CV-07-1770-PHX-NVW, 2009 WL 1904294, at *25 (D. Ariz. July 1, 2009), concluded that Arizona's lethal injection protocol was not unconstitutional, and the matter is presently on appeal.

the Arizona Supreme Court rejecting this claim was neither contrary to nor an unreasonable application of clearly established federal law.

## CONCLUSION

The Court concludes that Petitioner is not entitled to habeas relief on any of his claims. The Court further finds that an evidentiary hearing in this matter is neither warranted nor required.[8] Therefore, Petitioner's First Amended Petition for Writ of Habeas Corpus must be denied and judgment entered accordingly.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that might be consumed drafting and reviewing an application for a certificate of appealability (COA) to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right, and (2) whether the court's

---

[8] The Court previously denied Petitioner's request for evidentiary development as to specific claims (Dkt. 132), but has now conducted an independent review as to all of Petitioner's claims as required by Rule 8 of the Rules Governing Section 2254 Cases.

procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claim 3. Therefore, the Court issues a COA as to this claim. For the remaining claims and procedural issues, the Court declines to issue a COA for the reasons set forth in the instant order and the Court's order of September 30, 2005. (Dkt. 132.)

Based on the foregoing,

**IT IS HEREBY ORDERED** that Petitioner's First Amended Petition for Writ of Habeas Corpus (Dkt. 82) is **DENIED WITH PREJUDICE.** The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** the stay of execution entered on April 4, 2002 (Dkt. 2) is **VACATED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issue:

> Whether Petitioner is entitled to relief on Claim 3, alleging that remarks by two prospective jurors at *voir dire* irreparably tainted the entire jury panel in violation of his right to an impartial jury.

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007-3329.

DATED this 28th day of September, 2009.

Paul G. Rosenblatt
United States District Judge