1  **WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| Eugene Allen Doerr, | No. CV-02-00582-PHX-JJT |
|---|---|
| Petitioner, | **ORDER** |
| v. | <u>DEATH PENALTY ORDER</u> |
| David Shinn, *et al.*, | |
| Respondents. | |

This case is before the Court on remand from the Ninth Circuit Court of Appeals.

Petitioner Eugene Allen Doerr is an Arizona death row inmate. On September 28, 2009, this Court denied his amended petition for writ of habeas corpus. (Doc. 141.) On December 2, 2014, the Ninth Circuit Court of Appeals remanded the case, ordering the Court to reconsider Claim 28 of his petition in the light of intervening law, including *Martinez v. Ryan*, 566 U.S. 1 (2012). (*See* Doc. 156.) The Ninth Circuit subsequently expanded the remand to address the impact of *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc), on Doerr's habeas claims. (*See* Doc. 184.) Both sets of remanded issues have been fully briefed. (Docs. 167, 174, 179, 185–87.)

Because the Court finds that Doerr is entitled to relief pursuant to *McKinney*, the Court does not address the *Martinez* issue.

# BACKGROUND

The Arizona Supreme Court summarized the facts surrounding the crime and Doerr's arrest as follows:

> At approximately 10:00 a.m. on September 24, 1994, two Phoenix police officers responded to a "check welfare" dispatch following a 911 call. Upon arriving at a bungalow-style apartment, they found the front door ajar and a disheveled Eugene Doerr sitting on the coffee table in the living room. He wore only shorts and was covered with blood.
>
> When asked what had occurred, Doerr replied: "I don't know. I woke up with this—with a dead body back there." In a bedroom doorway, Officer Wirth found a naked woman lying in a pool of blood. Detecting no pulse, he instructed his partner to radio the fire department. Doerr responded, "[Y]ou don't need fire because she's dead." He told the officers that he had awakened, gone to the bathroom, and found the body on the floor. He denied knowing the victim's identity.
>
> The four-room apartment showed signs of a violent struggle, with blood in every room. At trial, the medical examiner testified that the victim, 39-year-old Karen Bohl, died of multiple blunt force trauma. She suffered numerous injuries to the head, including a fractured nose, abrasions, cuts, bruises, and a two-inch laceration that exposed her skull. Her left hand was swollen and red. Her right hand was clenched in a fist holding hairs consistent with her own. Her left nipple and areola had been cut off, and above her right nipple were small lacerations. The body was covered in blood and fecal matter. Blood also formed a V-shaped pattern down her back from saturated hair.
>
> The victim had been assaulted vaginally and rectally with an instrument of some kind. The doctor testified that the wall between her rectum and cervix had been destroyed. A bloody pipe, apparently part of a broken lampstand, and a bloody broom handle were found nearby—objects that the medical examiner said could have produced the injuries. Because of significant blood loss, swelling, and bruising, the doctor concluded that the injuries likely occurred prior to or during the victim's death. There were twenty-six other areas of injury to her body. Her blood alcohol level tested at .25, but no other drugs were detected. Tests for semen were negative.
>
> Defendant Doerr was also injured. His right hand was swollen, and he had minor cuts on his forearm, above his wrist, and on his left foot. His chest, stomach, pubic area, and hands were smeared and caked with blood.
> . . . .

> Defendant first claimed that he had no idea how the woman got there. Later, as officers waited for a search warrant, he told them that he thought her purse and ID were in the bathroom "because I remember seeing a purse and I don't own a purse." He also said the white car parked out front belonged to the victim. "That is her car she said . . . I think." One of the officers testified that Doerr hesitated before adding the "I think."
>
> Doerr voluntarily went to the police station. During questioning, he asked one of the officers if he thought a judge would give him life for the murder. He also said, "[S]he must have really made me mad for me to do something to her like this." The police did not test Doerr for drugs or alcohol until about 3:00 p.m., five hours after the 911 call. The tests were negative.

*State v. Doerr*, 193 Ariz. 56, 59–61, 969 P.2d 1168, 1171–73 (1998).

A jury convicted Doerr of premeditated first-degree murder, sexual assault, and kidnapping. *Id.* at 61, 969 P.2d at 1173. After a presentence hearing, the trial court found the murder was especially heinous, cruel, or depraved, an aggravating circumstance under A.R.S. § 13-703(F)(6).[1] *Id.* The court found insufficient mitigating evidence to warrant leniency and sentenced Doerr to death. *Id.* On direct appeal, the Arizona Supreme Court affirmed. *Id.* at 72, 969 P.2d at 1184.

After unsuccessfully pursuing post-conviction relief ("PCR") in state court, Doerr commenced these habeas proceedings. (*See* Doc. 82.) The Court denied relief (Docs. 132, 141) and Doerr appealed.

**DISCUSSION**

On December 29, 2015, the Court of Appeals issued its en banc opinion in *McKinney*, 813 F.3d 798. The court held the Arizona Supreme Court, for a period of more than 15 years, consistently violated *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), in its capital sentencing analysis by requiring a defendant to show a causal nexus between his proffered mitigating evidence and the crime. *McKinney*, 813 F.3d at 802.[2] On October 3, 2016, the United States Supreme Court denied the State's petition for writ of certiorari.

---

[1] Now renumbered as A.R.S. § 13-751(F)(4).
[2] From *State v. Wallace*, 160 Ariz. 424, 773 P.2d 983 (1989), to *State v. Anderson*, 210 Ariz. 327, 111 P.3d 369 (2005). The Arizona Supreme Court reviewed Doerr's sentence in 1998.

- 3 -

*Ryan v. McKinney*, 137 S. Ct. 39 (2016). On December 12, 2016, the Ninth Circuit granted Doerr's motion to expand the remand to include the impact of *McKinney* on Doerr's claims.

### A. Additional background

At the presentence hearing, Doerr's trial counsel presented testimony from four lay witnesses and two mental health experts. (RT 8/30/96; RT 10/21/96.) The evidence supported the following mitigating circumstances: cooperation with law enforcement, alcoholism and intoxication at the time of the crimes, lack of a serious criminal history, impaired mental capacity due to organic brain damage, abusive family history, and low intelligence. (*See* ROA 143.)

First, Doerr presented testimony from a longtime friend, John Bibo. They met when Doerr was panhandling in Illinois. Doerr was "destitute," "basically a homeless person on the streets." (RT 8/30/96 at 5–6.) Bibo gave Doerr some money and something to eat and let him stay with him. Doerr was "helpful" and "seemed like a good person." (*Id.* at 7.) When Bibo moved away, he and Doerr kept in contact. According to Bibo, "[Doerr] would write me but he is not a real good writer. . . . His education was limited. He could barely read or write." (*Id.* at 9–10.)

Doerr later married and had children. Bibo got the family an apartment and Doerr worked at a restaurant. (*Id.* at 14.) When the restaurant went out of business, Doerr crashed his pickup and was charged with DUI. (*Id.* at 14–15.) After that, he "drifted around." (*Id.* at 15–16.) Bibo testified that Doerr had a hard time when he was no longer able to see his children. (*Id.* at 35.)

Bibo testified that Doerr "didn't really want to talk about [his parents]." (*Id.* at 19.) Bibo knew Doerr had been in an orphanage for several years but did not know the details of his childhood. (*Id.* at 19.)

Bibo testified that he believed Doerr suffered from memory loss. He said that when Doerr got a DUI in Texas, he was unable to remember the location of the car. (*Id.* at 34–35.)

Bibo also testified that Doerr drank a lot. (*Id.* at 22.) He recalled that one night an intoxicated Doerr "flipped out" and attacked him. (*Id.* at 24–27.)

Bibo characterized Doerr as a "worthwhile individual," an honest person and a good father. (*Id.* at 25.)

Hollie Ortiz, Doerr's paternal aunt, testified about Doerr's childhood in Alton, Illinois. Doerr's parents, Charles and Alice, had two children, Eugene and his sister Lucy. (*Id.* at 44.) Charles was "violent, aggressive, mean to his children." (*Id.* at 43.) He was "very abusive to his children, and actually anybody that really came in contact with him." (*Id.*)

Alice and Charles never liked Doerr and "called him the ugly one." (*Id.* at 45.) Hollie testified that she babysat the children on several occasions. "Eugene was . . . still in diapers and his hair was real, real long." (*Id.* at 45.) Once, when she tried to give him a bath, she noticed "his bottom had sores from one end to the other. He looked like he had syphilis." (*Id.*) Hollie recalled an incident when she cut Doerr's hair; when Alice and Charles returned they complained, "You have cut our little girl's hair and now he is really ugly." (*Id.*)

Charles and Alice's house was "disgusting." (*Id.* at 46.) Instead of using a bathroom upstairs, they used a bucket next to the stove. (*Id.*) The kitchen was filled with cockroaches and dirty dishes. (*Id.*) Alice was "neglectful" of the home and the children. She was "just kind of slow, different, peculiar," like she was "in a shell." (*Id.* at 54, 57.) Alice "didn't show any affection, [or] motherly sign toward her children." (*Id.* at 57.) She never crossed Charles; "[w]hatever he said, went." (*Id.* at 55.)

Both parents neglected and abused Doerr. Hollie saw Alice "take a pissy diaper" off Doerr, dry it on the line, then "put it right back on him." (*Id.* at 46.) "There would be feces in the crib with Eugene in the corner." (*Id.*) "They didn't give him milk. . . . They would give him water and tea basically. If you ask them why, they just say, he didn't need it." (*Id.*) Hollie also testified that when Doerr would cry, his parents simply left him in his crib and shut the door. (*Id.* at 47.)

Hollie observed that Doerr was malnourished. She described him as having "little skinny arms and a big belly . . . like a child from the third world." (*Id.* at 50.) Later, when Hollie visited him at the Illinois Soldiers' and Sailors' Children's School, an orphanage where Doerr had been placed after running away from home, he was very thin, weighing only 115 pounds at six feet tall. (*Id.*) When asked about his weight, he replied that he didn't get anything to eat at home. "If mom and dad ate, we didn't get anything to eat if there wasn't anything left." (*Id.*)

On Thanksgiving, when Doerr's family visited Hollie's home, he and Lucy had to stay in the car with Charles's "attack dog" while their parents ate inside. (*Id.* at 50–51.)

Charles was "always cruel" to Doerr. (*Id.* at 53.) He once made Doerr stand in a corner in his dirty underwear for three hours. (*Id.*) According to Hollie, there was never any affection in Doerr's family; "[i]t was always stupid, ugly, get out of my sight, things like that." (*Id.* at 57.) Hollie testified that Charles once punished Doerr by "siccing his dog on him." (*Id.* at 58.) When Doerr got into trouble at school, Charles made him stand in a corner from about 3:30 in the afternoon to 8:30 at night. (*Id.* at 47.) He was not allowed to eat dinner or use the bathroom. (*Id.*) Hollie tried to sneak him food but he was afraid to be caught eating and hid the food in his pocket. (*Id.*)

Hollie testified that Doerr suffered "numerous broken collarbones" as a result of abuse. (*Id.* at 48.) She also saw Charles whip and hit Doerr and observed whip marks from a belt on Doerr's buttocks and legs. (*Id.* at 51.) Alice and Charles did not take Doerr to the doctor because "they were afraid they would get caught . . . [and] people would find out what really went on at home." (*Id.* at 49.)

Eventually, Alice and Charles moved away, with Charles explaining "I don't want you people in my life, in my business." (*Id.* at 52.) After the family moved, Hollie would send money for Christmas presents for the kids, but Charles spent the money on himself. (*Id.* at 54.)

Hollie described Charles as "absolutely sick." (*Id.* at 51.) She testified that if anyone confronted Charles, he would cause a big fight. He was a "bully." (*Id.*)

Hollie further testified that Doerr "wasn't your normal child." (*Id.* at 53–54.) He "didn't know how to mix well with other kids because he wasn't allowed to play with other children and/or with people in general." (*Id.* at 53.) Lucy and Doerr "weren't around [sic] to associate with family let alone any other people. They were just totally isolated." (*Id.* at 53–54.) Even Doerr's grandparents were not allowed to see him. (*Id.* at 54.)

According to Hollie, Doerr just wanted to be "accepted and loved"; he would sometimes tell lies to try to make himself look good. (*Id.* at 59.) Doerr was "always quiet, passive." (*Id.* at 76.) Hollie never saw Doerr act violently. (*Id.*)

Hollie testified that Charles sexually abused Doerr's sister, Lucy. (*Id.* at 60.) Lucy and Doerr were afraid and wanted to run away. (*Id.* at 59.) Doerr "was neglected from the time he was born till . . . he started running away." (RT 8/30/96 at 47.) Doerr ran away from home many times to "[g]et away from the abuse and . . . how he was made to feel." (*Id.* at 55.)

Doerr eventually began living at the Illinois Soldiers' and Sailors' Children's School. When she went to visit him there, Doerr "was just so shocked and excited that somebody was, you know, really wanted to see him." (*Id.*) Doerr stayed with Hollie for a month. The head of the school told her that "Eugene has a lot of problems . . . . [S]ome children are born retarded and some children grow retarded, due to the environment." (*Id.* at 55–56.) Doerr got along with Hollie's family, but he did not know how to interact with them and was a "loner"; he would laugh at "inappropriate times" and acted "different." (*Id.* at 56.)

Hollie testified that she was surprised Doerr was able to marry and have any children. She did not think he would be able to "function" at that level. (*Id.* at 53.)

Bruce Forsythe also testified on Doerr's behalf. Forsythe employed Doerr as a day laborer for his home remodeling and repair business in the early 1990s. (*Id.* at 84–85.) He testified that Doerr was trustworthy and a hard worker who had good mechanical aptitude. (*Id.* at 84–93.)

Occasionally Doerr drank to excess. Forsythe recalled Doerr sleeping on job sites while jack-hammering was going on around him. (*Id.* at 89.) Forsythe also testified that when Doerr drank he would go on a bender and be gone for several days. (*Id.* at 91–93.)

Finally, Debra Campbell, a coworker, testified on Doerr's behalf. She stated that when she took Doerr to get his driver's license he had to take the test orally because he had difficulty reading the exam. (*Id.* at 95–96.) Campbell also testified that she felt safe around Doerr and was comfortable leaving her children alone with him. (*Id.* at 96–97.)

Doerr also presented the testimony of two neuropsychologists, Dr. Daniel Blackwood and Dr. Marc Walter. Dr. Blackwood testified that his test results indicated "the presence of brain dysfunction and impaired brain" with "specific disturbance in the right spheral hemisphere." (RT 10/21/96 at 8.) He described the effects of Doerr's brain impairment on his overall functioning and its detrimental impact on his emotional and behavioral controls. (*Id.* at 12–13.) He also tested Doerr's IQ. The result was a full scale IQ of 80, which placed Doerr around the lowest 10th percentile. (*Id.* at 25–26.) He further testified that he could not "quantify" a causal connection between Doerr's brain damage and the crime. (*Id.* at 28.)

Dr. Walter testified about the likely risk factors that contributed to Doerr's brain damage, including the physical abuse of his mother while Doerr was in utero, childhood abuse, malnourishment, neglect, deprivation, a learning disorder, head injuries, early and ongoing heavy drinking, and serious motor vehicle accidents. (*Id.* at 35, 39–40.) He also testified that the "very bizarre and cruel way" Doerr was raised likely contributed to his inappropriate affect and his inability to control his behavior. (*Id.* at 35–36.) He testified that Doerr was "left essentially to rot in his crib when he was a baby. He wasn't changed. He wasn't bathed." (*Id.*) Dr. Walter noted that Doerr "was ridiculed throughout his childhood by his father. He was not given attention . . . certainly not by his father and denied affection by his mother. As a result, he developed a totally skewed sense of how to relate to people." (*Id.* at 36.) On cross-examination, Dr. Walter acknowledged that he could not affirmatively say Doerr's brain damage "cause[d] the murder." (*Id.* at 50, 68.)

In addition to this testimony, Doerr's counsel filed a sentencing memorandum, consisting of a letter drafted by mitigation specialist Holly Wake, which detailed Doerr's social history. (ROA 134.) Wake's letter recounted the following mitigation evidence, gained from interviews and her review of the record.

Doerr's grandfather, Charles William Doerr, was described by family members as a "functional alcoholic." (*Id.* at 4.) His sister, Eugena, died at around age 50 as a result of complications related to her alcoholism. (*Id.*)

Charles William Doerr married Helen Dickey. They had two children, Charles and Hollie. Charles was also known to torture small animals. (*Id.*) Family members described him as a "bully" who was always beating people up. They also described him as "borderline illiterate." (*Id.*) They said that Charles would have qualified for special education if schools had offered it at the time. (*Id.*)

Charles dropped out of school and married Alice. (*Id.*) Family members described Alice as having "some sort of mental deficiency" and noted that she had a sister who was "mentally handicapped." (*Id.* at 5.)

Charles ruled Alice and the children with an "iron hand." (*Id.*) Alice was afraid of him. She would not speak without checking with him and would never "go against" him. (*Id.*) She sometimes fought with Charles but would then go back into her "closed shell." (*Id.*) Lucy believed Alice was an alcoholic. (*Id.*)

Hollie described Charles and Alice as "particularly neglectful and abusive" towards Doerr and Lucy. (*Id.*) Charles would shave the children's heads as punishment. (*Id.*) Another relative believed Doerr had suffered broken bones that were never treated medically. (*Id.*)

When Doerr was less than a year old, Hollie found him in his crib stacked with soiled diapers; Doerr had "dried feces on his face and clothes." (*Id.*) Charles's mother, Helen, apparently knew of the abuse, but never reported it because she did not want her son to get into trouble. (*Id.* at 5–6.)

According to Hollie, when Doerr was about two years old, his hair was long and matted. His buttocks were "raw with blisters" and he was so sore that he could not run water over himself without crying out. (*Id.* at 6.)

Lucy said that her father's favorite pastime was "beating her and Eugene." (*Id.*) Charles was a "dictator," and their house was "like a prison." (*Id.*)

When the family moved, Charles cut the cord to the television. (*Id.*) The family had a telephone, but Charles kept it locked up and the children did not know the phone number. (*Id.*) The children were not allowed to do anything besides going to school and cleaning the house. (*Id.*) Every fall, the children were given one new outfit, which they had to wear until it fell apart. (*Id.*)

One Christmas, Charles bought himself a CB radio. He bought Doerr a pocket knife and Lucy a stapler, but took both presents back. (*Id.*) Lucy said their father "pretty much took away their childhoods." (*Id.*) According to Lucy, Charles "was not happy about his life and made it miserable for everyone around him." (*Id.* at 7.)

Doerr stated that his father would tell him that he could not do anything right, call him "so fucking stupid," and tell him to "shut up." (*Id.* at 6–7) Doerr said he "wasn't allowed to think." (*Id.* at 7.)

Charles forced Lucy to wear long dresses and bind her breasts. (*Id.*) He sexually molested her. (*Id.*) Charles also starved Doerr "for a week or better at a time" and would make him sit at the table and watch everyone else eat. (*Id.* at 8.) Charles and Alice would take the children out to eat and then not let them eat anything. (*Id.*)

One family member remembered seeing cigarette burns on Alice and the children, and Hollie recalled that "it was not uncommon to see strap marks on Eugene's legs and back." (*Id.*) They remembered Charles punishing Doerr by forcing him to stand in the corner for hours, once making him do so as a toddler with soiled pants draped over his face. (*Id.*) According to Lucy, if Doerr fell asleep standing in the corner, Charles would wake him and force him to continue standing in place. (*Id.*)

Doerr stated that his father made him ride the school bus wearing a sign that read "I peed the bed." (*Id.*) Lucy and Doerr both recalled spending "several hours and days" alone in their rooms, allowed to leave only for meals or to use the bathroom but not allowed to lie on their beds. (*Id.*) Doerr recalled that his father "constantly" beat him, and trained a dog to attack him. (*Id.* at 8–9.) A cousin remembered Charles beating Doerr "to a pulp" with a belt buckle and knocking him through a glass window. (*Id.* at 9.)

In his early teens, Doerr ran away from home. He was eventually placed in the Illinois Soldiers' and Sailors' Children's School. (*Id.* at 9–10.) He was found to be "Educable Mentally Handicapped" and qualified for special education. (*Id.* at 10.) Doerr's parents refused to be involved in his care. (*Id.*)

At around 15 years old, Doerr began drinking. At 18, he was discharged from the school and returned home. (*Id.* at 10–11.)

As an adult, Doerr picked up manual labor jobs when available. He was homeless when John Bibo befriended him and gave him a place to live. Doerr did "odd jobs" around town. (*Id.* at 11.) In the early 1980s, Doerr married and had four children. When Bibo visited, the family did not have much money, and Bibo took them grocery shopping and bought them toys. (*Id.*)

Doerr eventually ended up in Phoenix, where Bruce Forsythe hired him as a laborer. (*Id.* at 11–12.) Bruce said Doerr was initially very quiet but became friendly and was "like a kid." (*Id.* at 12.) Bruce testified that he held portions of Doerr's paychecks for him so that he would not "drink up his whole paycheck." (*Id.*)

Debbie Campbell, who worked with Bruce, described Doerr as "hesitant" and "kind of slow." (*Id.*) She said he could not read or write, and that when she took him to get a driver's license, someone had to read the exam to him. (*Id.*) She testified that Doerr worked hard and rarely took time off. (*Id.* at 13.) Shortly before his arrest, she recalled Doerr holding her newborn granddaughter and telling the child's mother "to be good and never hurt her." (*Id.* at 13.)

Wake's memorandum also recounted prior evaluations of Doerr, including exams administered when Doerr was an adolescent that revealed him to be "stagnant . . . in intellectual, emotional, social, educational development"; functioning as "retarded"; and having academic skills that were "seriously retarded" and "almost nil, falling off at the low second grade level." (*Id.* at 13–15.) A social worker's report described Doerr at age 16 as experiencing "extreme isolation" during childhood and a pattern of conflict with a father who seemed "quite disturbed." (*Id.* at 14.)

As relevant here, after the presentence hearing the trial court made the following findings concerning Doerr's mitigating evidence. With respect to the statutory mitigating factor of diminished capacity under A.R.S. § 13-703(G)(1), the court found "defendant has failed to prove by a preponderance of the evidence that there was any causal connection between any brain damage and the murder of Karen Bohl." (Doc. 174-3, Ex. G at 8.)

With respect to Doerr's nonstatutory mitigating evidence, the court first found "that defendant has proven by a preponderance of the evidence that he had an abusive family history." (*Id.* at 10.) The court concluded, however, that "[w]hile a mitigating circumstance, the court gives it little weight, since there has been no causal connection or nexus shown between defendant's family history and the murder of Karen Bohl." (*Id.*)

The court next found that "defendant proved by a preponderance of the evidence that he is an alcoholic, but . . . did not prove any causal connection between the murder and his alcoholism. . . . The court finds that defendant's alcoholism is not a mitigating circumstance under the facts of this case." (*Id.*) The court also stated that Doerr's self-reported drinking at the time of the crime "has been given very little weight by the court." (*Id.*)

Next, the court found that "[w]hile defendant has a low IQ, he has failed to prove that has any causal connection to Karen Bohl's murder." (*Id.* at 11.)

Finally, the court determined that "[e]ven if defendant had some brain damage, . . . it would be minimal and would not have affected his ability to control his actions." (*Id.*)

On direct review, the Arizona Supreme Court affirmed the trial court's findings:

. . . A difficult family background is not mitigating in the absence of "some connection with the defendant's offense-related conduct." *State v. Towery,* 186 Ariz. 168, 189, 920 P.2d 290, 311 (1996). . . . This burden is heightened for adult offenders because of their increased level of personal responsibility. *See State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989).

No direct evidence was presented at the mitigation hearing to support a causal connection between the defendant's abusive childhood and the murder. Even the psychological witnesses admitted that they could not confirm such a nexus. . . . While the judge found that the defense had established an abusive family history and dysfunctional childhood by a preponderance of the evidence, he correctly gave these circumstances minimal weight.

The court also accepted the defendant's claim that he was an alcoholic, but found no proof of a causal connection to the crime.

. . . .

Alcohol or drug impairment may constitute a nonstatutory mitigating circumstance when viewed together with a history of abuse. *See Stokley,* 182 Ariz. at 523, 898 P.2d at 472. However, the defendant failed to show that he was intoxicated at the time of the offense. . . . The trial judge did not err in concluding that the defendant failed to establish this circumstance.

The court also rejected Doerr's I.Q. as a mitigator. It was found to be 80, at the low end of the low average range. Both Doctors Blackwood and [State's expert] Youngjohn testified that this would not affect his ability to know right from wrong. The court found that the defendant had a decent job and worked hard. His employer testified that he had good mechanical aptitude and learned new tasks quickly and easily. The record demonstrates no connection between the defendant's intelligence level and the murder. *See State v. Bishop,* 127 Ariz. 531, 535, 622 P.2d 478, 482 (1980).

Defendant claims that he has "severe organic brain damage," and that this affected his capacity to appreciate the wrongfulness of his conduct or to conform it to the law. Even if the evidence of this defect was insufficient under § 13–703(G)(1), he says, the judge should have given it weight as nonstatutory mitigation.

. . . Dr. Blackwood said that the tests at most "pointed to the presence of brain dysfunction and impaired brain." He admitted that he was surprised by the negative PETSCAN, although it did not cause him to change his conclusions. On cross-examination, Blackwood said he found no causal connection

between Doerr's possible brain damage and the homicide. Dr. Walter, who did not conduct tests on the defendant but merely reviewed the other experts' reports, also admitted that he could not connect the brain damage to the murder.

*Doerr*, 193 Ariz. at 70–71, 969 P.2d at 1182–83.

B. <u>Analysis</u>

A sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings*, 455 U.S. at 114; *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978). While the sentencer "may determine the weight to be given relevant mitigating evidence," it "may not give it no weight by excluding such evidence from [its] consideration." *Eddings*, 455 U.S. at 114–15. Applying *Lockett* and *Eddings*, the Supreme Court has held that a state cannot adopt a "causal nexus" rule – that is, a rule precluding a sentencer from considering mitigating evidence unless there is a causal connection between the evidence and the crime. *Tennard v. Dretke*, 542 U.S. 274, 287 (2004). The sentencer may, however, consider "causal nexus . . . as a factor in determining the weight or significance of mitigating evidence." *Lopez v. Ryan*, 630 F.3d 1198, 1204 (9th Cir. 2011), *overruled on other grounds by McKinney*, 813 F.3d at 819.

In *McKinney*, the Ninth Circuit held the Arizona Supreme Court, during a time-period encompassing its review of Doerr's case, "consistently" applied an impermissible causal nexus test to mitigating evidence in capital cases. *McKinney*, 813 F.3d at 803. The court explained:

> The decisions of the Arizona Supreme Court make clear that family background or a mental condition could be given weight as a nonstatutory mitigating factor, but only if defendant established a causal connection between the background or condition and his criminal behavior. For a little over fifteen years, the Arizona Supreme Court routinely articulated and insisted on its unconstitutional causal nexus test. . . .

*Id.* at 815.

In Doerr's case, both the trial court and the Arizona Supreme Court "articulated and insisted on" this causal nexus test with respect to Doerr's family history and mental condition evidence.

In *Greenway v. Ryan*, 866 F.3d 1094 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 2625, and *Apelt v. Ryan*, 878 F.3d 800 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 2716, the Ninth Circuit has offered additional guidance for interpreting its decision in *McKinney*. The court discussed several "critical factors" to be considered in determining whether the Arizona Supreme Court violated *Eddings* by applying a causal nexus test in cases upholding a death sentence. *Apelt*, 878 F.3d at 839–40.

While the court in *McKinney* did not include Doerr's case in its discussion of decisions in which the Arizona Supreme Court applied the causal nexus test, the remaining factors discussed in *Greenway* and *Apelt* unmistakably indicate that the trial court and the Arizona Supreme Court did apply such test in Doerr's case. First, in sentencing Doerr, the trial court stated "a factual conclusion that . . . [Doerr's] proffered mitigation failed to affect his conduct." *Apelt*, 878 F.3d at 840. The trial court explicitly found no causal connection linking the crime with Doerr's childhood background, alcohol abuse, or low IQ. (Doc. 174-3, Ex. G at 8–11.) The trial court also found that Doerr's brain damage did not "affect[] his ability to control his actions." (*Id.* at 11)

The Arizona Supreme Court likewise noted that there was no causal connection between the mitigating evidence and Doerr's conduct in committing the crimes. *Doerr*, 193 Ariz. at 70–71, 969 P.2d at 1182–83. Thus, the court in *Doerr* "on its face . . . expressly exclude[d] . . . mitigation evidence . . . on the ground that it lacked causal relationship to the commission of the crime." *Greenway*, 866 F.3d at 1097. The Arizona Supreme Court rejected Doerr's mitigating factors "as a matter of law, on the theory that [they were] not related to the commission of the crime." *Id*.

In addition, when reviewing Doerr's mitigating evidence, the Arizona Supreme Court cited *Wallace*, one of the cases which, according to *McKinney*, established Arizona's unconstitutional causal nexus test. *Doerr*, 193 Ariz. at 70, 969 P.2d at 1182; *see Apelt*, 878 F.3d at 840. The court also pin-cited *Towery*, which the court in *McKinney* included among the cases where the Arizona Supreme Court had applied an unconstitutional causal nexus test. *Doerr*, 193 Ariz. at 70, 969 P.2d at 1182; *see McKinney*, 813 F.3d at 815–16.

Finally, the Arizona Supreme Court repeatedly used the language found to be problematic in *McKinney*'s discussion of cases where the Arizona Supreme Court improperly applied a causal nexus test to mitigating evidence. *McKinney*, 813 F.3d at 813–17, 824–26. The "formulations we enumerated in *McKinney*," *Greenway*, 866 F.3d at 1098, are present throughout the Arizona Supreme Court's decision in Doerr's case.

For example, with respect to evidence of Doerr's family background, the Arizona Supreme Court found the evidence "not mitigating in the absence of 'some connection with the defendant's offense-related conduct.'" *Doerr*, 193 Ariz. at 70, 969 P.2d at 1182 (quoting *Towery*, 186 Ariz. at 189, 920 P.2d at 311). With respect to Doerr's alcoholism, the court found "no proof of a causal connection to the crime." *Id.* The court made the same "no connection" finding as to evidence of Doerr's low IQ. *Id.* at 71, 969 P.2d at 1183.

The Court concludes that the state courts' application of a causal nexus test did not constitute harmless error. *See McKinney*, 813 F.3d at 822 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)); *Greenway*, 866 F.3d at 1100. Rather, the error had a "substantial and injurious effect or influence" on the sentencing decision and on the Arizona Supreme Court's independent review.

Doerr presented substantial evidence of extreme childhood abuse and deprivation, but the state courts gave it no weight or consideration because they found no causal connection between the mitigating evidence and the murder. *See McKinney*, 813 F.3d at 823 ("Dr. McMahon diagnosed McKinney as suffering from PTSD as a result of his horrific childhood. McKinney's PTSD was important mitigating evidence, central to his plea for leniency, but the Arizona Supreme Court, as a matter of law, gave it no weight."). The courts reached the same conclusion with respect to evidence of Doerr's alcoholism, low IQ, and brain damage, inappropriately circumscribing consideration of the evidence due to its lack of a causal connection to the crime. *See Doerr*, 193 Ariz. at 70–71, 969 P.2d at 1182–83.

The fact that the murder was particularly gruesome does not foreclose a finding that Doerr was prejudiced by the *Eddings* error. "We may find prejudice despite the horrific

nature of an underlying crime." *Doe v. Ayers*, 782 F.3d 425, 447 n.34 (9th Cir. 2015); *see Douglas v. Woodford*, 316 F.3d 1079, 1091 (9th Cir. 2003) ("The gruesome nature of the killing did not necessarily mean the death penalty was unavoidable."); *Smith v. Stewart*, 189 F.3d 1004, 1013 (9th Cir. 1999) ("The horrific nature of the crimes involved here does not cause us to find an absence of prejudice.").

The court concludes that this mitigating evidence offered at sentencing, "central to [Doerr's] plea for leniency," "would have had a substantial impact on a capital sentencer who was permitted to evaluate and give appropriate weight to it as a nonstatutory mitigating factor." *McKinney*, 813 F.3d at 823. Therefore, the *Eddings* error was not harmless.

## CONCLUSION

Applying the holding in *McKinney*, the Court finds that the sentencer and the Arizona Supreme Court violated *Eddings* by subjecting Doerr's mitigating evidence to an unconstitutional causal nexus test. The error was not harmless.

Accordingly,

**IT IS ORDERED** that Doerr's amended petition for writ of habeas corpus is granted unless the State of Arizona, within 120 days from the entry of this Judgment, initiates proceedings either to correct the constitutional error in Doerr's death sentence or to vacate the sentence and impose a lesser sentence consistent with the law.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter Judgment accordingly.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to Janet Johnson, Clerk of the Arizona Supreme Court, 1501 W. Washington Street, Phoenix, Arizona 85007-3329.

Dated this 3rd day of February, 2020.

Honorable John J. Tuchi
United States District Judge

- 17 -