1    **WO**

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

9    Eugene Allen Doerr,                    No. CV-02-00582-PHX-JJT

10              Petitioner,                 **ORDER**

11   v.                                     DEATH PENALTY ORDER

12   Charles L. Ryan, *et al.*,

13              Respondents.

        Petitioner Eugene Allen Doerr is an Arizona death row inmate. On September 28, 2009, this Court denied his amended petition for writ of habeas corpus. (Doc. 141.) On December 2, 2014, the Ninth Circuit Court of Appeals granted Doerr's request for a "limited remand," ordering this Court to reconsider Claim 28 "in the light of intervening law," including *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc). (*See* Doc. 156.) The Ninth Circuit later expanded the remand to address the impact of *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc), on Doerr's habeas petition. (*See* Doc. 184.)

        Ultimately, this Court granted relief on the second remanded issue, finding that Doerr was entitled to relief under *McKinney* because the trial court and the Arizona Supreme Court committed *Eddings* error by requiring a causal connection between Doerr's mitigating evidence and the murder.[1] (Doc. 189.) The Court granted a conditional writ as to Doerr's death sentence, ordering the State either to "correct the constitutional error in

_____

[1] *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982).

Doerr's death sentence or vacate the sentence and impose a lesser sentence consistent with the law." (*Id.* at 17.) Having determined that Doerr was entitled to relief on the *McKinney* issue, the Court did not address remanded Claim 28, which alleges ineffective assistance of counsel at sentencing. (*Id.* at 1.)

Respondents moved to stay the Court's order pending resolution of their appeal. (Doc. 191.) The Court denied the motion. (Doc. 197.)

Subsequently, the Ninth Circuit granted Respondent's Motion to Stay Lower Court Ruling "pending final resolution of these appeals." (*See* Doc. 198 at 1–2.) The Ninth Circuit also granted Respondents' Motion to Stay and Remand for Adjudication of Undecided *Martinez* Issues, writing that "[a]djudication of Claim 28 by the district court will assist this Court in the resolution of these appeals." (*Id.* at 2.)

## BACKGROUND

On April 15, 1996, a jury convicted Doerr of premeditated first-degree murder, sexual assault, and kidnapping for the 1994 killing of Karen Bohl. The Arizona Supreme Court summarized the facts surrounding the crime as follows:

> At approximately 10:00 a.m. on September 24, 1994, two Phoenix police officers responded to a "check welfare" dispatch following a 911 call. Upon arriving at a bungalow-style apartment, they found the front door ajar and a disheveled Eugene Doerr sitting on the coffee table in the living room. He wore only shorts and was covered with blood.

> When asked what had occurred, Doerr replied: "I don't know. I woke up with this—with a dead body back there." In a bedroom doorway, Officer Wirth found a naked woman lying in a pool of blood. Detecting no pulse, he instructed his partner to radio the fire department. Doerr responded, "[Y]ou don't need fire because she's dead." He told the officers that he had awakened, gone to the bathroom, and found the body on the floor. He denied knowing the victim's identity.

> The four-room apartment showed signs of a violent struggle, with blood in every room. At trial, the medical examiner testified that the victim, 39-year-old Karen Bohl, died of multiple blunt force trauma. She suffered numerous injuries to the head, including a fractured nose, abrasions, cuts, bruises, and a two-inch laceration that exposed her skull. Her left hand was swollen and red. Her right hand was clenched in a fist holding hairs consistent with her own. Her left nipple and areola had been cut off, and above her right nipple were small lacerations. The body was covered in blood and fecal matter. Blood also formed a V-shaped pattern down her back from saturated hair.

> The victim had been assaulted vaginally and rectally with an instrument of some kind. The doctor testified that the wall between her rectum and cervix

had been destroyed. A bloody pipe, apparently part of a broken lampstand, and a bloody broom handle were found nearby—objects that the medical examiner said could have produced the injuries. Because of significant blood loss, swelling, and bruising, the doctor concluded that the injuries likely occurred prior to or during the victim's death. There were twenty-six other areas of injury to her body. Her blood alcohol level tested at .25, but no other drugs were detected. Tests for semen were negative.

Defendant Doerr was also injured. His right hand was swollen, and he had minor cuts on his forearm, above his wrist, and on his left foot. His chest, stomach, pubic area, and hands were smeared and caked with blood.

. . . .

Defendant first claimed that he had no idea how the woman got there. Later, as officers waited for a search warrant, he told them that he thought her purse and ID were in the bathroom "because I remember seeing a purse and I don't own a purse." He also said the white car parked out front belonged to the victim. "That is her car she said . . . I think." One of the officers testified that Doerr hesitated before adding the "I think."

Doerr voluntarily went to the police station. During questioning, he asked one of the officers if he thought a judge would give him life for the murder. He also said, "[S]he must have really made me mad for me to do something to her like this." The police did not test Doerr for drugs or alcohol until about 3:00 p.m., five hours after the 911 call. The tests were negative.

*State v. Doerr*, 193 Ariz. 56, 59–61, 969 P.2d 1168, 1171–73 (1998).

The court also discussed the testimony of Victor Rosales, a jailhouse informant. Rosales testified that he had been Doerr's cellmate. *Id.* at 60, 969 P.2d at 1172. According to Rosales, Doerr initially did not remember anything about the murder, but he later told Rosales that he recalled picking the victim up, partying with her, and then getting into an argument. *Id.* at 61, 969 P.2d at 1173. Doerr wanted to have sex with the victim but she refused. *Id.* He told Rosales that "usually when you go pick out a woman, pick up a broad at a bar and take her partying, she knows what is expected." *Id.* Doerr stated that "he should have buried the bitch in the back yard." *Id.* Rosales also claimed that Doerr described playing with the victim's blood. *Id.*

The trial court found that the murder was especially cruel, heinous, and depraved, an aggravating factor under A.R.S. § 13–703(F)(6).[2] *Id.* The court found the mitigating

---

[2] Since renumbered as A.R.S. § 13–751(F)(4). The Court will refer to the statute in place at the time of Doerr's trial and sentencing.

evidence insufficient to warrant leniency and sentenced Doerr to death.[3] *Id.* The Arizona Supreme Court affirmed. *Id.* at 72, 969 P.2d at 1184.

After unsuccessfully pursuing post-conviction relief ("PCR") in state court, Doerr commenced these habeas proceedings. (Docs. 1, 82.)

## DISCUSSION

Claim 28 of Doerr's first amended petition alleges that trial counsel performed ineffectively at sentencing by failing to investigate and present evidence of Doerr's mental impairments. (Doc. 82 at 161-90; *see* Doc. 105 at 116.) The Court found the claim procedurally barred because it was not raised in state court, rejecting Doerr's argument that the claim's default was excused by the ineffective assistance of PCR counsel. (Doc. 132 at 14–15.) On "limited remand" the Court of Appeals has ordered this Court to reconsider Claim 28 in the light of *Martinez* and its progeny, which hold that the ineffective assistance of PCR counsel can excuse the default of claims of ineffective assistance of trial counsel. (Docs. 156, 198.)

The issue has been fully briefed. (Docs. 167, 174, 179.) In his opening brief, however, Doerr adds a claim that he is intellectually disabled under *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Hall v. Florida*, 572 U.S. 701 (2014), and "therefore his death sentence must be vacated." (Doc. 167 at 101.) He also asks the Court for a "limited stay and abeyance" so that he can exhaust his *Atkins* claim in state court. (*Id.* at 123.)

Respondents argue that Doerr is not permitted to expand the Ninth Circuit's "limited remand" by adding an *Atkins* claim. (Doc. 174 at 15–16.) The Court agrees.

The Ninth Circuit has "repeatedly held . . . that a district court is limited by this court's remand in situations where the scope of the remand is clear." *United States v. Thrasher*, 483 F.3d 977, 982–83 (9th Cir. 2007) (quoting *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172 (9th Cir. 2006)). In *Thrasher* the Ninth Circuit held that the district court did not err in refusing to consider a new ineffective assistance of counsel argument

---

[3] Doerr was sentenced prior to the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 609 (2002), which held that a jury, not a judge, must make the findings that render a defendant eligible for death.

based on evidence presented during a post-appeal evidentiary hearing. 483 F.3d at 982–83. The court explained that the case was "remanded for a single purpose"—"a hearing to resolve *a* critical disputed fact"—and thus "the plain language of the disposition precluded the district court from considering any other arguments concerning [counsel's] effectiveness." *Id.* at 983 (emphasis in original) (quotations omitted); *see Holmes v. Miller*, 768 F. App'x 781, 782–83 (9th Cir. 2019) (explaining that the district court "correctly understood the scope of [its] remand," which did not include taking evidence on an ineffective assistance of counsel claim that had not been raised in the petition).

Here, the mandate is clear: "for the district court to reconsider, in light of intervening law, Claim 28." (Doc. 156.) On remand this Court is directed to determine whether the claim's default is excused. As Doerr admits, his *Atkins* claim is not a part of Claim 28. (Doc. 179 at 22.) Therefore, this Court cannot consider it. "A district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) (citations omitted); *see Creech v. Ramirez*, No. 1:99-CV-00224-BLW, 2017 WL 1129938, at *11 (D. Idaho Mar. 24, 2017) (explaining, in a case remanded pursuant to *Martinez*, that the language of the order "reveals . . . this case is before this Court on a limited remand. It is not a free-for-all. Specifically, there is no language in the Ninth Circuit's order suggesting that the Court of Appeals empowered this Court to reopen the record and accept additional, post-remand evidence").

Doerr's only argument that his *Atkins* claim falls within the scope of the remand is his assertion that on remand he is required to "raise all known claims." (Doc. 179 at 22.) For this proposition he relies on dicta in *Scott v. Ryan*, 686 F.3d 1130, 1135 n.1 (9th Cir. 2012). In the footnote he cites, the Ninth Circuit denied Scott's request for remand pursuant to *Martinez* because the case had already been remanded for consideration of Scott's claims of ineffective assistance of counsel at sentencing and that was his "opportunity to present all the new evidence he thought relevant to the district court." *Id.* In light of the above

authority, this passage cannot be read to suggest that a petitioner can expand a limited remand to raise for the first time an entirely unrelated claim.

## A. Applicable law

### 1. *Martinez v. Ryan*

Federal review is generally unavailable for a claim that has been procedurally defaulted. In such situations, review is barred unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice that excuses the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). *Coleman* held that ineffective assistance of counsel in post-conviction proceedings cannot establish cause for a claim's procedural default. *Id.*

In *Martinez*, however, the Court announced a new, "narrow exception" to that rule. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17; *see also Trevino v. Thaler*, 569 U.S. 413, 418 (2013).[4]

Accordingly, under *Martinez* an Arizona petitioner may establish cause and prejudice for the procedural default of an ineffective assistance of trial counsel claim by demonstrating that (1) PCR counsel was ineffective and (2) the underlying ineffective assistance claim has some merit. *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14); *see Ramirez v. Ryan*, 937 F.3d 1230, 1242 (9th Cir. 2019*), pet. for cert. filed*, No. 20-1009 (Jan. 20, 2021); *Atwood v. Ryan*, 870 F.3d, 1033, 1059–60 (9th Cir. 2017).

In *Ramirez*, the Ninth Circuit set out the framework for analyzing claims under *Martinez*:

> to establish "cause" under *Martinez* . . . [a petitioner] must demonstrate that post-conviction counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). *Claubourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014),

---

[4] In *Runningeagle v. Ryan*, 825 F.3d 970, 981–82 (9th Cir. 2016), the Ninth Circuit rejected the argument, raised by Respondents here, that *Martinez* does not apply to Arizona cases prior to 2002, when the Arizona Supreme Court expressly directed defendants to raise ineffective assistance of counsel claims in PCR proceedings rather than on direct appeal.

*overruled on other grounds by McKinney*, 813 F.3d at 819. In turn, S*trickland* requires demonstrating "that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Id.* (citation omitted). Determining whether there was a reasonable probability that the result of the post-conviction proceedings would be different "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.*

To establish "prejudice" under *Martinez*'s second prong of the "cause and prejudice" analysis, [a petitioner] must demonstrate that his underlying ineffective assistance of trial counsel claim is "substantial." *Id.* In *Martinez*, the Supreme Court defined substantial to be a "claim that has some merit," and explained the procedural default of a claim will not be excused if the ineffective assistance of counsel claim "is insubstantial, *i.e.*, it does not have any merit or [ ] it is wholly without factual support." *Martinez*, 566 U.S. at 14–16.

*Ramirez*, 937 F.3d at 1241.

The Supreme Court in *Martinez* "provided no further definition of substantial, but cited the standard for issuing a certificate of appealability as analogous support for whether a claim is substantial." *Ramirez*, 937 F.3d at 1241 (citing *Martinez*, 566 U.S. at 14). A claim is substantial for purposes of a certificate of appealability if "reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement." *Id.* (citing *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). To determine whether the underlying claim of ineffective assistance of trial counsel is "substantial" for purposes of "prejudice" under *Martinez*, the court undertakes a "general assessment" of the claim's merits. *Ramirez*, 937 F.3d at 1241 (quoting *Cook*, 688 F.3d at 610 n.13).

Although the "cause" and "prejudice" analyses "overlap," "the requirements remain distinct." *Id.* In *Ramirez* the court reiterated that a finding of "prejudice" for purposes of *Martinez*'s "cause and prejudice" analysis, "which requires only a showing that the trial level ineffective assistance of counsel claim was 'substantial,' does not diminish the requirement . . . that petitioner satisfy the 'prejudice' prong under *Strickland* in establishing ineffective assistance by post-conviction counsel." *Id.* at 1242 (quoting *Clabourne*, 745 F.3d at 377 (internal quotations omitted).

The Ninth Circuit has offered additional guidance in assessing whether "cause" exists under *Martinez*. In *Atwood*, for example, the court explained:

> In evaluating whether the failure to raise a substantial claim of ineffective assistance of trial counsel in state court resulted from ineffective assistance of *state habeas* counsel under *Strickland*, we must evaluate the strength of the prisoner's underlying ineffective assistance of *trial* counsel claim. If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised.

870 F.3d at 1059–60 (emphasis in original); *Hooper v. Shinn*, 985 F.3d 594, 627 (9th Cir. 2021); *see Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective.").

In *Runningeagle v. Ryan*, 825 F.3d 970, 982 (9th Cir. 2016), the court addressed the standard necessary to find that PCR counsel's performance was prejudicial. The court explained that under *Martinez*:

> Although the prejudice at issue is that in PCR proceedings, this is a recursive standard. It requires the reviewing court to assess trial counsel's as well as PCR counsel's performance. This is because, for us to find a reasonable probability that PCR counsel prejudiced a petitioner by failing to raise a trial-level IAC [ineffective assistance of counsel] claim, we must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised.

*Id.*; *see Murray (Roger) v. Schriro*, 882 F.3d 778, 816 (9th Cir. 2018).

2.     Ineffective assistance of counsel

Claims of ineffective assistance of counsel are governed by the principles set out in *Strickland*, 466 U.S. 668. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15, 16–17 (2009) (per curiam). The "standard is necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at 688–89.

Deficient performance, *Strickland*'s first prong, "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To make this showing, a petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). "The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at 689). "[T]he relevant inquiry . . . is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Murray (Robert) v. Schriro*, 745 F.3d 984, 1011 (9th Cir. 2014) (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998)).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S.

at 694. "The likelihood of a different result must be substantial, not just conceivable." *Hooper*, 985 F.3d at 628 (quoting *Richter*, 562 U.S. at 112).

The petitioner "'bears the highly demanding and heavy burden [of] establishing actual prejudice.'" *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams v. Taylor (Terry Williams)*, 529 U.S. 362, 394 (2000)). For claims of ineffective assistance of counsel at sentencing, prejudice is assessed by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536 (quoting *Williams (Terry)*, 529 U.S. at 397–98).

Because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *see Rhoades v. Henry*, 638 F.3d 1027, 1049 (9th Cir. 2011).

> ### 3. Evidentiary development

In *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Supreme Court held that where the state court has denied a habeas petitioner's claim on the merits under 28 U.S.C. § 2254(d), review by the federal court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 181. However, where a state court has not adjudicated the merits of a claim because of a procedural bar, a district court may consider new evidence in determining whether the petitioner can overcome that bar. *See Dickens*, 740 F.3d at 1321 (holding that *Pinholster* did not bar petitioner from presenting new evidence to support a cause-and-prejudice argument under *Martinez* because *Pinholster* applies only to claims previously "adjudicated on the merits in State court proceedings"); *Detrich v. Ryan*, 740 F.3d 1237, 1246-47 (9th Cir. 2013) (en banc) ("*Pinholster*'s predicates are absent in the context of a procedurally defaulted claim in a *Martinez* case.").

In *Dickens* the court also rejected the argument that 28 U.S.C. § 2254(e)(2) barred evidentiary development in federal court, explaining that a petitioner seeking to show "cause" under *Martinez* is not asserting a "claim."[5] 740 F.3d at 1321. ("A federal court's determination of whether a habeas petitioner has demonstrated cause and prejudice . . . is not the same as a hearing on a constitutional claim for habeas relief."); *see Woods v. Sinclair*, 764 F.3d 1109, 1138 n.16 (9th Cir. 2014) (explaining that neither *Pinholster* nor § 2254(e)(2) "categorically bar [a petitioner] from obtaining such a hearing or from presenting extra-record evidence to establish cause and prejudice for the procedural default. . . .").

Therefore, whether to expand the record or hold an evidentiary hearing is left to this Court's discretion.

**B.    Additional facts**

1.    Trial and sentencing

Doerr was represented at trial by lead counsel Kevin Burns and co-counsel Brad Bransky, both of the Maricopa County Public Defender's Office. It was Burns's first capital case. (Doc. 167-4, Ex. 56, ¶ 3.) His workload included 30 to 40 felony cases. (*Id.*, ¶ 5) Bransky carried a similar caseload. (*Id.*, Ex. 57 at 1.)

An investigator, Paulette Kasieta, was assigned to the case. (*Id.*, Ex. 56, ¶ 8.) Defense counsel did not retain a mitigation specialist until after Doerr was convicted. (*Id.*, ¶ 13.) They then retained Holly Wake, who had experience in developing mitigation and in writing presentence reports. (*Id.*, ¶ 14.)

Defense counsel retained three mental health experts. The first, Dr. Donald Tatro, a clinical psychologist, performed a psychological examination to "assess present mental condition and probable condition of the defendant at the time of the offense." (ROA 134, Wake Social History, Ex. A at 1.) The examination took place on April 16, 1995. (*Id.*)

Dr. Tatro reviewed the police reports and the autopsy report, conducted a clinical interview, and administered a series of tests. (*Id.* at 1, 10.) The results of one of the tests

_____

[5] Twenty-eight U.S.C. § 2254(e)(2) severely limits the circumstances in which a federal habeas court may hold an evidentiary hearing on claims not developed in state court.

were "very suggestive" of "organic brain damage." (*Id.* at 10.) Dr. Tatro noted that "people with organic brain dysfunction frequently have greater difficulty keeping their impulses under control than normally functioning people do." (*Id.*) He recommended a "thorough psychoneurological examination . . . to confirm with greater specificity and to expand upon the evidence of organicity found in this examination" (*Id.*)

Dr. Tatro's report contained his observations of Doerr and information Doerr provided about his background. Dr. Tatro noted that during the interview Doerr would smile or laugh inappropriately. (*Id.* at 4.) Doerr told Dr. Tatro that he had difficulty in school and never learned to read or write. (*Id.* at 8.) He stated that he began drinking "regularly and heavily" at age 15. (*Id.* at 9.) Doerr wet the bed until he was placed out of home at age 15. (*Id.* at 6.)

Dr. Tatro noted "the very dysfunctional, interpersonally cut-off, unusually emotionally neglectful circumstances of [Doerr's] childhood." (*Id.*) Doerr detailed for Dr. Tatro the abuse he suffered at the hands of his father. (*Id.* at 5.) As punishment, his father would make Doerr sit on his bed or stand in the corner for hours. (*Id.*) Doerr and his older sister, Lucy, were treated like slaves, denied food, and beaten with a belt. (*Id.* at 6.) They lived in the country, and one of Doerr's chores was to carry in water for baths, "a hundred gallons, five gallons at a time." (*Id.*) When he wet the bed his father would make him wear a sign on the school bus saying "I peed the bed." (*Id.*) Doerr's father sexually molested Lucy. (*Id.* at 7.) Doerr said that he didn't have a childhood. (*Id.* at 5.) He told Dr. Tatro that he once shot at his father, trying to kill him. (*Id.* at 8.)

Dr. Tatro concluded that Doerr was raised by a "very withdrawn, unresponsive, neglectful, mostly absent mother and an extremely harsh, critical, domineering, abusive, and equally emotionally remote father." (*Id.*) Doerr felt isolated and rejected; ultimately, he became "very egocentric." (*Id.*)

Dr. Tatro summarized his findings as follows:

> Doerr is a seriously disturbed individual as a consequence of organic brain damage, marked schizoid traits of personality, severely developmentally impaired social comprehension and judgment, a disordered sexual identity and adjustment, which inclines him to find sexual satisfaction in sadistic

behavior, and long-term, chronic alcohol dependence, exacerbated by a corollary dependence on marijuana.

(*Id.* at 13.)

Dr. Tatro opined that this "array of problems . . . makes it probable that [Doerr] was, as he claims, severely intoxicated and in a state of diminished, altered consciousness at the time of the offense" and "lends credence to his claim of defective memory for the events in question, although he gave indication, both immediately following his arrest and in this interview, that his amnesia for what happened is not as complete as he more typically claims." (*Id.*) Dr. Tatro continued:

> [Doerr's] mental problems are sufficiently severe, chronic, and self-control-impairing that they can properly be viewed as mitigating of his responsibility. In all likelihood, he was both seriously out of touch with that part of his personality that normally considers consequences and out of control of his impulses. The role of brain damage in this should not be underestimated (in comparison to the role of alcohol) and, for this reason, the seriousness, extent, and implications of organic dysfunction need to be more thoroughly investigated.

(*Id.*) Dr. Tatro opined that Doerr's "psychological and neurological problems combine to make him a potentially dangerous individual." (*Id.*)

Based on Dr. Tatro's findings with respect to possible brain damage, counsel retained Dr. Daniel Blackwood, a neuropsychologist, to conduct further testing. (*See* ROA 134, Wake Social History, Ex. L.) Dr. Blackwood's neuropsychological examination took place on May 16, 1995. (*Id.* at 1.)

Like Dr. Tatro, Dr. Blackwood noted Doerr's inappropriate laughter. (*Id.* at 2.) Doerr reported that he was involved in a car accident in Florida in 1987 where he was injured and lost consciousness. (*Id.* at 1.) He reported a second car accident where he drove head-on into a telephone pole. (*Id.* at 1–2.) He also stated that when he was a freshman in high school he was hit in the head with a baseball bat and lost consciousness. (*Id.* at 2.)

Dr. Blackwood measured Doerr's full-scale IQ as 80. (*Id.* at 4.) He administered a battery of neuropsychological tests. Dr. Blackwood explained that the results "clearly point to the presence of brain dysfunction, with specific disturbance in the right cerebral

hemisphere" and "indicate that Mr. Doerr's ability to function in a normal fashion in daily activities and his ability to respond in ways which would be expected of most individuals of his general intelligence are compromised." (*Id.* at 6.) Dr. Blackwood opined that Doerr's "ability to control his behavior" was diminished "as a result of impaired brain function." (*Id.*) He "believe[d] it is quite likely that Mr. Doerr's brain dysfunction contributed to the actions resulting in the current charges," but could not "assign any relative value to the proportion of such contribution." (*Id.*) Dr. Blackwood agreed with Dr. Tatro that Doerr was "quite dangerous." (*Id.*)

Based on Dr. Blackwood's conclusion that Doerr had brain damage, counsel sought a PET scan.[6] The scan, performed September 29, 1995, revealed no brain abnormalities. (*See* Doc. 167-2, Ex. 16.)

After Doerr was convicted, counsel retained another neuropsychologist, Dr. Marc Walter, to assist at sentencing. Dr. Walter did not conduct an independent evaluation of Doerr but reviewed the record, including the reports of the other experts, and testified at the presentencing hearing. Dr. Walter was retained in July 1996, one month before the hearing began. (*See* Doc. 167-3, Ex. 20.)

Prior to the presentencing hearing, defense counsel filed a sentencing memorandum (ROA 134). It consisted of a single page and indicated that Doerr was submitting "an expanded social history of the defendant for the Court's consideration, along with evidence to be adduced and argued at the presentence hearing." (*Id.*) Counsel attached to the memorandum a 22-page social history written by mitigation specialist Wake. (*Id.*, Wake Social History.) As discussed below, that social history and the attached exhibits contained additional and corroborating evidence about Doerr's traumatic childhood.

On the first day of the presentencing hearing, August 30, 1996, defense counsel called four lay witnesses to testify on Doerr's behalf: John Bibo, a long-time friend; Bruce

---

[6] Positron emission tomography.

Forsythe, Doerr's boss; Debra Campbell, a co-worker; and Hollie Ortiz, Doerr's paternal aunt.[7]

Bibo testified that he met Doerr when Doerr was panhandling in Illinois. Doerr was "destitute," "basically a homeless person on the streets." (RT 8/30/96 at 5–6.) Bibo gave him some money and food and let Doerr stay with him. Doerr was "helpful" and "seemed like a good person." (*Id.* at 7.) They kept in touch when Bibo moved away. According to Bibo, "[Doerr] would write me but he is not a real good writer. . . . He could barely read or write." (*Id.* at 9–10.)

Bibo believed Doerr suffered from memory loss. He also testified that Doerr drank a lot. (*Id.* at 22.) He recalled that one night an intoxicated Doerr "flipped out" and attacked him. (*Id.* at 24–27.)

Bibo characterized Doerr as a "worthwhile individual," an honest person and a good father. (*Id.* at 25.)

Forsythe testified that he had employed Doerr as a day laborer for his home remodeling and repair business in the early 1990s. (*Id.* at 84–85.) Doerr was trustworthy and a hard worker who had good mechanical aptitude. (*Id.* at 84–93.)

Occasionally Doerr drank to excess. Forsythe recalled him sleeping on job sites while jack-hammering was going on around him. (*Id.* at 89.) Forsythe also testified that when Doerr drank he would go on a bender and be gone for several days. (*Id.* at 91–93.)

Debra Campbell, a coworker, testified that when she took Doerr to get his driver's license he had to take the test orally because he had difficulty reading the exam. (*Id.* at 95–96.) Campbell also testified that she felt safe around Doerr and was comfortable leaving her children alone with him. (*Id.* at 96–97.)

Hollie Ortiz testified about Doerr's childhood in Illinois. Doerr's parents, Charles and Alice, had two children, Eugene and his sister, Lucy. (*Id.* at 44.) Charles, a large man, was "violent, aggressive, mean to his children." (*Id.* at 43.) He was "very abusive to his children, and actually anybody that really came in contact with him." (*Id.*)

---

[7] Hollie Ortiz also goes by the names Holly Pectol and Hallie S. Terry. (*See* Doc. 167 at 38 n.25.

Alice and Charles never liked Doerr and "called him the ugly one." (*Id.* at 45.) Hollie testified that she babysat the children on several occasions. "Eugene was . . . still in diapers and his hair was real, real long." (*Id.* at 45.) Once, when she tried to give him a bath, she noticed "his bottom had sores from one end to the other. He looked like he had syphilis." (*Id.*) Hollie recalled an incident when she cut Doerr's hair so he would look like a boy; Alice and Charles complained, "You have cut our little girl's hair and now he is really ugly." (*Id.*)

Charles and Alice's house was "disgusting." (*Id.* at 46.) Instead of using a bathroom upstairs, they used a bucket next to the stove. (*Id.*) The kitchen was filled with cockroaches and dirty dishes. (*Id.*) Alice was "neglectful" of the home and the children. (*Id.* at 54.) She was "quiet, like in a shell." (*Id.* at 54, 57.) Alice "didn't show any affection, [or] motherly sign toward her children." (*Id.* at 57.) She was afraid of Charles and never crossed him; "[w]hatever he said, went." (*Id.* at 55.)

Both parents neglected and abused Doerr. Hollie saw Alice "take a pissy diaper" off Doerr, dry it on the line, then "put it right back on him." (*Id.* at 46.) "There would be feces in the crib with Eugene in the corner." (*Id.*) "They didn't give him milk. . . . They would give him water and tea basically. If you ask them why, they just say, he didn't need it." (*Id.*) When Doerr cried, his parents simply left him in his crib and shut the door. (*Id.* at 47.)

Hollie testified that Doerr was malnourished. She described him as having "little skinny arms and a big belly . . . like a child from the third world." (*Id.* at 50.) Later, when Hollie visited him at the Illinois Soldiers' and Sailors' Children's School ("ISSCS"), a state-run orphanage where Doerr had been placed after running away from home, he was very thin, weighing only 115 pounds at six feet tall. (*Id.*) When asked about his weight, he replied that he didn't get anything to eat at home. "If mom and dad ate, we didn't get anything to eat if there wasn't anything left." (*Id.*)

On Thanksgiving, when Doerr's family visited Hollie's home, he and Lucy had to stay in the car with Charles's "attack dog" while their parents ate inside. (*Id.* at 50–51.) If

anyone said anything, Charles "would just go off" and say "they are my kids," "stay out of my business," and "children are to be seen and not heard." (*Id.* at 50.)

Charles was "always cruel" to Doerr. (*Id.* at 53.) To punish Doerr for "messing his pants," Charles made him stand in a corner "with dirty underwear under his face" for three hours. (*Id.*) Hollie testified that Charles once punished Doerr by "siccing his dog on him." (*Id.* at 58.) When Doerr got into trouble at school, Charles made him stand in a corner from about 3:30 in the afternoon to 8:30 at night. (*Id.* at 47.) He was not allowed to eat dinner or use the bathroom. (*Id.*) Hollie tried to sneak him food but he was afraid to get caught eating and hid the food in his pocket. (*Id.*)

Charles could not control his temper. (*Id.* at 59.) He once threw Doerr through a glass window or door. (*Id.*)

Hollie testified that Doerr suffered "numerous broken collarbones" as a result of the abuse; she once saw his arm in a homemade sling. (*Id.* at 48.) She saw Charles whip and hit Doerr and observed whip marks from a belt on Doerr's buttocks and legs. (*Id.* at 51.) Charles "would hit him and call him stupid." (*Id.* at 49.) Alice and Charles did not take Doerr to the doctor because "they were afraid they would get caught . . . [and] people would find out what really went on at home." (*Id.*)

There was never any affection in Doerr's family; "[i]t was always stupid, ugly, get out of my sight, things like that." (*Id.* at 57.)

Doerr and Lucy were both abused, but Lucy "was treated a little bit better" because she was "the pretty one." (*Id.* at 49.) There was absolutely no love or caring in the household and the children received no hugs or kisses. (*Id.*) The parents showed no affection toward each other. (*Id.* at 58.)

Eventually, Alice and Charles moved the family away, with Charles explaining "I don't want you people in my life, in my business." (*Id.* at 52.) After the family moved, Hollie would send money for Christmas presents for the kids, but Charles spent the money on himself. (*Id.* at 54.)

Hollie described Charles as "absolutely sick." (*Id.* at 51.) She testified that if anyone confronted him, he would start a big fight. (*Id.*) He was a "bully." (*Id.*)

Hollie further testified that Doerr "wasn't your normal child." (*Id.* at 53–54.) He "didn't know how to mix well with other kids because he wasn't allowed to play with other children and/or with people in general." (*Id.* at 53.) Lucy and Doerr "weren't around [sic] to associate with family let alone any other people. They were just totally isolated." (*Id.* at 53–54.) Even Doerr's grandparents were not allowed to see him. (*Id.* at 54.)

Hollie testified that Doerr just wanted to be "accepted and loved." (*Id.* at 59.) He would sometimes tell lies to try to make himself look good. (*Id.*) He was "always quiet, passive." (*Id.* at 76.) Hollie never saw him act violently. (*Id.*)

Hollie testified that Doerr and Lucy were given one new outfit to wear every year. (*Id.* at 59.) Lucy was forced to dress in a plain manner, with her breasts bound. (*Id.*)

Hollie testified that Charles sexually abused Lucy. (*Id.* at 60.)

Lucy and Doerr were afraid and wanted to run away. (*Id.* at 59.) Doerr "was neglected from the time he was born till . . . he started running away." (*Id.* at 47.) He ran away from home many times, beginning at age ten, to "[g]et away from the abuse and . . . how he was made to feel." (*Id.* at 55.)

Doerr eventually began living at the ISSCS. When Hollie went to visit him there, Doerr "was just so shocked and excited that somebody was, you know, really wanted to see him." (*Id.*)

The head of the school told her that "Eugene has a lot of problems. . . . [S]ome children are born retarded and some children grow retarded, due to the environment." (*Id.* at 55–56.)

Doerr once stayed with Hollie for a month. He got along with her family, but he did not know how to interact with them and was a "loner." (*Id.* at 56.) He would laugh at "inappropriate times" and acted "different." (*Id.*)

When Hollie was asked about mental health issues in her family, she testified that Alice's sister was "referred to as afflicted" and was "definitely retarded." (*Id.* at 57.) Alice herself was "just kind of slow, different, peculiar." (*Id.*)

Hollie testified that she was surprised Doerr was able to marry and have children. She did not think he would be able to "function" at that level. (*Id.* at 53.)

Hollie testified that the abuse Doerr and his sister suffered was never reported. (*Id.* at 60.) She continued: "The abuse . . . was just so terrible that I feel like, from my heart, that the person responsible for all this ugly stuff is my brother, for the things he did. And you just can't imagine the things he put these children through." (*Id.*)

The presentencing hearing was continued until October 20, 1996, to allow time for interviews of the expert witnesses.

On October 9, 1996, defense counsel filed a Notice of Mitigating Factors, listing six mitigating circumstances: (1) cooperation with law enforcement, (2) being under the influence of alcohol at the time of the crime, (3) lack of criminal history, (4) impaired mental capacity due to organic brain damage, (5) abusive family history, and (6) low level of intelligence. (ROA 143.)

On October 16, 1996, counsel submitted a Supplement to Defendant's Sentencing Memorandum, which included interviews of Doerr's sister and parents by defense investigator Kasieta. (ROA 145, Ex. A.) Lucy described "her childhood life as hell." (*Id.* at 2.) Her father beat her and Doerr every day with a belt or open hand. (*Id.*) The children "were sent to bed for days at a time." (*Id.*) They were forced to stand in a corner "sometimes for half a day, all day or all night." (*Id.* at 3.) Doerr's parents were reluctant to be interviewed. (*See id.*, Charles Doerr Interview at 1.) They denied the most serious allegations of abuse and characterized Doerr as a "habitual liar." (*Id.* at 3.)

The presentencing hearing continued on October 21, 1996. Doerr's counsel presented the testimony of the two neuropsychologists, Drs. Blackwood and Walter.

Dr. Blackwood testified that he reviewed Dr. Tatro's evaluation, a psychological evaluation of Doerr conducted in 1976, records from the Illinois Department of Children

and Family Services ("DCFS"), records from the Maricopa County Correctional Health Services, and letters handwritten by Doerr. (RT 10/21/96 at 6–7.) Dr. Blackwood testified that his test results indicated "the presence of brain dysfunction and impaired brain" with "specific disturbance in the right spheral hemisphere." (*Id.* at 8.) He opined that the damage was caused by head injuries, alcohol abuse, and malnutrition in infancy. (*Id.* at 10–11.) He detected no evidence of malingering on Doerr's part. (*Id.* at 11.)

Dr. Blackwood described the effects of Doerr's brain impairment on his overall functioning. He testified that the impairment impacted Doerr's "emotional reactions and behavioral controls" and his ability to control his behavior and respond appropriately. (*Id.* at 12–13.) Dr. Blackwood acknowledged that a PET scan of Doerr's brain was normal, but testified that such a finding would not preclude the presence of brain damage and would not cause him to change his conclusions about Doerr's condition. (*Id.* at 13.)

On cross-examination, Dr. Blackwood admitted he was surprised when he learned that Doerr's PET scan was normal, and that the normal result could raise questions about Doerr's level of cooperation in taking the tests Dr. Blackwood administered. (*Id.* at 18-19.) He admitted that he could not draw a causal connection between Doerr's brain damage and the homicide. (*Id.* at 20.) Dr. Blackwood also testified that if in fact Doerr had mechanical aptitude and was good with his hands, as other witnesses had testified, then his poor showing on motor skills tests might have been the result of Doerr "screwing around." (*Id.* at 23–24.) Dr. Blackwood testified that Doerr's IQ was 80, which placed him around the lowest 10th percentile, or the low end of the low average range. (*Id.* at 25–26.)

On redirect examination, Dr. Blackwood explained that he could not "quantify" a causal connection between Doerr's brain damage and the crime, but that did not mean such a connection was absent. (*Id.* at 28.) He reiterated that Doerr's brain damage would "disrupt" his ability to control his behavior. (*Id.* at 28–29.)

Dr. Walter testified next. He did not perform any testing or evaluate Doerr, but acted as a consultant, reviewing the prior neuropsychological exams and raw data, the "psychological histories" from the ISSCS, hospital records related to an automobile

accident Doerr was involved in, and the social history prepared by Holly Wake. (*Id.* at 33-34, 70–71.) Dr. Walter concluded that Doerr's "brain damage," "psychological disturbances," and "personality problems" contributed to the offense. (*Id.* at 35.)

Dr. Walter testified about the likely risk factors that contributed to Doerr's brain damage, including the physical abuse of his mother while Doerr was in utero, childhood abuse, malnourishment, neglect, deprivation, a learning disorder, early and ongoing heavy drinking, and head injuries, including injuries from two serious motor vehicle accidents. (*Id.* at 35, 39–40.) He also testified that the "very bizarre and cruel way" Doerr was raised likely contributed to his inappropriate affect and his inability to control his behavior. (*Id.* at 35–36.)

Dr. Blackwood testified that Doerr was "left essentially to rot in his crib when he was a baby. He wasn't changed. He wasn't bathed." (*Id.*) He testified that Doerr was "beaten for minor infractions" and "ridiculed throughout his childhood by his father. He was not given attention . . . certainly not by his father and denied affection by his mother. As a result, he developed a totally skewed sense of how to relate to people." (*Id.* at 36.) Doerr was "abused as a child, nutritionally malnourished, and deprived as a child, suffering a learning disorder, [and] had probably been a heavy drinker for many years." (*Id.* at 35)

Dr. Walter opined that Doerr's right-hemisphere brain damage might have caused him to disassociate once he attacked the victim and that he might not have been "really aware" that he was actually killing her. (*Id.* at 37–38). He testified that Doerr's upbringing and brain damage could have "triggered a rage," adding that people with right-hemisphere brain damage tend to have a "higher degree of interpersonal violence." (*Id.* at 38.) Such individuals also "have a great difficulty starting and stopping their behavior." (*Id.* at 42.) The right-hemisphere damage, combined with alcohol use, would impair Doerr's ability to control his behavior. (*Id.* at 39.) Individuals with right-hemisphere brain damage also have difficulty learning from experience and reading social cues. (*Id.* at 41–42.) Dr. Walter again opined that during the offense Doerr might have experienced a "rage reaction" followed

by disassociation, which would account for his amnesia. (*Id.* at 43–45.) Dr. Walter believed that Doerr's brain damage was a "contributing factor" in the victim's death. (*Id.* at 70.)

On cross examination, Dr. Walter acknowledged that he did not review crime scene photographs, police reports, the autopsy report, or any of Doerr's statements to the police. (*Id.* at 50–51.) He testified that the PET scan showed Doerr's brain was not abnormal. (*Id.* at 52–53.) Dr. Walter agreed that there was nothing in the hospital records showing that Doerr suffered a head injury in one of his car accidents, and that information about the other accident was based solely on Doerr's own statements. (*Id.* at 61–62.)

The State then called Doerr's mitigation specialist, Holly Wake. The prosecutor questioned her about what aggravating factors she found. Wake replied: "that the victim suffered terribly. It was over a long period of time. Her body was mutilated. We don't know at what point she died, before or after. It was—she died in a very cruel manner." (*Id.* at 77-78) Wake also acknowledged that she did not personally contact Doerr's parents or sister, and that her report did not contain the negative information provided by Doerr's ex-wives. (*Id.* at 79–82.)

On the final day of the presentencing hearing, November 18, 1996, the State presented rebuttal testimony from Dr. James Youngjohn, a clinical neuropsychologist. Dr. Youngjohn evaluated Doerr, conducted tests, reviewed records, and prepared a report. (RT 11/18/96 at 6–7.) He opined that Doerr had a history of only minor head injuries. (*Id.* at 8.) He also testified that Doerr did not appear to be putting forth his best efforts in taking the tests, and that Doerr's scores suggested he was "attempting to exaggerate or feign psychiatric disturbance." (*Id.* at 11, 17.) Dr. Youngjohn testified that Doerr's good mechanical aptitude, temper control, and patience in learning new things suggested that he was not brain impaired. (*Id.* at 22.)

According to Dr. Youngjohn, a PET scan is a "very sensitive measure of both brain structure and function." (*Id.* at 22.) Doerr's normal PET scan further demonstrated that he did not have brain damage. (*Id.*) Instead, Dr. Youngjohn diagnosed Doerr with a

psychopathic personality. (*Id.*) Dr. Youngjohn acknowledged that Doerr suffered from a learning disability. (*Id.* at 34–35.)

On cross-examination, Dr. Youngjohn admitted that he was the subject of nine professional complaints by other neuropsychologists and that a frequent subject of the complaints was his readiness to find that a test subject had malingered. (*Id.*)

Prior to Dr. Youngjohn's testimony, in lieu of additional testimony, defense counsel submitted reports from Drs. Blackwood and Walters responding to Dr. Youngjohn's report, and a letter from Dr. Joseph Heiserman rebutting Dr. Youngjohn's opinion about Doerr's PET scan results. (Doc. 168, Ex. 63.)

Dr. Blackwood agreed with Dr. Youngjohn that Doerr's test results were "likely influenced by motivation and psychiatric factors" but reiterated that "Doerr's original test performance in my opinion was clear demonstration of impaired brain function even in the presence of such obvious non-neurogenic factors." (*Id.*, "Ex. A" at 1.) He again concluded that "there is in fact most probably an impairment in the functioning of Mr. Doerr's brain." (*Id.*) Dr. Blackwood also noted his disagreement with Dr. Youngjohn's opinion that the negative PET scan was "conclusive evidence of the absence of brain damage." (*Id.*)

Dr. Walter challenged Dr. Youngjohn's opinion that Doerr's test results demonstrated malingering or lack of cooperation, noting that visual and attention problems, as well as psychological factors, could have accounted for Doerr's performance. (*Id.*, "Ex. B" at 1.) He opined that "Dr. Blackwood's interpretation of the results was accurate in that Mr. Doerr's behavior and test performance suggested cerebral dysfunction." (*Id.*) Dr. Walter suggested that Dr. Youngjohn's findings indicated that Doerr's "brain damage is more diffuse than was originally suspected." (*Id.*) He challenged as factually unsupported Dr. Youngjohn's opinion that Doerr suffered only minor or mild head injuries in the two reported automobile accidents. (*Id.* at 2.) Dr. Walter again explained that he saw "little indicating lack of cooperation" on Doerr's part, seeing instead "levels of performance which would be expected from someone with a deficit in attention." (*Id.*) He noted that Dr. Youngjohn "[f]or some unexplained reason . . . did not administer many of the tests

most sensitive to brain damage" and explained that the test "most sensitive to brain damage" showed "marked impairment." (*Id.*) Dr. Walter categorized the examination Dr. Youngjohn conducted as a psychological rather than a neuropsychological evaluation. (*Id.*)

Dr. Walter also disputed Dr. Youngjohn's scoring of Doerr on a test designed to measure psychopathy. (*Id.* at 3.) Unlike Dr. Youngjohn, Dr. Walter did not find that Doerr met the criteria for a psychopathic personality. (*Id.*)

Finally, Dr. Walter called into question Dr. Youngjohn's opinion that the lack of a positive PET scan "is highly suggestive that the defendant does not have any sort of brain damage." (*Id.*) Dr. Walter explained that there were insufficient data regarding a PET scan's ability to detect the presence of brain damage and that the accuracy of the scan can be affected by the manner in which it is administered. (*Id.*)

Dr. Walter concluded that after reviewing Dr. Youngjohn's report, his opinion changed from finding that Doerr had "focal right frontal brain damage" to a finding that Doerr's brain damage was "diffuse." (*Id.*)

Dr. Heiserman wrote to defense counsel that he did not "believe that a normal PET scan can be taken as absolute proof of the absence of acquired brain damage." (*Id.*, "Ex C.") He explained that "subtle lesions" or a "diffuse abnormality" might not be detected by a PET scan. (*Id.*)

At the conclusion of the presentencing hearing, defense counsel submitted a response to the State's sentencing memorandum. (Doc. 168, Ex. 5.) The memo argued in support of the six mitigating circumstances noticed prior to the hearing, including Doerr's impaired mental capacity, abusive family background, and low IQ. (*Id.*) Counsel argued that Doerr suffered from organic brain damage as found by Drs. Tatro, Blackwood, and Walter, and challenged Dr. Youngjohn's contrary opinion. (*Id.* at 4–6.)

On November 27, 1996, the trial court issued its special verdict. (Doc. 174-3, Ex. G.) First, the court found that the State had proved that the murder was especially cruel and especially heinous and depraved under § 13–703(F)(6). (*Id.* at 2–6.) In determining that the

murder was heinous and depraved, the court found, in part, that Doerr relished the murder as indicated by Victor Rosales's testimony that Doerr "played with" the victim's blood. (*Id.* at 5–6.)

The court then addressed the mitigation circumstances, starting with the statutory mitigating circumstance set forth in § 13–703(G)(1), which the court found Doerr had failed to prove. *Id.* at 6. The court explained:

> While there was evidence presented that shows the defendant may have been drinking the evening of the murder, there was no evidence presented, except through the defendant himself as to the extent of the drinking. The only objective evidence was that the defendant at the time of the blood alcohol test showed no sign of alcohol or drugs in his system.
>
> It is possible the alcohol may have dissipated but the Court notes that each officer who came in contact with the defendant that day testified that he was coherent and did not smell of alcohol.
>
> The Court has also considered the defendant's low level intelligence as to the statutory mitigating circumstance, but does not find the defendant's low IQ to have impaired in any way his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. While the defendant has an IQ in the low average range, he is not retarded. As his employer testified, he is very adept mechanically, learns quickly and is a good worker.
>
> The Court notes that the defendant, during the violent attack on Karen Bohl, made numerous decisions. As Dr. Walter even testified, the more decisions one makes, the less likely one is to be out of control. The defendant consciously decided to use a knife to cut off the victim's nipple and to make cuts above the other nipple. He used one object to forcefully tear the victim's vaginal area, and then another to forcefully tear her rectal area. He had to have removed his clothes, as evidenced by the victim's dried blood around his pelvic area.
>
> As to the evidence produced of organic brain damage, there was a conflict between Drs. Tatro, Blackwood and Walter on the one hand, and Dr. Youngjohn on the other. The Court finds that the opinions of Drs. Tatro, Blackwood and Walter were speculative and do not prove by a preponderance of the evidence that there was brain damage which significantly impaired defendant's capacity to appreciate the wrongfulness of the conduct or to conform the conduct to the requirements of law.
>
> Even if there were impaired brain function, despite the PETSCAN test findings, the court finds the defendant has not proven by a preponderance of the evidence that it would be anything more than minimal impairment and that it would not have <u>significantly</u> impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.
>
> In addition, defendant has failed to prove by a preponderance of the evidence that there was any causal connection between any brain damage and the murder of Karen Bohl. Even Dr. Walter testified that he couldn't say that the

defendant probably was in a rage reaction just that there was a strong likelihood. The testimony and reports of the defendant's neuropsychological experts were fraught with conjecture.

(*Id.* at 6–7) (emphasis in original).

With respect to Doerr's nonstatutory mitigating evidence, the court first found "that defendant has proven by a preponderance of the evidence that he had an abusive family history" and came from "a seriously dysfunctional unloving family and had a very abusive father." (*Id.* at 10.) The court concluded, however, that "[w]hile a mitigating circumstance, the court gives it little weight, since there has been no causal connection or nexus shown between defendant's family history and the murder of Karen Bohl" and "[o]ver twenty years has elapsed between the defendant's abuse and neglect from his father and the murder." (*Id.*)

The court next found that "defendant proved by a preponderance of the evidence that he is an alcoholic, but . . . did not prove any causal connection between the murder and his alcoholism. . . . The court finds that defendant's alcoholism is not a mitigating circumstance under the facts of this case." (*Id.*) The court also stated that Doerr's self-reported drinking at the time of the crime "has been given very little weight." (*Id.*)

Next, the court found that "[w]hile defendant has a low IQ, he has failed to prove that has any causal connection to Karen Bohl's murder." (*Id.* at 11.)

Finally, the court determined that "[e]ven if defendant had some brain damage, . . . it would be minimal and would not have affected his ability to control his actions." (*Id.*)

The court concluded:

The mitigating circumstance found by the Court of the abusive and dysfunctional childhood is not sufficiently substantial to outweigh the aggravating circumstances of the cruelty, heinousness or depravity of Karen Bohl's murder and to call for leniency.

In fact, even if this Court were to consider every one of the factors proposed by the defendant as a mitigating circumstance, when balanced against the especially cruel, heinous or depraved manner in which the defendant murdered Karen Bohl, those mitigating circumstances, given minimal weight, would not be sufficiently substantial to call for leniency. This murder clearly is above the norm for first degree murder.

(*Id.* at 11–12.)

2.    Appeal

On direct review, the Arizona Supreme Court affirmed the trial court's findings with respect to the aggravating factor and mitigating circumstances. *Doerr*, 193 Ariz. at 67–71, 969 P.2d at 1179–1183. As to the latter, the court first discussed the (G)(1) statutory mitigating circumstance. The court addressed Doerr's argument that the trial court improperly rejected the opinions of Drs. Tatro, Blackwood, and Walter in favor of Dr. Youngjohn's contrary opinion:

> Defense counsel overstates the testimony of his witnesses. The trial judge found, according to his special verdict, that the opinions of Doctors Blackwood, Walter, and Tatro were "speculative," and our review of the record supports this assessment. Dr. Walter, a clinical neuropsychologist, performed no tests, made no independent evaluation of the defendant, and prepared no report. Instead, he relied on the reports of Tatro, Blackwood, and defense investigator Holly Wake, along with other available documentation. Walter postulated, among other things, that the defendant could have incurred brain damage as a result of injuries suffered in utero. During cross-examination, however, he admitted that there was no factual basis for such a theory. "I am not saying this happened definitely but this, I think, could quite likely have been one of the causes, one of the many factors resulting in his brain damage. I can't say for sure that it occurred." Further questioning about other "factors" raised by Dr. Walter produced similar concessions. Although he testified to his belief that brain damage, if it existed, would likely have affected the defendant's behavior, Dr. Walter admitted that it also might not have had any effect.

> Dr. Blackwood conducted psychological tests that indicated to him the presence of brain damage. He was surprised by the results of a PETSCAN, which was negative for such damage, but that did not alter his conclusion. During cross-examination, Blackwood admitted that he found no causal connection between the suspected defect and the murder. He also stated that "[w]ith a longer series of decisions being involved, then the likelihood increases that at some point the person is not acting because of brain damage."

> The defense failed to establish that brain damage impaired Doerr's capacity to control his conduct. In fact, extensive evidence was presented to the contrary. His friend, employer, and co-worker each testified that the defendant was a good worker, had a strong mechanical aptitude, and quickly grasped new tasks despite poor reading and writing skills.

*Id.* at 68–69, 969 P.2d at 1180–81 (citations omitted). The court agreed with the trial court that Doerr failed to prove that organic brain damage impaired his capacity under § 13–703(G)(1).

The court then turned to Doerr's nonstatutory mitigating evidence. The court agreed with the trial court that Doerr's cooperation with the police, whom he called on the morning after the murder, was entitled to little if any mitigating weight. *Id.* at 69–70, 969 P.2d at 1181–82. The court also agreed that Doerr's lack of a felony record was entitled to no mitigating weight. *Id.* at 70, 969 P.2d at 1182.

The court turned to the remaining mitigating circumstances, beginning with Doerr's traumatic childhood:

> Defense counsel claims that, because of an abusive childhood, the defendant left home at a young age and "was still functioning as a child at the time these events occurred." A difficult family background is not mitigating in the absence of "some connection with the defendant's offense-related conduct." . . . This burden is heightened for adult offenders because of their increased level of personal responsibility. . . .
>
> No direct evidence was presented at the mitigation hearing to support a causal connection between the defendant's abusive childhood and the murder. Even the psychological witnesses admitted that they could not confirm such a nexus. Three of Doerr's acquaintances, including a long-time friend, his employer, and a co-worker, testified that the defendant was a good worker and maintained social relationships. Moreover, the defendant left home in his early teens and had little, if any, contact with his family for nearly twenty years. While the judge found that the defense had established an abusive family history and dysfunctional childhood by a preponderance of the evidence, he correctly gave these circumstances minimal weight.

*Id.* (citations omitted).

The court then agreed with the trial judge that Doerr had failed to prove he was impaired by alcohol when he committed the murder. *Id.* at 70–71, 969 P.2d at 1182–83. Next, the court agreed that Doerr's low IQ was not a mitigating circumstance because it bore no connection to the crime. *Id.* at 71, 969 P.2d at 1183.

Finally, the court considered Doerr's claim that his "severe organic brain damage" and low IQ were impairments that should have been given weight as a nonstatutory mitigating circumstance. *Id.* The court again found that the defense "overstated" the experts' findings with respect to the impairment and any connection to the murder:

> Dr. Blackwood said that the tests at most "pointed to the presence of brain dysfunction and impaired brain." He admitted that he was surprised by the negative PETSCAN, although it did not cause him to change his conclusions. On cross-examination, Blackwood said he found no causal connection between Doerr's possible brain damage and the homicide. Dr. Walter, who did not conduct tests on the defendant but merely reviewed the other experts'

reports, also admitted that he could not connect the brain damage to the murder. . . .

Defendant's third expert, Dr. Tatro, a clinical psychologist, did not testify at trial or during the presentence hearing, but prepared a written report for the public defender a year before trial. He concluded that Doerr "is a seriously disturbed individual as a consequence of organic brain damage." He observed that "[i]n all likelihood, [Doerr] was both seriously out of touch with that part of his personality that normally considers consequences and out of control of his impulses." Tatro, however, did not directly address whether the defendant's brain damage impaired his capacity to know right from wrong on the night of the murder.

The state's expert, Dr. Youngjohn, testified that the medical records showed no evidence of brain damage. He also said that the results of the neuropsychological testing suggested that the defendant was not fully cooperating. Youngjohn observed that Doerr's mechanical aptitude, non-verbal test performance, and grip strength contradicted the alleged damage to his right spheral hemisphere. Under these circumstances, we agree with the trial judge that the defendant failed to establish mental impairment as a nonstatutory mitigator.

*Id.* (citations omitted).

Independently reweighing the aggravating factor and the mitigating circumstances, the court concluded that "the trial court properly found the heinous, cruel or depraved aggravator, and that the mitigating circumstances were insufficient to call for leniency." *Id.* at 72, 969 P.2d at 1184.

### 3.    PCR proceedings

The Arizona Supreme Court appointed Treasure VanDreumel to represent Doerr in his PCR proceedings.

VanDreumel performed no investigation and never met with Doerr. She filed a PCR petition on September 29, 2000, raising the following claims: (1) ineffective assistance of counsel at trial; (2) ineffective assistance of trial and appellate counsel; and (3) the State's failure to timely collect biological evidence from Doerr violated his due process rights. (Doc. 174, Ex. A.) The petition did not include a claim that trial counsel performed ineffectively at sentencing. (*Id.*)

On June 21, 2001, the PCR court denied the petition without an evidentiary hearing.[8] (Doc. 174-1, Ex. B.) The court found that Doerr's claim of ineffective assistance of counsel

---

[8] Maricopa County Superior Court Judge Ronald S. Reinstein presided over both the trial and the PCR proceedings.

at the guilt phase of trial "could not be further from the truth. Trial counsel did an excellent job in difficult circumstances." (*Id.* at 2.) The court went on to discuss the mental health evidence:

> Finally, the court notes that the defendant's propounded psychological defense is based solely on speculation, conjecture, and guesswork. As the Supreme Court pointed out in the Opinion in this case as to the mitigating factors, the defense overstated the testimony of its witnesses. Dr. Walter admitted that he didn't independently evaluate the defendant, and his testimony was equivocal at best. All of the defense experts at sentencing attempted to gloss over the results of the PETSCAN, which the defendant ordered and which showed no evidence of brain damage. All of them relied heavily on the defendant's own self-serving statements.

(*Id.* at 3–4.) The Arizona Supreme Court denied review on March 19, 2002. (ROA 12.)

### 4. Federal habeas proceedings

In Claim 28 of his habeas petition, Doerr alleged that his rights were violated by counsel's ineffective performance at the sentencing phase of trial. (Doc. 82 at 161.) Specifically, Doerr faulted counsel for not retaining a neurologist "to substantiate the claims of brain damage" and "a psychiatrist who, as a medical doctor, would have provided more information on the exact nature of Doerr's psychiatric problems as well as what happened the night of the crime." (*Id.* at 177–78.) Doerr contended that while counsel did present expert testimony, they failed to "provide expert witnesses with materials they needed to provide an accurate profile of Doerr's mental health." (*Id.* at 176.) Doerr also cited as ineffective performance counsel's failure to rebut the testimony of Victor Rosales. (*Id.* at 179.) Finally, he criticized Holly Wake, the mitigation specialist, for failing to compile a complete social history. (*Id.* at 175, 181.)

As already noted, Doerr did not raise this claim in state court, and the Court found it procedurally defaulted and barred from federal review. (Doc. 132 at 14–15.) That ruling, however, was made before the United States Supreme Court issued its opinion in *Martinez*.

In support of the claim, Doerr has attached a set of exhibits to his supplemental *Martinez* brief.[9] As discussed next, these exhibits include evaluations from a new set of medical and mental health experts; school records and the complete records from the

---

[9] There are 68 exhibits, totaling more than 2000 pages. (*See* Docs. 167-1, 179-1.)

DCFS; declarations of lay witnesses, including Doerr's sister and ex-wives; declarations and documents concerning Victor Rosales; and declarations from members of the defense team.[10] (*See* Docs. 167-1, 179-1.) For the purpose of its analysis under *Martinez*, the Court will accept as true the information set forth in the expert reports and the witness declarations.

### a.  Experts

Doerr offers the report of Dr. Pamela Blake, a neurologist from Georgetown University. (Doc. 167-1, Ex. 1.) In her report, dated January 15, 2003, Dr. Blake diagnoses Doerr with frontal lobe impairment, probable dissociative disorder, a history of prolonged childhood traumatization, dyslexia, and migraine headaches. (*Id.* at 9.) Dr. Blake describes the results of Doerr's neurological examination as "very abnormal." (*Id.* at 8.) She found frontal lobe impairment, which leads to distractibility, impulsivity, lack of guilt or shame, poor planning skills, and an inability to regulate behavior. (*Id.*) She opines that the etiology of Doerr's impairment consists of a genetic component and "profound childhood maltreatment." (*Id.* at 8–9.) She also opines that Doerr's behavior immediately following the crime, as well as his poor memory and recall, "is strongly suggestive of dissociation." (*Id.* at 9.)

Doerr next offers the report of Dr. Dorothy Lewis, a psychiatrist from Yale University. (Doc. 167-1, Ex. 2.). In the report, dated March 8, 2004, Dr. Lewis diagnoses Doerr with a "complex parasomnia," "a physiologic brain disorder characterized by abnormal electrical activity in the brain, especially during sleep, which causes individuals to behave in ways that appear to be conscious and volitional, but which actually occur during sleep states." (*Id.* at 3.) Dr. Lewis detected signs of abnormal activity in the right temporal-parietal regions and the central cortex "consistent with seizure activity." (*Id.*) These "electrical abnormalities of the brain . . . are intensified during sleep, causing

---

[10] Doerr has also submitted a declaration from attorney Larry Hammond who opined that counsel's performance fell below the standard of care required by *Strickland* at the time of Doerr's trial. (Doc. 167-4, Ex. 53.) The Court has taken Hammond's opinion into account but does not view it as dispositive. *Cf. LaGrand v. Stewart*, 133 F.3d 1253, 1270 n.8 (9th Cir. 1998) (holding that *Strickland* does not require that expert testimony of outside attorneys be used to determine the appropriate standard of care).

aberrant, sometime[s] . . . violent acts for which [Doerr's] memory is clouded or absent." (*Id.* at 21.) The "epileptiform nature" of Doerr's disorder was documented in a QEEG performed by another neuropsychologist, Dr. Ricardo Weinstein. (Doc. 167-1, Ex. 2 at 22.) Dr. Lewis opines that Doerr was in an "altered state of consciousness both at the time of the offense and even afterward when he called his boss and the police." (*Id.* at 23, 28.) According to Dr. Lewis, the parasomnia diagnosis was available in 1996. (*Id.* at 28–29.) Dr. Lewis also opines that Doerr should have been examined by a neurologist and a psychiatrist, and that an EEG would have been a more helpful procedure than a PET scan, which is not used to diagnose a seizure disorder. (*Id.* at 31.) Dr. Lewis concludes that Doerr suffers from abnormal brain functioning as characterized by parasomnias, seizure disorder, and manifestations of a bipolar mood disorder. (*Id.* at 37.) According to Dr. Lewis, Doerr's mood and sleep disorders were "documented in three previous generations." (*Id.* at 7.)

Doerr offers a letter written by Dr. George Woods, a neuropsychiatrist from California. (Doc. 167-1, Ex. 4.) In the letter, dated September 25, 2015, Dr. Woods writes that Doerr suffers from "significant brain injury" as captured in neuropsychological testing. (*Id.*) He states that the injury was not revealed by the PET scan, which does not capture the electrical activity of the brain. (*Id.*) He writes that Doerr has a "history consistent with neurobehavorial patterns that emanate from electrical abnormalities of the brain as well as other cognitive deficits" and a "history of mental states . . . that are consistent with seizure activity," including "sleep walking and sleep eating . . . as well as inappropriate laughter, unexplained rage reactions and times when he was nonresponsive while appearing to be awake." (*Id.*) Dr. Wood further opines that Doerr suffers from "mild intellectual disability." (*Id.*) He recommends a "multi-lead, sleep-deprived Electroencephalogram" and a complete neuropsychiatric exam. (*Id.*) According to Dr. Woods, the "intellectual deficits in [Doerr's] family" and the "presence of epilepsy and emotional (mood) disorders" are intergenerational. (*Id.*)

Doerr next offers an evaluation conducted by Dr. Nell Riley, a neuropsychologist from California. (Doc. 167-2, Ex. 5.) In the evaluation, dated August 16, 2004, Dr. Riley

diagnoses Doerr with cognitive disorder not otherwise specified (NOS), including "marked deficits in multiple areas of neuropsychological function." (*Id.* at 12.) Dr. Riley found "multiple indications of brain dysfunction" and determined that Doerr's IQ was at the low end of average. (*Id.* at 16.) She notes that multiple members of Doerr's family suffered from mental retardation, learning disabilities, and severe psychiatric illness, indicating a "genetic contribution" to Doerr's deficits. (*Id.*) Dr. Riley also describes traumatic brain injury from "minor motor vehicle accidents" in which Doerr was involved. (*Id.*) She states that Dr. Blackwood, the neuropsychologist who examined Doerr and testified at the presentencing hearing, had "little information regarding Doerr's abnormal developmental history and extensive family history of psychiatric disorders and mental deficiency." (*Id.*) Dr. Riley also critiques Dr. Youngjohn, the State's expert witness, finding that his evaluation "appeared to be aimed not toward presenting a balanced picture of Doerr's cognitive strengths and weaknesses, but rather in proving that Doerr was a malingerer." (*Id.*) She also opines that Dr. Youngjohn erroneously interpreted test data and overstated some findings. (*Id.*)

Doerr offers a letter written by Dr. Robert Heilbronner, a neuropsychologist from Chicago. (Doc. 167-2, Ex. 6.) In the letter, dated September 20, 2015, Dr. Heilbronner states that he reviewed the reports of other experts, including Dr. Youngjohn's report and opinion that Doerr malingered. (*Id.* at 1.) Dr. Heilbronner opines that Dr. Youngjohn's methodology was improper and that many of his conclusions were a product of confirmatory bias. (*Id.* at 10.) According to Dr. Heilbronner, Dr. Youngjohn's interpretation of test data was faulty and he failed to include tests that were sensitive to brain dysfunction. (*Id.* at 4.) Dr. Heilbronner also opines that Doerr's verbal learning disability could have affected his test performance. (*Id.* at 7.)

Doerr next offers a declaration by Dr. Kevin McGrew, an educational psychologist from Minnesota. (Doc. 167-2, Ex. 7.) In the declaration, dated September 23, 2015, Dr. McGrew states that he had reviewed the six available IQ tests administered to Doerr. He concludes that Doerr's IQ scores "meet or approximate the two standard deviations

below the mean IQ diagnostic score range" and that "a complete clinical evaluation, including consideration of adaptive behavior, must be made in order to determine whether [Doerr] meets criteria for a diagnosis of intellectual disability."[11] (*Id.* at 22.)

Finally, Doerr offers a declaration by Dr. Dennis William Keyes, an educational psychologist from South Carolina. (Doc. 167-2, Ex. 8.) In his declaration, dated January 31, 2003, Dr. Keyes finds that Doerr is "functionally illiterate" and "severely limited in his ability to read and comprehend most written information, or to successfully produce any complex written statements." (*Id.*, ¶¶ 6, 8.) Dr. Keyes opines that it would be "virtually impossible for [Doerr] to read/comprehend complex legal pleadings and correspondence from his attorneys without significant levels of assistance." (*Id.*, ¶ 10.)

###### b. *Records*

Doerr offers school records and his DCFS file. (Doc. 167-2, Ex's. 9–13.) As noted below, defense counsel had obtained some of the latter documents but not Doerr's school records.

The DCFS records reveal Doerr's educational difficulties and detail his dysfunctional home-life, most notably his relationship with his hostile, violent, and disturbed father. DCFS took guardianship of Doerr at around age sixteen after his repeated attempts to run away from home. He was placed in a state-run orphanage, the ISSCS.

The records show that in 1973, when Doerr was in eighth grade, he was referred for a psychological evaluation to determine his eligibility for Educable Mentally Handicapped ("EMH") classes. (Doc. 167-2, Ex. 9 at 1.) Trial counsel had access to this document, and Wake referred to it and attached it as an exhibit to her social history. (ROA 134, Wake's Social History, Ex. D.)

---

[11] Doerr attached to his reply brief a declaration from Dr. Alan S. Kauffman, a professor of psychiatry at Yale. (Doc. 179-1, Ex. 68.) Dr. Kauffman opines that Doerr "qualifies as an individual with an intellectual disability" under the standard of *Hall v. Florida*, 572 U.S. 701, based on his IQ, significantly sub-average adaptive behavior, and the early onset of the disability. (*Id.* at 1.)

During that evaluation, Doerr's full-scale IQ was measured at 76. (Doc. 167-2, Ex. 9 at 1.) His teacher reported that Doerr was functioning far below grade level with a "rather severe deficit in reading skills." (*Id.*) He was reading at a second grade level and could do arithmetic only at a fourth grade level. (*Id.* at 2.) He had repeated first grade. (*Id.* at 1.) He was reported to have experienced nocturnal enuresis until age eight and a half. (*Id.*)

The evaluator noted that Doerr's performance had declined since his last evaluation but did not feel this was the result of a deterioration of Doerr's abilities, but rather that he had become "stagnant" in his "intellectual, emotional, social, and educational development." (*Id.* at 2.) Doerr had a "poor self concept," had trouble fitting in socially, and felt other children were "making fun of him." (*Id.* at 1.) He was reported to have "deficits" in recall and memory. (*Id.* at 2.) The examiner noted that while Doerr "does not appear to be a genuinely retarded youngster, he certainly is functioning as such at the present time." (*Id.* at 2.) Doerr was found eligible for EMH. (*Id.*)

In October 1975, at age fifteen, an "apparently somewhat disturbed" Doerr arrived at the DCFS office using a false name and claiming that his parents were dead. (*Id.* at 6.) DCFS learned his true identity and reported him to his father. (*Id.*) Doerr became upset and described his father as "a very violent person, usually armed, and willing to shoot him for running away." (*Id.* at 6–7.) When his father arrived, Doerr began to cry. (*Id.* at 8.) DCFS staff released Doerr to his father with the proviso that "we don't want that kid hit tonight." (*Id.* at 7–8.) Noting that the father seemed "rather threatening and violent in manner," a caseworker concluded that "we probably erred in letting Eugene be taken back by the father and mother."[12] (*Id.* at 9.)

In December 1975, DCFS took custody of Doerr and placed him in special education programs at ISSCS. (*Id.* at 10.) Doerr was found to be a neglected minor—"namely: that [he] is mentally retarded and in need of special education" and that his father had "deprived [him] of special education by withdrawing [him] from the Education for the

---

[12] On the DCFS paperwork, this caseworker's name is printed variously as "David M." or "Mike" "Reed" or "Peed." He has submitted a declaration under the name David M. Reed. (Doc. 167-3, Ex. 43.)

Mentally Handicapped Program." (*Id.* at 14.) His caseworker noted that Doerr had a "low IQ" and "could well be a child abuse victim." (*Id.* at 18.) He also noted that Doerr reported extreme isolation during his childhood, "a pattern of serious conflict with his father," and "violence at school and at home." (*Id.*) He wrote that Doerr's father "seems quite disturbed" and noted that Doerr reported "some bizarre occurrences in his childhood." (*Id.*)

The caseworker reported a phone conversation with Doerr's father who stated that withdrawing Doerr from the EMH program was a "family matter" and threatened to call the sheriff if anyone from DCFS showed up on his property. (*Id.* at 19–20.) The caseworker described Doerr's father as "very suspicious" and "rather threatening." (*Id.*) The next day Doerr and his father met with the caseworker. Doerr's father said he "loved the boy" but stated he is "beyond us" and "all yours now." (*Id.* at 21.) He told the caseworker to take Doerr "far away, 'cause if I ever saw him again, I wouldn't take it.'" (*Id.*) He then left the office. (*Id.*) Doerr was "a little scared." (*Id.* at 22.) He said that his father would hire a private detective to "find him and kill him." (*Id.*)

Doerr's caseworker recounted a conversation with Doerr where Doerr spoke about violent incidents in his life, including a knife fight with his father at age eight. (*Id.* at 25.) Doerr said his father frequently hit him. (*Id.*) He also told the caseworker that on long car rides his father would slap him in the face—apparently to keep him awake, out of a "extreme fear of carbon monoxide" poisoning. (*Id.* at 26.) According to Doerr, his family was very isolated and lived without a visitor for seven years. (*Id.*) Doerr told the caseworker his only friend was a big tree in the yard. When his father found out he communicated with the tree, he called Doerr crazy and chopped the tree down. (*Id.*) The caseworker noted that Doerr "seems to be possibly quite disturbed" and his family was "quite ill too." (*Id.*)

In January 1976, Doerr's paternal aunt heard that DCFS intended to return him to his parents. She called the department expressing her concern and explaining that Doerr's parents "had been real mean to their kids"—for example, making Doerr stand in a corner for six hours without food. (*Id.* at 32.) She asked the caseworker not to tell Doerr's father

that she had called. (*Id.* at 33.) The caseworker noted that this was "[f]urther evidence that Eugene came from an abusive & possible psychotic home." (*Id.*)

During an evaluation by a school psychologist in April 1976, when Doerr was sixteen, he stated that he was afraid of his father and was never close to him, and that "[w]hen I was raised I had the shit kicked out of me." (*Id.* at 35.) He told the examiner that he had been arrested numerous times for things like stealing, vandalism, and running away from home. (*Id.*) He had a "quick" temper and had been involved in numerous knife fights. (*Id.*) He described six fainting episodes that he said resulted from "starvation." (*Id.*) He told the evaluator that he was "mostly a loner" with no close friends or hobbies. (*Id.*) Trial counsel had access to this document and Wake referred to it and attached it as an exhibit to her social history. (ROA 134, Wake's Social History, Ex. K.)

During this evaluation an IQ test was performed resulting in a full-scale score of 83, placing Doerr in the thirteenth percentile. (*Id.* at 35–36.) Doerr was still reading at a second grade level and doing arithmetic at a fourth grade level. (*Id.* at 36.) Test results revealed Doerr as "a poorly motivated and poorly disciplined, emotionally immature and labile, socially rather insensitive, chronically frustrated and extremely manipulative individual whose self concept is minimally developed. . . ." (*Id.*) The evaluator noted that Doerr was "raised in a very mal-adaptive environment." (*Id.*) He described Doerr as an "overly defensive adolescent boy of limited intellectual development . . . whose basic academic skills [were] seriously retarded" and found that he qualified for special education. (*Id.*) He opined, however, that Doerr needed "to be in a more secure and therapeutic setting than ISSCS can provide." (*Id.*)

In January 1977, Doerr's maternal grandmother, Alice Hohmann, expressed an interest in taking him in, but changed her mind after Doerr's father "called her and explicitly told her not to take Eugene, unless she wanted to cause family problems." (Doc. 167-2, Ex. 9 at 70.) Doerr told his caseworker that he was also concerned for his sister and wanted "to get her out." (*Id.* at 74–75.)

In June 1977, Doerr decided that he wanted to join the army. (*Id.* at 85.) The caseworker wondered whether Doerr could "really pass those tests?" (*Id.* at 86.) Doerr "flunked" the tests and remained at ISSCS. (*Id.* at 88.)

In November 1977, Doerr was returned to his parents' home. (*Id.* at 100.) In a memo from December 1977, the ISSCS Superintendent wrote that the "key to success or failure seems to lie in the student/father relationship, so much depends on the efforts and patience of these individuals, the prognosis at this time, at best, is guarded." (*Id.* at 110.) Trial counsel had access to this document and Wake referred to it and attached it as an exhibit to her social history. (ROA 134, Wake's Social History, Ex. I.)

Doerr's school records show that he scored mostly Ds in elementary school and junior high school, with mixture of grades from Ds to As in high school. (Doc. 167-2, Ex's 10–13.)

### c.     *Lay witnesses*

Doerr offers declarations from nine lay witnesses, including three of the witnesses who testified at the presentencing hearing. Two of those witnesses—Hallie Terry and Bruce Forsythe—attest that the defense team did not prepare them for their testimony and failed to inform them about the nature and importance of mitigating evidence.

In her declaration, dated May 20, 2003, Hallie Terry indicates that she was contacted by the defense investigator only after Doerr had been convicted. (Doc. 167-3, Ex. 38, ¶ 3.) She never spoke with defense counsel but gave a statement to mitigation specialist Wake. (*Id.*, ¶¶ 2–3.) She states in her declaration that her family has a history of mood disorders. Her mother suffered from severe depression and Terry herself has depression and bipolar disorder. (*Id.*, ¶¶ 12–13.) Her children also suffer from mood disorders. (*Id.* ¶¶ 15–16.) Alcoholism is also prevalent throughout the family, with Terry's maternal grandmother, maternal aunt, and paternal grandfather all being alcoholics. (*Id.*, ¶¶ 18–19.) Terry states that Doerr "wasn't quite mentally right," had mood swings, and was hyper as a child. (*Id.*, ¶¶ 23, 31.) According to Terry, both Doerr and his father "have an inappropriate laughter."

(*Id.*, ¶ 22.) She states that as a child Doerr would "go into a trance-like state until someone basically woke him or snapped him out of it." (*Id.*, ¶ 31.)

Forsythe, Doerr's former boss, provided declarations dated September 10, 2002, and June 30, 2003. (Doc. 167-3, Ex's. 39, 40.) He states that he called defense counsel fifteen times to try to provide information but did not receive a return call until the day of Doerr's trial. (*Id.*, Ex. 40, ¶ 2.) He indicates that if he had been properly prepared, he could have provided additional information about Doerr's intellectual limitations. (*Id.*) According to Forsythe, Doerr could not read or write. (*Id.*, Ex. 39 at 1.) Others had to fill out forms for him. (*Id.*) He never had a bank account or a check book and was unable to pay his taxes by himself. (*Id.*) He could not read a menu and had to order by pointing at pictures of the food. (*Id.* at 2.) When asked to pick up supplies, he could remember only three items. (*Id.*) He could not read a map or distinguish between streets and avenues. (*Id.*) Forsythe was able to teach Doerr basic tasks, like measuring, but Doerr was never able to recognize any measurement beyond a quarter of an inch. (*Id.*)

Forsythe states that Doerr sometimes could not focus, and it seemed like he "was out of step with the rest of the world." (*Id.*, Ex. 40, ¶ 27.) He talked to himself "as if he was having a conversation with someone who was right there." (*Id.*, ¶ 32.) It seemed like Doerr was "two different people a lot of the time, even when he hadn't been drinking." (*Id.*, ¶ 39.) He had mood swings; some days he would be very energetic, "like a kid flying up and down the ladder at work," but other days he was down and depressed. (*Id.*, ¶¶ 39, 40.)

Doerr offers the declaration of his older sister, Lucy. (Doc. 167-3, Ex. 36.) The declaration, dated April 4, 2003, was filed under seal because she did not want her parents to know about it.[13] (*Id.*, Ex. 37.) In the declaration she states that she had refused to testify on Doerr's behalf at the presentencing hearing because she was afraid their father would kill her if he found out that she had spoken about her childhood. (Doc. 167-3, Ex. 36, ¶¶ 4-8.)

---

[13] The father has since passed away, eliminating the need to keep the document sealed. (Doc. 167-3, Ex. 37.)

Lucy recounts the abuse she and Doerr suffered as children. Their father "constantly" screamed at them and hit them, while their mother "stayed out of his way and never took up for [them.]" (*Id.*, ¶ 10.)

Their father was extremely paranoid. (*Id.*, ¶ 40.) He did not tell his children the home phone number and put a lock on the phone so the children could not dial out. (*Id.*)

Lucy believes her parents had children only so "they would have slaves to serve their wishes and to take care of them and the house." (*Id.*, ¶ 9.) From the time the children were ten and eight, they were responsible for all of the cooking and cleaning. (*Id.*, ¶ 42.) One of their chores was emptying the "potty" buckets their parents used instead of going to the outhouse. (*Id.*, ¶ 55.) If the cleaning was not done properly, the children would be awakened in the middle of the night and forced to re-wash the dishes. (*Id.*, ¶ 4.)

Throughout their childhood, Lucy and Doerr "literally starved." (*Id.*, ¶ 52.) Their father would mark the milk carton and count slices of meat to be sure the children had not drunk or eaten anything. (*Id.*, ¶ 53.) They were once given a free meal by their school principal. The principal then told their parents, and the children were beaten. (*Id.*, ¶ 52.)

Both children were subjected to inhumane punishments. They were made to stand in a corner for hours, forbidden to use the bathroom; when they would wet their pants, their parents would beat them. (*Id.*, ¶ 25.) On other occasions, they were forced to stay in bed, for weekends or weeks at a time. (*Id.*, ¶ 30.) They had to remove their underwear when they were beaten with a paddle or belt. (*Id.*, ¶ 62.) Their father would whip them so hard that they had "welts all over." (*Id.*, ¶ 17.) The beatings sometimes occurred for "nothing at all." (*Id.*, ¶ 19.) Lucy was once beaten by her father while she had her period. (*Id.*, ¶ 18.) He made her strip naked and beat her with his belt while she was bent over in front of him holding a sanitary napkin. (*Id.*)

Their father was also sexually abusive. He molested Lucy beginning when she was twelve years old. (*Id.*, ¶ 56.) He explained that "he was doing sexual things to show [her] what men do and what they really want." (*Id.*, ¶ 59.) When Lucy confided in her mother

about the abuse, her mother told her that it was her fault. (*Id.*, ¶ 63.) Lucy said she would believe that her father sexually abused her brother. (*Id.*)

According to Lucy, she and Doerr were also sexually abused by neighborhood teenage boys who babysat for them. (*Id.*, ¶ 90.) The teenagers would make her and Doerr get naked so the boys could fondle their genitals. (*Id.*)

Lucy recounts her brother's odd behavior. There were times when Doerr would faint, hit his head on the floor, and continue to be unresponsive. (*Id.*, ¶ 26.) Afterwards, Doerr would not recall what happened. (*Id.*, ¶ 27.) He experienced bad headaches. (*Id.*) At times, he seemed like another person; he would get a "funny, blank look" on his face. (*Id.*, ¶ 77.) Both Doerr and his father "acted like they heard voices no one else heard." (*Id.*, ¶ 78.) Doerr had trouble regulating his mood; he would often bang his head against the wall. (*Id.*, ¶ 87.) He was very hyper; he exaggerated and told obvious lies. (*Id.* ¶¶ 79–82.) He also suffered from depression, attempting suicide on several occasions and binge drinking. (*Id.*, ¶¶ 114–15.)

Lucy describes mental illness on both sides of her family. Her father's side of the family was "crazy." (*Id.*, ¶ 97.) Her paternal grandfather "was a bad alcoholic"; her paternal grandmother was "crazy too and a hypochondriac"; and an uncle "drank himself to death." (*Id.*, ¶¶ 97, 106.) Lucy's mother and maternal aunt both had "something wrong with [their] head." (*Id.*, ¶ 106.) Her mother had "mental problems," like she was "only playing with half a deck," and was illiterate. (*Id.*, ¶¶ 108, 109.)

In a declaration dated September 12, 2002, John Bibo, a friend who testified at the presentencing hearing, provided information about Doerr's illiteracy. (Doc. 167-3, Ex. 41.) He states that Doerr had difficulty finding a job because he could not read the advertisements and needed help filling out applications. (*Id.* at 1.) Bibo took Doerr to get his driver's license. (*Id.*) Because he could not read, Doerr was given a test with pictures. (*Id.*) Doerr wrote poorly, with incomplete sentences and misspelled words. (*Id.*)

Doerr has also provided declarations from individuals who did not testify at the presentencing hearing. In a declaration dated June 30, 2003, Robbie Samsun, Doerr's

former roommate, attests that he phoned the Public Defender's Office several times thinking he could serve as a character witness, but no one returned his calls. (Doc. 167-3, Ex. 42., ¶ 10.) Samsun describes Doerr as looking "malnourished and skinny." (*Id.*, ¶ 4.) Doerr was "slow" and "limited"; it appeared "like he didn't really know how to take care of himself." (*Id.*, ¶¶ 6– 7.) The Doerr Samsun knew "did not seem as if he could hurt a fly." (*Id.*, ¶ 9.)

Two of Doerr's caseworkers with the Illinois DCFS have submitted declarations. David Reed, in a declaration dated September 16, 2003, confirmed the information in his case notes as outlined above. (Doc. 167-3, Ex. 43.) He describes Doerr as "very skinny" and "seem[ing] slightly retarded." (*Id.*, ¶ 6.) He characterizes Doerr's family as "very disturbed," "abusive and possibly psychotic." (*Id.*, ¶¶ 5, 23.) Reed believes that "by the time [Doerr] reached the system it may have already been too late. In many ways, he was a kid who never had a chance in life." (*Id.*, ¶ 28.) No one from the defense team contacted Reed to talk about Doerr. (*Id.*, ¶ 29.)

In a declaration dated April 9, 2003, another caseworker, Mark Hubbard, attests that Doerr "still stands out in my mind as one of the most pathetic kids at the ISSCS." (Doc. 167-3, Ex. 44, ¶ 5.) Doerr "lived in a fantasy world." (*Id.*, ¶ 6.) He "never fit in and he never had any friends at the home." (*Id.*, ¶ 7.) He "constantly told tales that were inconceivable and utterly impossible." (*Id.*) He told stories "to try and make himself look like or seem as capable as what he thought normal people were." (*Id.*) The lying was a "defense mechanism . . . to cover up or deny the reality of [Doerr's] abusive home situation." (*Id.*, ¶ 8.) None of the other children fantasized or exaggerated to the extent Doerr did, which might have been a reflection of how badly he was abused before coming to the ISSCS. (*Id.*) Hubbard did not think Doerr was retarded but "his intellectual skills were very limited." (*Id.*, ¶ 11.) Doerr "did not have a good grasp on reality and, therefore, had a hard time distinguishing between right and wrong." (*Id.*, ¶ 16.) Hubbard was never contacted by Doerr's defense team. (*Id.*, ¶ 18.)

Finally, Doerr's ex-wives, Juanita Decker and Brenda Horath, have provided declarations. Decker was Doerr's first wife. In her declaration, dated September 17, 2003, she states that she was contacted by Doerr's attorneys but they never explained the concept of mitigation and she believed they only wanted to hear positive things about Doerr. (Doc. 167-3, Ex. 45, ¶¶ 1–2.)

Decker was married to Doerr for six years and they had four children together. (*Id.*, ¶ 3.) Three of the children had "serious mental disabilities." (*Id.*, ¶ 4.)

Decker states that Doerr had a "dark side" and became a different person, cruel and paranoid, when he drank. (*Id.*, ¶ 9.) Over time, he became more controlling; he would not let Decker leave the yard without him. (*Id.*, ¶ 10.) Without warning, Doerr would change "from a fun person to the meanest, most evil man." (*Id.*, ¶ 11.) Decker states that when Doerr argued with her he would explode with rage and address her like he thought she was his father. (*Id.*, ¶ 12.) He beat Decker and tied her up with pantyhose and raped her. (*Id.*, ¶¶ 13–14.) Afterwards he denied that he had been violent and blamed her for going out and getting attacked. (*Id.*, ¶ 13.) Doerr complained of headaches and said he could hear voices talking to him. (*Id.*, ¶ 15) Sometimes he would look scared and say he saw "monsters." (*Id.*) After these episodes he would "fall into a deep sleep." (*Id.*, ¶ 16.)

Doerr had "strange sleep habits." (*Id.*, ¶ 20.) He would laugh, like he had heard a joke, or kick and yell like he was having a nightmare. (*Id.*) If he was startled awake, he would "jump up really quick, looking frightened." (*Id.*) He also wet the bed. (*Id.*) Sometimes he passed out, though his eyes remained open. (*Id.*, ¶ 21.) He would not be able to respond to questions and "sounded incoherent." (*Id.*) At times when he was awake he would "zone out," even during a conversation. (*Id.*, ¶ 23.) He would sleepwalk, sometimes going to the kitchen and making and eating a sandwich. (*Id.*, ¶ 25.)

Doerr had burn scars on his arms and legs from when his father had put out cigarettes on him. (*Id.*, ¶ 29.) He and his sister were both scared of their father. (*Id.*, ¶ 30.) Decker had heard that Doerr's father sexually abused Lucy, but she did not know if he had sexually abused Doerr as well. (*Id.* at 35.)

Decker recounts other incidents of bizarre behavior on Doerr's part, the problems caused by his alcohol abuse, and his involvement in a serious car accident when he was thrown from the vehicle. (*Id.*, ¶¶ 37–41.)

Decker states that their oldest son was diagnosed with ADHD and has "severe impulse control problems." (*Id.*, ¶¶ 45–46.) He was placed in special education programs but was expelled for inappropriate behavior. (*Id.*, ¶¶ 48–51.) He also suffered from "horrible depression." (*Id.*, ¶ 50.) Their other son was diagnosed with ADHD, oppositional defiance disorder, and depressive disorder, and is "borderline mentally retarded." (*Id.*, ¶¶ 54–55.) He behaved violently and experienced "trance-like dissociative state[s]." (*Id.*, ¶¶ 55–57.) The youngest child, a daughter, was diagnosed as mentally retarded. (*Id.*, ¶ 63.) She had "conflict and anger issues" and experienced "violent mood swings and out of control behavior." (*Id.*, ¶¶ 63–64.)

Decker concludes that Doerr was a loving and caring person, but "[w]hen he'd 'zone out,'" . . . he became a different person who was capable of killing someone but not realizing it until after he snapped out of it." (*Id.*, ¶ 69.)

Doerr's second wife, Brenda Horath, provided a declaration, dated May 21, 2003. (Doc. 167-3, Ex. 46.) She states that the defense investigator, Paulette Kasieta, told her she wanted to hear "anything good" about Doerr. (*Id.*, ¶ 2.) However, Horath was still angry at Doerr, from whom she had been divorced a little more than a year. (*Id.*, ¶¶ 2–3.) Because she was still angry, Horath "play[ed] up Doerr's violent temper when he was drinking and drugging." (*Id.*, ¶ 7.) She "now see[s] how mentally ill [Doerr] is and how he could not have been in his right state of mind the night of the murder." (*Id.*, ¶ 5.)

Horath notes that Doerr's weight would fluctuate because he gained weight when he started eating in his sleep. (*Id.*, ¶ 16.) When he woke up he would not remember that he had been sleepwalking and eating. (*Id.*, ¶ 24.) Other "very strange things" happened when Doerr was asleep. (*Id.*, ¶ 21.) He would wet the bed, thrash about like he was fighting somebody, or get up and walk into the backyard to smoke a cigarette and not

know that Horath was with him. (*Id.*, ¶¶ 21–22.) If she pushed him he would snap out of it and begin to scream "Leave me alone." (*Id.*, ¶¶ 25–26.)

Doerr had "episodes" where he sat and brooded about something from his past. He would get a look in his eyes of "uncontrolled rage" then "fly into a rage" and become "very cruel." (*Id.*, ¶¶ 30, 37–38.) When they had sex during one of Doerr's episodes, he would be "very rough" and call her demeaning names. (*Id.*, ¶ 39.) Afterwards, he would deny saying or doing anything wrong. (*Id.*, ¶ 40.) During these episodes Doerr would stare off into space "as if he was hearing voices" and mutter to himself "like he was having a conversation with an imaginary person." (*Id.*, ¶¶ 48–49.)

Horath describes an episode when Doerr awoke from a nap and attacked her daughter, chasing her into her bedroom, punching a hole through the door, and attempting to strangle her and suffocate her with a pillow. (*Id.*, ¶¶ 54–56.) She broke free and ran outside for help. (*Id.*, ¶ 56.) Doerr pursued her, throwing a tire iron at her as she got on her bike and rode away. (*Id.*, ¶ 57.) The police were called and Horath kicked Doerr out of the apartment. (*Id.*, ¶ 58.) Later, he showed up at the apartment on a new bike and wearing new clothes he had bought with money stolen from Horath's savings account. *Id.*, ¶ 59.) He seemed to have no memory of the incident. (*Id.*)

Based on Doerr's behavior when he was in one of his episodes, Horath believes Doerr was "capable of killing someone." (*Id.*, ¶ 61.) She does not believe he could do so when he was in his right mind. (*Id.*) She concludes that Doerr's "childhood affected him in ways I will never fully understand, but I do have compassion for him because it is obvious to me he is a very sick man." (*Id.*)

### d. *Rosales evidence*

Doerr offers the transcript of an interview of Victor Rosales by the prosecutor and lead counsel Burns. (Doc. 167-3, Ex. 47.) In the interview, which took place on August 16, 1995, Rosales claimed he was Doerr's cellmate. (*Id.* at 9.) He stated that Doerr had all his legal paperwork with him and would show some of the documents to Rosales. (*Id.*) Rosales read "little bits" of the reports and court records so he knew details of what they contained.

(*Id.* at 12.) He believed that fellow inmate Steven Schwartz also saw Doerr's paperwork. (*Id.* at 13.) According to Rosales, Doerr remembered details of the crime after reading the police reports. (*Id.* at 16, 33.) Doerr was angry with the victim because she wouldn't put out and wanted to leave. (*Id.* at 18.) He told Rosales he had hit the victim with a pipe and a lamp and had vaginal and anal sex with her after she was dead. (*Id.* at 20–22, 26.) Doerr kicked her dead body, played with her blood, and dragged her body around. (*Id.* at 23–24.) Rosales said Doerr was not a slow reader or illiterate. (*Id.* at 23.) He stated that Doerr "ran a store" in jail and "nobody fucked with him." (*Id.* at 27.)

Rosales stated that the prosecutor and a detective had contacted him in his pod. (*Id.* at 14.) He met with them only once. (*Id.*) Rosales claimed he did not ask for, and was not offered, anything in return for his testimony. (*Id.* at 28.)

Doerr has provided a later declaration from Rosales dated September 10, 2004. (Doc. 167-4, Ex. 48.) Here Rosales acknowledges that he was never Doerr's cellmate and admits that he met with State officials two or three times, not just once, before his pretrial interview. (*Id.*)

Doerr next offers an affidavit from Jennifer Wakefield, a law clerk with the Federal Public Defender's office who interviewed Rosales in 2004. (Doc. 167-4, Ex. 49.) Wakefield states that Rosales believed the detective who interviewed him and other inmates about the Doerr case "was putting different stories together" to "get the story [he] wanted." (*Id.*, ¶ 4.) Rosales admitted that some of his statements about Doerr were "a lie," that he felt pressured to make statements against Doerr, and that the detective told him what to say and do. (*Id.*) He admitted that some of his testimony came from what other inmates had told him. (*Id.*, ¶ 6.) He again acknowledged that he was never Doerr's cellmate and that the jail "never put Mexicans and whites together." (*Id.*, ¶ 5.)

Doerr offers declarations from Steven Schwartz dated July 27, 2004, and August 18, 2015. (Doc. 167-4, Ex's. 50, 51.) Schwartz states that he, not Rosales, was Doerr's cellmate. (*Id.*, Ex. 50 at 1.) He was not called as a witness at trial. According to Schwartz, Doerr arrived at the jail "completely disoriented" and "terrified" and was disliked, bullied,

and extorted by other inmates, including Rosales. (*Id.* at 1–2.) Schwartz indicates that Rosales read all of Doerr's police reports and paperwork so that he would be able to "put together a story the prosecution would want" and get a deal in his own case. (*Id.* at 1–4.)

e.     *Counsel's performance*

Doerr offers a declaration from lead counsel, Kevin Burns, dated September 22, 2015. (Doc. 167-4, Ex. 56.) Burns states that his heavy caseload prevented him from visiting Doerr regularly. (*Id.*, ¶ 9.) Burns provided Doerr with police reports, unaware of his reading difficulties. (*Id.*, ¶ 7.) This may have resulted in Doerr sharing the reports with other inmates, as another inmate (Rosales) testified against Doerr claiming to have graphic details of the crime. (*Id.*) Approximately six months into his representation of Doerr, Burns retained a psychologist to "assess Mr. Doerr's present mental condition and to assess his mental state at the time of the crime." (*Id.*, ¶ 10.) This initial evaluation was conducted at a flat rate of $350, and no detailed history of Doerr was provided. (*Id.*) Burns then retained a neuropsychologist to determine whether Doerr had brain damage. (*Id.*, ¶ 12.) Although the evaluation showed such damage, Burns "did not seek to hire a medical doctor, such as a neuropsychiatrist or neurologist, to provide further support for Mr. Doerr's brain damage" nor did he "retain a psychiatrist to evaluate Mr. Doerr and determine if there were psychiatric conditions that would help understand his unusual behavior." (*Id.*) Burns states he had no "strategic reason" for these failures. (*Id.*)

Burns sought funding for a mitigation specialist only after Doerr had been convicted. (*Id.*, ¶ 13.) His office would not approve adequate funding for his first choice for the position, so Burns retained Holly Wake. (*Id.*, ¶ 14.) Burns treated Wake as an expert and expected her to write a report. (*Id.*) Because Wake submitted a report, she was interviewed by the State. (*Id.*, ¶ 15.) Burns failed to raise an "overall objection" to the prosecution interviewing her. (*Id.*) He states that he lacked any strategic reason for failing to raise a proper objection. (*Id.*) As a result, the prosecution was able to ask Wake questions and access information that might otherwise have been privileged. (*Id.*)

Due to his case load and funding issues, when the presentencing hearing approached, Burns did not spend much time preparing the testimony of either expert or lay witnesses. (*Id.*, ¶ 16.) He did not call an expert to rebut the testimony of the State's expert, Dr. Youngjohn, who claimed that Doerr was malingering, and had no "strategic reason" for failing to do so. (*Id.*, ¶ 17) Burns also acknowledges that he failed to present either an opening statement or a closing argument during the presentencing hearing. (*Id.*, ¶ 18.)

Co-counsel Brad Bransky, in a declaration dated September 22, 2015, states that he carried a caseload of 30 to 50 cases. (Doc. 167-4, Ex. 57.) Bransky believes that counsel should have retained a mitigation specialist from the time they were appointed. (*Id.*)

Doerr offers declarations from Paulette Kasieta, the defense investigator. (Doc. 167-4, Ex's. 59, 60.) In these declarations, dated September 13, 2014, and September 21, 2015, Kasieta states that budget constraints and a heavy caseload made it difficult to do an effective job on a case like Doerr's that required additional time and attention. (*Id.*, Ex. 60, ¶ 2.) Kasieta explains that she conducted the investigation requested of her, but there were no team meetings to develop the case and she was not told what defense would be presented. (*Id.*, ¶ 3.) Kasieta was not a mitigation specialist, she had no mental health background or training, and this was her first capital case. (*Id.*, ¶ 4.) Nonetheless, she traveled to Illinois to meet with Doerr's parents. (*Id.*, Ex. 59, ¶ 6.) Charles admitted he punished Doerr by making him sit on the side of his bed, sometimes for a day or more, and making him stand in a corner. (*Id.*, ¶ 9.) He admitted that he punished Doerr for wetting the bed by hanging out the soiled sheets for kids on the school bus to see. (*Id.*, ¶¶ 6–7.) He also limited the amount of food Doerr was provided. (*Id.*) Kasieta also interviewed Doerr's first wife, Juanita Decker. (*Id.*, ¶ 11.) She described incidents where Doerr would get a "funny look on his face and appear to be looking through her, then referring to her by his father's name." (*Id.*) When Doerr was in this state he would become violent. On one occasion he raped her; she became pregnant but had a miscarriage. (*Id.*, ¶ 12.)

Kasieta was the defense team member who visited Doerr most often. (*Id.*, Ex. 60, ¶ 4.) She found him extremely immature and childlike. (*Id.*, ¶ 6.) Doerr told Kasieta that

when he was a little boy, his mother performed oral sex on him and his father "did things to him that weren't right." (*Id.*, Ex. 59, ¶ 10.) After Doerr was convicted, Kasieta was not really involved in the case anymore. (*Id.*, Ex. 60, ¶ 7.) Instead, Wake was hired as the mitigation specialist. (*Id.*) Although she had conducted the family interviews, Kasieta did not work with Wake. (*Id.*) According to Kasieta, the defense team thought Wake's social history report was "extremely disappointing." (*Id.*, Ex. 59, ¶ 16.)

Doerr next provides a declaration by Appolon Beaudouin, a mitigation investigator with the Illinois Appellate Defender's Office. (Doc. 167-4, Ex. 61.) In his declaration, dated September 25, 2015, Beaudouin explains that he assisted with the investigation in Doerr's case at the request of Kasieta. (*Id.*, Ex. 61, ¶ 4.) He was asked to interview Doerr's sister, Lucy, and he obtained some of Doerr's school records. (*Id.*) Beaudouin considered his meeting with Lucy, in May 1995, to be an initial interview from which he would provide preliminary information to defense counsel in "check-list form." (*Id.*, ¶ 6.) He expected to be asked to conduct follow-up interviews, which would have generated "a more formal report and additional information." (*Id.*) However, he was not asked to do any further work. (*Id.*) Beaudouin states that, given the severe childhood trauma and abuse Lucy reported, he was surprised not to be asked to conduct further investigation. (*Id.*, ¶ 10.)

Next, Doerr offers a declaration from PCR counsel, Treasure VanDreumel, dated September 24, 2015. (Doc. 167-4, Ex. 58.) VanDreumel was appointed to represent Doerr in March 2000. (*Id.*, ¶ 4.) At the time, she had little capital experience. Doerr's case was only her second capital PCR case, and it came either during or just after her first capital PCR appointment. (*Id.*, ¶ 5.) Because she was new to PCR work, she did no independent investigation, treating the case like a direct appeal and relying on the record. (*Id.*, ¶¶ 4–5.) While representing Doerr, VanDreumel also served as second chair in a capital murder trial. (*Id.*, ¶ 6.) That trial ended in July 2000 and Doerr's PCR petition was due at the end of August. (*Id.*) VanDreumel received an extension until October 27 to file the petition, but she filed one month early because she erroneously believed that the time spent in PCR proceedings would be deducted from the time available in federal habeas proceedings. (*Id.*)

VanDreumel states that because she treated this case like a direct appeal and rushed to file the petition, she "did not interview witnesses, request funds for experts, or interview trial counsel or the trial investigators," and she never met with Doerr. (*Id.*, ¶¶ 7–8.) She sent him written correspondence, unaware of his reading difficulties. (*Id.*)

VanDreumel indicates that she was not "aware that the performance standard for post-conviction attorneys required conducting an independent, thorough investigation of the case in its entirety, including but not limited to sentencing issues." (*Id.*, ¶ 7.) She explains that if she had conducted the necessary investigation, she "most definitely would have raised a claim that trial counsel's deficient performance resulted in prejudice to Mr. Doerr." (*Id.*, ¶ 14.)

VanDreumel states that now, with twenty years of experience as a capital defense trial attorney, she realizes "it is critical to develop and understand the client's life story in order to explain how that history impacted his life choices and actions and consequently, why a defendant's life should be spared. This was not done in Mr. Doerr's case." (*Id.*, ¶ 12.) VanDreumel faults trial counsel's performance but also acknowledges that she omitted a claim of ineffective assistance of counsel at sentencing because she "failed to conduct the necessary investigation" and "was simply unaware of the challenges which could have, and should have, been raised with respect to Mr. Doerr's sentencing phase." (*Id.*, ¶ 13.) She concludes: "My performance as PCR counsel in this case fell below the reasonable standards of practice by omitting a claim that trial counsel was ineffective during the sentencing phase of Mr. Doerr's trial. This was more than a blunder; it is an error of constitutional magnitude and one that I deeply regret." (*Id.*, ¶ 15.)

Finally, Doerr presents declarations, both dated September 14, 2015, from Oliver Loewy and Statia Peakhart, lawyers who worked with the Arizona Capital Representation Project ("Project") at the time of Doerr's trial. (*Id.*, Ex's. 54, 55.) Loewy has attached to his declaration a memorandum dated September February 13, 1995, memorializing a conversation he had with lead counsel Burns. (*Id.*, Ex. 54, ex. A.) He wrote that Burns did not know "when the last court date was or when the next court date is." (*Id.*) Burns had

told him that Doerr would accept a plea deal; Loewy wrote that "Burns may not understand that mitigation is critical to pleading the case." (*Id.*)

In her declaration, Peakhart states that she reached out to Burns and invited him to consult with the Project. (*Id.*, Ex. 55, ¶ 6.) Burns met with the Project staff just once. (*Id.*) Peakhart believes that if Burns had taken advantage of the Project's resources, including its Capital Defense Seminar and its Manual for Arizona capital defenders, and followed their performance standards, Doerr "would not be on death row." (*Id.*, ¶¶ 7–9.)

## C. Analysis

The Court must now determine, pursuant to *Martinez*, whether "cause" and "prejudice" exist to excuse the default of Claim 28. Doing so requires a review of the claim's merits. *Ramirez*, 937 F.3d. at 1241–42; *Hooper*, 985 F.3d at 627; *Atwood*, 870 F.3d at 1059–60.

As discussed above, to show "cause" under *Martinez*, Doerr must demonstrate that PCR counsel's performance was both deficient and prejudicial under the *Strickland* standard. *Id.* at 1241. Whether PCR counsel's performance was prejudicial—whether there was a reasonable probability of a different result during the PCR proceedings if counsel had raised the underlying ineffective assistance of counsel claim—is directly tied to the claim's strength. *Id*. A showing of "prejudice" for purposes of *Martinez*'s "cause" and "prejudice" standard requires a finding that the underlying ineffective assistance of counsel claim is "substantial" or has "some merit." *Id.*

The Court first addresses PCR counsel VanDreumel's admission that she provided ineffective assistance. Counsel's assessment of her performance is not dispositive. The Court is "not obligated to accept a self-proclaimed assertion by . . . counsel of inadequate performance." *Edwards v. Lemarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quotations omitted); *see Atkins v. Singletary*, 965 F.2d 952, 959−60 (11th Cir. 1992) (explaining that admissions of deficient performance are not decisive because ineffectiveness is a question the court must decide). Reasonableness is judged "as of the time of counsel's conduct," *Strickland*, 466 U.S. at 690, and the "latter-day emergence of

[counsels]' belief in their own incompetence runs afoul of the rule of contemporary assessment." *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995); *see McAfee v. Thurmer*, 589 F.3d 353, 356–57 (7th Cir. 2009) (explaining that counsel's "reflection after the fact" that she should have used a different strategy "is irrelevant to the question of ineffective assistance of counsel").

VanDreumel's confession of incompetence does not relieve the Court of its duty to undertake an objective evaluation of her performance. That evaluation includes a consideration of both the deficient performance and the prejudice prongs of *Strickland*. *See Ramirez*, 937 F.3d at 1241 (explaining that "cause" under *Martinez* requires a showing that PCR counsel's performance was both deficient and prejudicial pursuant to *Strickland*).[14]

The starting point for the Court's analysis is *Ramirez* itself, where the Ninth Circuit reviewed the merits of an underlying claim of ineffective assistance of trial counsel and concluded that "cause" and "prejudice" existed to excuse its default.

Ramirez alleged that trial counsel performed ineffectively at sentencing by failing to present mitigating evidence of mental retardation; brain damage; childhood poverty, neglect, and abuse; in utero exposure to pesticides and alcohol; and the fact that Ramirez was the product of the rape of his 15-year-old mother by his uncle. *Ramirez v. Ryan*, No. CV-97-01331-PHX-JAT, 2016 WL 4920284, at *8 (D. Ariz. Sept. 15, 2016), *rev'd and remanded*, 937 F.3d 1230 (9th Cir. 2019). He also alleged that counsel's failure to provide the defense expert with evidence of his low IQ constituted ineffective assistance. *Id.* On remand from the Ninth Circuit, the district court undertook a *Martinez* analysis to determine whether the claim's default was excused by the ineffective assistance of PCR counsel. *Id.*, at *1. The court considered the merits of the underlying claim and found that trial counsel did not perform ineffectively at sentencing. *Id.* at *9–12. Because the underlying claim was without merit, the court concluded, PCR counsel did not perform ineffectively by failing to raise it. *Id.* at *13.

---

[14] The same principles apply to lead counsel Burns's statements, discussed above, that he did not have a strategic reason for failing to take certain actions. (*See* Doc. 167-4, Ex. 56, ¶¶ 12, 15.)

The Ninth Circuit reversed, holding that the district court "erred by conducting a full merits review of Ramirez's underlying ineffective assistance of trial counsel claim on an undeveloped record."[15] *Ramirez*, 937 F.3d at 1242. The court explained that the analysis under *Martinez* is "a two-step process: first, decide whether the procedural default is excused, and if so, then address the claim squarely, after allowing a chance for any necessary record or evidentiary development." *Id.*, n.7; *but see Runningeagle*, 825 F.3d at 982 n.13 ("[T]here is no meaningful difference between finding a claim in default and reviving it but denying it on its merits.").[16]

Based on that directive, this Court's analysis will address only the first step of *Martinez*'s "two-step process": determining whether "cause" and "prejudice" exist to excuse the default of Claim 28. The Court will be guided by *Ramirez* and other Ninth Circuit precedent applying *Martinez*.

In its *Martinez* analysis, the Ninth Circuit in *Ramirez* first determined that the underlying claim of ineffective assistance of trial counsel was "substantial" and therefore prejudice under *Martinez* was established. 937 F.3d at 1241.

At sentencing, Ramirez's counsel submitted a memorandum and presented testimony from three family members and two Arizona Department of Corrections employees. *Id.* at 1236. The memorandum "highlighted Ramirez's ability to adapt in the structured life of prison" and "discussed his chaotic childhood, school attendance, history of substance abuse and sexual abuse, gang affiliation, and impaired state of mind at the time of the murders." *Id.* The memorandum also included the report of a psychologist, Dr. McMahon, who opined that at the time of the crimes Ramirez's ability to appreciate the wrongfulness of his conduct or conform his conduct to the law was significantly diminished. *Id.* at 1236.

---

[15] In *Ramirez* the district court denied the petitioner's request for an evidentiary hearing but granted his request to expand the record with the exhibits attached to his *Martinez* brief. *Ramirez v. Ryan*, No. CV-97-01331-PHX-JAT, Doc. 261 at 21.

[16] The court in *Runningeagle*, noting that the petitioner "had the opportunity to fully develop in the district court the evidentiary basis for his procedurally defaulted IAC claims," found that even if "cause" did exist for a claim's default, it "would still deny the revived claim on the merits." 825 F.3d at 982 n.13.

Counsel had presented Dr. McMahon with police reports, plea agreements and sentencing orders from Ramirez's previous offenses, and a public defender's notes from an interview with Ramirez. *Id.* Counsel did not, however, provide Dr. McMahon with Ramirez's prior IQ scores, which ranged from 70 to 77, or his school records. *Id.* In the absence of that information, Dr. McMahon performed a less-comprehensive IQ test which resulted in a score of 94, and was "in no way indicative of any form of mental retardation." *Id.* at 1236–37.

Dr. McMahon's report also contained information that contradicted information set out in counsel's sentencing memorandum. For example, the memorandum stated that Ramirez's mother, Maria, was an alcoholic, while Dr. McMahon wrote that she "never worked, devoting her time as a traditional Mexican-American mother whose responsibility revolves around the home and her children" and "was always there for [Ramirez] when he needed her as he was growing up." *Id.* at 1236.

At the sentencing hearing Ramirez's aunt testified that Maria was about sixteen when she gave birth to *Ramirez. Id.* at 1237. Ramirez's biological father was not around. She testified that she heard Maria drank while she was pregnant. *Id.* She stated that Maria would stay out partying all night and would disappear for days. *Id.* Maria was involved with "a lot of men." *Id.* She would make Ramirez cook for his siblings and clean the house because she "wasn't home watching over the kids, the way a mother should." *Id.* Ramirez's grandmother raised him for a couple of years. *Id.* Ramirez had behavioral problems as a child. *Id.*

Mary, Ramirez's younger sister, testified that he was very affectionate and helped keep his siblings clothed and fed, but that Maria "was there for us too." *Id.* Mary testified that Maria did not have a drinking problem until later in life. *Id.* She could not recall where Ramirez went to school or whether he changed schools frequently. *Id.*

Cynthia, another younger sister, testified that Ramirez was a good brother who supported his wife and son. *Id.* She testified that she and Ramirez were "hardly together"

when they were younger. *Id.* In the year before the crime, however, Ramirez lived with her, helped her out with chores, and gave her money every week. *Id.*

The Department of Corrections employees testified about Ramirez's job duties in prison and said he was a good worker. *Id.*

In supplemental briefing after the case was remanded to the district court, Ramirez provided new information that "reveal[ed] the extent of abuse, poverty, and neglect that Ramirez suffered as a child" and "contrasted with the information revealed at sentencing." *Id.* at 1238–39. The Ninth Circuit relied on this evidence in assessing the strength of the underlying ineffective assistance of counsel claim.

The court noted that new declarations by family members revealed that Ramirez was born to a poor migrant worker family. *Id.* at 1239. They were continually exposed to pesticides in the fields where they worked. *Id.* Ramirez's mother became pregnant with him after being raped by her brother-in-law. *Id.* Maria was an alcoholic and drug user who drank during her pregnancy. *Id.* She attempted to abort the fetus by ingesting herbs and jumping off a counter. *Id.*

Maria did not nurture or show love to Ramirez. *Id.* He was "shuttled around" between various family members because "[n]obody wanted him," and no mother-child bond ever developed. *Id.* Maria told a family member that she would put beer in Ramirez's bottle "when he was just a few years old." *Id.* Ramirez and his siblings went hungry, not eating for days while Maria was out drinking and partying. *Id.* Ramirez stole food to feed himself. *Id.* Maria and her children moved frequently, and the homes she found for them were always "filthy," with animal feces on the floor. *Id.* Ramirez and his siblings ate on the floor and slept on dirty mattresses. *Id.*

Maria physically abused Ramirez, hitting him with "anything she could get her hands on, including electrical cords and shoes." *Id.* She solicited men for sex in bars and allowed men to have sex with her daughter to support her drug and alcohol habit. *Id.* Maria had an infant who died from exposure after being left in the house without heat in the winter while Maria was out partying. *Id.*

Ramirez experienced developmental delays, including delays in walking, bathroom training, and speaking. He was unable to read, and displayed "slow" or odd behavior. *Id.* He could not take care of himself at a basic level: he had poor hygiene, did not know how to comb his hair, and ate with his hands because he could not use utensils properly. *Id.*

After discussing the evidence in these lay declarations, the court noted that Dr. McMahon also provided a new declaration. *Id.* at 1240. He stated that if he had been given Ramirez's previous IQ scores, he "would not have concluded that Ramirez was not intellectually disabled" because those scores "would have indicated to me that Mr. Ramirez may be retarded and it would have greatly expanded the nature of the evaluation I did conduct." *Id.* In addition, two new experts opined that Ramirez was intellectually disabled and one of the experts found he suffered from brain dysfunction. *Id.* at 1247.

Based on its review of this record, the Ninth Circuit found, in contrast to the district court, that there was a substantial claim that trial counsel had performed deficiently and that Ramirez was prejudiced by that performance. *Id.* at 1244–47. The court found counsel's performance deficient because "she failed to pursue or present evidence that Ramirez was intellectually disabled; failed to provide potentially powerful mitigating evidence to Dr. McMahon; and subsequently relied on Dr. McMahon's report, despite possessing conflicting facts." *Id.* at 1244. The court found that Ramirez was prejudiced because the "mitigation evidence presented during sentencing did not consistently or accurately describe the circumstances of Ramirez's life" and "the picture of mitigation presented at sentencing is relatively innocuous compared to the details that later emerged about Ramirez's life." *Id.* at 1246. The court noted, for example, that Dr. McMahon's description of Ramirez's relationship with his mother "could not be farther from the truth." *Id.* at 1245. The court also found that the new evidence was neither cumulative to the evidence offered at sentencing nor speculative or weak. *Id.* at 1246–47. Because the underlying claim of ineffective assistance of counsel was substantial, prejudice under *Martinez* was established. *Id.* at 1247.

The court then determined that cause for the claim's default existed because PCR counsel performed deficiently in failing to raise the underlying claim and there was a reasonable probability that the result of the PCR proceedings would have been different if the claim had been raised. *Id.* at 1248.

The factors that led the Ninth Circuit to find that Ramirez's claim of ineffective assistance of trial counsel was substantial and that PCR counsel performed ineffectively in failing to raise it are not present in Doerr's case. His counsel did not ignore red flags with respect to Doerr's mental health or traumatic background; nor did they present contradictory or inaccurate information about his IQ or social history.

Dr. Tatro examined Doerr and determined that brain damage was likely. Dr. Blackwood was provided with records that included previous mental health evaluations, documents from the DCFS, and medical records. He conducted neuropsychological testing and confirmed the presence of brain damage. Dr. Walter was provided with the same background information along with Dr. Blackwood's test results and raw data and the mitigation specialist's social history report. He too found that Doerr suffered from brain damage. In addition to the diagnosis of brain damage, the evidence at sentencing showed that Doerr's IQ was consistently measured in the 76 to 80 range.

Counsel's performance did not result, as was the case in *Ramirez*, in the omission of important mitigating evidence. The information presented at sentencing covered the details of Doerr's troubled background, including the full range of abuse and neglect he suffered as a child, and detailed his brain damage.

The judge, therefore, was not left with an "innocuous" picture of Doerr's homelife or an inaccurate picture of his cognitive condition. In fact, the judge found that Doerr's traumatic childhood was a mitigating circumstance. Doerr's counsel presented a mitigating case that was more accurate, complete, and compelling than the evidence offered at Ramirez's sentencing, which omitted key mitigating information such as his exposure to pesticides, his in utero exposure to drugs and alcohol, details of the abuse and neglect he suffered as a child, his intellectual disability, and his brain dysfunction. As discussed

below, the new information Doerr has developed from both lay and expert witnesses is largely consistent with or cumulative of the evidence presented at sentencing.

Although Claim 28 is weaker than the claim at issue in *Ramirez*, the Court finds that it satisfies the low standard of being "substantial" for purposes of *Martinez*. The Court cannot say the claim "does not have any merit" or is "wholly without factual support." *Ramirez*, 937 F.3d at 1241 (quoting *Martinez*, 566 U.S. at 14–16). "Prejudice" therefore exists under *Martinez*. *Id.* For the reasons set forth below, however, the Court finds that PCR counsel's performance was not ineffective under *Strickland*, and therefore "cause" for the claim's default is absent.

### 1. Trial counsel's performance was not deficient

In his supplemental *Martinez* brief, Doerr alleges that trial counsel performed ineffectively at sentencing by failing to "to create a cohesive theory of defense." (Doc. 167 at 64.) He argues that:

> His trial attorneys, who were hampered by the system, cobbled together a few witnesses that were neither properly prepared nor adequately investigated. The one person who should have developed Mr. Doerr's case for life—the mitigation specialist—failed to conduct adequate investigation and instead made the State's case for death. Trial counsel went forward with mitigating evidence of brain damage but failed to retain the necessary experts to support their theory and failed to present testimony to rebut the State's expert. Counsel failed to adequately attack the sole aggravating circumstance and the snitch witness upon whom the State relied. And to top things off, counsel failed to present written or oral advocacy supporting a life sentence.

(Doc. 167 at 64.) While Doerr's allegations of deficient performance are not baseless, they fail to persuade. The Court considers them in the order set out in Doerr's brief.

#### a. Relationship with client

Doerr first argues that Burns failed to establish a relationship with him which would have allowed the defense team to develop a meaningful mitigation strategy. According to Doerr, "[i]f counsel had spent more time with his client, he would have been able to elicit details of Doerr's background, family life, and mental history, which would then have led him to more fruitful and effective mitigation investigation." (*Id.* at 69.)

Doerr notes that when the Office of the Public Defender was appointed to represent him, their supervising attorney filed a motion to withdraw because of the Office's excessive caseload. (ROA 12.) The motion advised that "the assignment of additional cases would jeopardize their ability to competently represent their existing clients, and this client, in a constitutional and ethical manner." (*Id.*) The Office remained on the case, however, and the motion was never ruled on. Burns himself had a heavy caseload which, as he acknowledged, prevented him from meeting regularly with Doerr. (Doc. 167-4, Ex. 56, ¶ 9.) Doerr moved for new counsel on several occasions, citing in part his lack of contact with Burns. (*See* RT 02/02/95 at 3; ROA 48; ROA 125.)

Instead of meeting with his client in person, Burns forwarded documents, including the police reports, for Doerr to review in jail. Burns was unaware that Doerr could barely read. (Doc. 167-4, Ex. 56, ¶¶ 7, 9.) This practice potentially resulted in other inmates gaining access to the information, including Rosales, who may have used such information as the basis of his testimony against Doerr. (*Id.*, ¶ 7.)

"[A]dequate consultation between attorney and client is an essential element of competent representation." *Correll v. Ryan*, 539 F.3d 938, 943 (9th Cir. 2008) (quoting *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983)). However, there is no minimum number of meetings required between counsel and client for counsel to be deemed competent. *Moody v. Polk*, 408 F.3d 141, 148 (4th Cir. 2005). "While the amount of consultation required will depend on the facts of each case, the consultation should be sufficient to determine all legally relevant information known to the defendant." *Tucker*, 716 F.2d at 581–82. In *Correll* the Ninth Circuit found that counsel's "penalty-phase consultation was unreasonably limited" where counsel met with his client only once or twice between trial and sentencing and failed to explain the significance of the sentencing hearing and possible mitigating circumstances. 539 F.3d at 943.

In Doerr's case, the record is unclear as to how much penalty-phase consultation took place directly between counsel and Doerr. Doerr was convicted on April 15, 1996. The presentencing hearing began on August 30, 1996. The court held a status conference

on June 10 to address Doerr's motion for change of counsel and his request to waive mitigation and proceed immediately to sentencing.[17] (*See* ROA 125.) At the conference, Doerr complained that he had seen his attorney only once since he was convicted and wondered what progress had been made on his case. (RT 6/10/96 at 4.) The parties point to nothing in the record that would establish how many additional meetings, if any, took place between Doerr and counsel.

Lacking that information, the question becomes whether there was "legally relevant information known to" Doerr that counsel was unaware of. The answer to that question appears to be no. Dr. Tatro and the mitigation specialist interviewed Doerr and obtained mitigating information about the abusive and dysfunctional household he was raised in and his subsequent struggles with behavioral problems and alcohol abuse. Further details about Doerr's childhood were obtained from Doerr's aunt Hollie, his sister, other family members, and from DCFS records. A friend and an employer who knew Doerr as an adult provided additional information. This contrasts with counsel's performance in *Correll*, where the lack of consultation contributed to counsel's deficient performance in failing to investigate "classic mitigators" such as family dysfunction, psychiatric history, head injuries, and drug abuse. *Id.* at 944–46. Evidence about each of these mitigators was discovered and presented in Doerr's case.

Because Doerr has not identified specific, legally relevant information counsel failed to obtain from him personally, he has not shown that counsel performed ineffectively by failing to meet and consult with him more frequently about mitigating evidence. *See Payton v. Woodford*, 258 F.3d 905, 922 (9th Cir. 2001) (finding counsel's performance was not ineffective where petitioner "points to nothing that would have happened differently had [counsel] and he spent more time together"), *overruled on other grounds by Brown v. Payton*, 544 U.S. 133 (2005).

---

[17] Doerr, who was dissatisfied with the conditions in which he was being held, withdrew his request to waive mitigation after learning that the presentencing hearing would be held in sixty days and not continued for seven months as he had believed. (RT 6/10/94 at 7.)

### b. *Mitigation specialist*

Doerr argues that mitigation specialist Wake acted as an independent witness, not as an advocate for Doerr. (Doc. 167 at 71.) He contends that Wake performed very little investigation and notes that she failed to contact Doerr's sister, parents, ex-wives, and DCFS caseworkers. (*Id.*) Finally, he argues that Wake prepared a substandard report, with omitted or incorrect information. (*Id.* at 73–74.) These complaints are overstated. Wake's social history report, with the attached exhibits, drew a detailed picture of Doerr's bizarre, dysfunctional home life, in particular the cruel and abusive behavior of his father, and made a case for a life sentence.

In compiling her report, Wake interviewed Doerr; Hollie Ortiz, Doerr's paternal aunt; Shirley Plunk, Doerr's second cousin; Linda Wineki, Shirley's daughter and Doerr's third cousin; Bruce Forsythe, Doerr's employer; Debbie Campbell, a co-worker; and John Bibo, Doerr's friend. (ROA 134, Wake's Social History at 2.) The defense investigator, Kasieta, interviewed Doerr's parents. Appolon Beaudoin, the Illinois investigator, interviewed Doerr's sister. Wake attached to her report the following exhibits: Dr. Tatro's evaluation; Beaudoin's notes of his interview of Doerr's sister; a letter from Dwaine May, Doerr's cousin; staffing reports and mental health evaluations from DCFC; Dr. Blackwood's evaluation; and hospital records relating to a 1988 car crash in Florida in which Doerr was injured after being thrown from his vehicle. (*Id.*, Ex's A–M.) Based on this information, Wake submitted six mitigating circumstances for the court to consider. (*Id.* at 21–22.)

In Beaudoin's interview notes, Lucy reported that her father "was abusive, his favorite past time was beating her and Eugene." (*Id.*, Ex. B at 1.) Lucy and Doerr were not treated like kids. (*Id.*) All they did was go to school and clean the house. (*Id.*) They were not properly dressed for school, and had to wear their clothes until they wore out. (*Id.*) They were not allowed to go to social functions. (*Id* at 2.) Their father "locked" the phone and they were not given the phone number. (*Id.* at 1.) He cut the cord to the tv. (*Id.*) They were punished by having to spend days in bed; they could leave only to eat. (*Id.*) They were

also forced to stand in a corner. (*Id.*) Doerr once fell asleep standing up; their father woke him and told him to get back into the corner. (*Id.*) Their father never gave them any encouragement and never had a kind word for anyone. (*Id.*) He verbally abused them, calling Lucy "bitch" and "whore." (*Id.* at 2.) She and Doerr both hated their homelife. (*Id.*) Doerr ran away many times, beginning at age ten. (*Id.*) When they visited their paternal grandmother, they had to stay outside while their parents went inside; they could enter the home only to use the bathroom. (*Id.*) Their father "took away their childhood." (*Id.*) He treated the family dog better than he treated his children. (*Id.*) Lucy believed that Doerr's "situation has a lot to do with how he was raised." (*Id.*)

Dwaine May's letter, which Wake quoted in her social history, corroborated the reports of abuse offered by Doerr, his aunt, and his sister. (*Id.*, Ex. C.) May wrote that Doerr's father "beat him to a pulp" with a belt buckle, sicced a dog on him, and threw him through a plate glass window. (*Id.* at 2.) He "would starve [Doerr] for a week or better and would make him sit at the table and watch everyone else eat." (*Id.*) When Doerr wet his pants, his father made him stand in the corner for six to eight hours with his soiled underwear on his head; if he removed the underwear he would be beaten. (*Id.*) May wrote that Doerr's father sexually molested Lucy. (*Id.* at 3.) He was a "monster" who made Doerr the way he is. (*Id.*) In a passage quoted by Wake in her report, May wrote that the "mortal abuse [Doerr] suffered would be enough to drive anyone over the edge. It's not Eugene who should be found guilty of murder it should have been his father Charles Doerr because he's the one who made Eugene the way he is." (*Id.*; ROA 134, Wake's Social History, at 21.)

At the conclusion of her report, Wake listed the proposed mitigating circumstances, which included the fact that Doerr was "raised in an environment totally devoid [of] love, affection, and respect," was "brutally abused both physically and emotionally from the time he was an infant until he was placed at [ISSCS]," and was "physically and emotionally isolated as a child." (*Id.* at 21.) She also listed the fact that he was found to be Educable Mentally Handicapped. (*Id.*) She cited the findings of Drs. Tatro and Blackwood

concerning Doerr's brain damage and personality traits. (*Id.* at 21–22.) Finally, Wake cited Doerr's intoxication at the time of the offense. (*Id.* at 22.) Contrary to Doerr's assertion, in listing and supporting these circumstances Wake advocated for a life sentence.

Doerr also argues that counsel performed ineffectively by failing to object when the State called Wake as a witness and questioned her about the aggravating factors in the case. (Doc. 167 at 75.) Wake's testimony about the cruelty of the murder was not helpful to the defense, but it did no more than state the obvious and so resulted in no prejudice to Doerr.

Based on the information she and the defense team assembled, Wake's work as a mitigation specialist does not support a claim that the performance of Doerr's attorneys was deficient.

### c. Lay witnesses

Doerr argues that counsel performed ineffectively by failing to prepare the lay witnesses for their testimony at the presentencing hearing. (Doc. 167 at 76.) The Court disagrees. As already discussed, counsel presented a substantial case in mitigation based on information provided by the lay witnesses showing that Doerr suffered terrible abuse and neglect as a child and struggled with daily life because of his low intelligence, behavioral problems, and alcohol abuse. The witnesses, in particular Hollie Ortiz, provided such information irrespective of whether they were properly informed about the nature of mitigating evidence. Counsel did not perform deficiently in their handling of the lay witnesses.

### d. Expert witnesses

Doerr argues that counsel performed ineffectively "by not retaining the necessary experts to prove brain damage and make a medical and psychiatric diagnosis, by not adequately preparing experts that were used, and by failing to present no [sic] rebuttal to the State's only expert, Dr. Youngjohn." (Doc. 167 at 77.)

Doerr first contends that counsel should have retained a neurologist and a psychiatrist in addition to the psychologist, Dr. Tatro, and the two neuropsychologists, Drs. Blackwood and Walters, counsel did retain for the presentencing hearing. This

argument is not persuasive. Counsel's choice of potential expert witnesses is a strategic decision entitled to deference. *Brown v. Uttecht*, 530 F.3d 1031, 1035 (9th Cir. 2008). "Attorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts." *Crittenden v. Ayers*, 624 F.3d 943, 966 (9th Cir. 2010). To impose on counsel an additional duty "to investigate independently of a request for information from an expert would 'defeat the whole aim of having experts participate in the investigation.'" *Sims v. Brown*, 425 F.3d at 560, 585–86 (9th Cir. 2005) (quoting *Hendricks*, 70 F.3d at 1038).

Doerr's counsel acted reasonably in selecting Dr. Tatro and then, following up on his suggestion that Doerr may have brain damage, retaining neuropsychologists to confirm that diagnosis. The fact that several years later, and with access to increased resources, habeas counsel were able to find different experts who reached different diagnoses does not mean that trial counsel's strategy was unsound. *See Brown*, 530 F.3d at 1035 (finding counsel did not perform ineffectively in failing to present testimony from a psychiatrist located by habeas counsel when psychiatrist's opinion wasn't reached until a decade after trial); *Crittenden*, 624 F.3d at 966 ("That none [of the experts retained by counsel] happened to unearth the particular line of mitigating evidence Crittenden now presents does not compel the conclusion that the investigation was deficient"); *cf. Pinholster v. Ayers,* 590 F.3d 651, 709 (9th Cir. 2009) (en banc) (Kozinski, C.J., dissenting)*, rev'd sub nom. Cullen v. Pinholster*, 563 U.S. 170 (2011) (describing the volume of new mitigating evidence, including new expert diagnoses, accumulated by habeas counsel in the years following sentencing).

Drs. Blackwood and Walter did not recommend that counsel retain additional experts or that Doerr undergo additional testing beyond the PET scan. *See Babbitt*, 151 F.3d at 1174 ("The experts [counsel] had retained did not state that they required the services of these additional experts. There was no need for counsel to seek them out independently."); *Stokley v. Ryan*, 659 F.3d 802, 813 (9th Cir. 2011) (finding counsel did not perform deficiently by failing to retain a neuropsychologist where petitioner had been

examined by a neurologist and a psychiatrist and neither stated that neuropsychological testing was necessary). "Having retained qualified experts, it was not objectively unreasonable for [counsel] not to seek others." *Payton v. Cullen*, 658 F.3d 890, 896 (9th Cir. 2011).

"This is not a situation where counsel failed to conduct any investigation into mental health mitigation." *Roybal v. Davis*, 148 F. Supp.3d 958, 1074 (S.D. Cal. 2015). In *Roybal* the petitioner alleged that counsel performed ineffectively by failing "to adequately investigate and present evidence of organic brain damage in mitigation at the penalty phase." *Id.* at 1072. Specifically, the petitioner asserted that "counsel failed to obtain complete medical records, failed to compile sufficient social history information, and failed to obtain adequate testing." *Id.* at 1072. The district court denied the claim. *Id.* at 1075.

Before trial, counsel obtained records from an alcohol treatment center, a hospital, and two correctional facilities. *Id.* at 1061. Counsel also retained three mental health professionals: a clinical psychologist and two psychiatrists. *Id.* at 1061–62. The psychologist, Dr. Friedman, administered tests that were positive for organicity. *Id.* at 1062. One of the psychiatrists, Dr. Cermak, testified at the penalty phase of trial. *Id.* at 1063. He reviewed the records and the psychologist's report. (*Id.*) He testified that the petitioner "has significant impairment cognitively due to some brain dysfunction" and concluded it was "very, very likely that what we're dealing with is organic brain damage." (*Id.* at 1063–64.)

Although trial counsel stated that he should have done more investigation with respect to the petitioner's reported head trauma, and Dr. Cermak opined that more thorough testing, such as that conducted in postconviction proceedings, would have allowed him to testify unequivocally that the petitioner had brain damage, the district court concluded that counsel's performance was neither deficient nor prejudicial. *Id.* at 1074–75. The court noted that "counsel retained three mental health experts to interview and evaluate Petitioner, compiled numerous records from Petitioner's time in substance abuse treatment, as well as correctional records including a psychological evaluation, interviewed family

members, friends, and acquaintances, and supplied these materials to their testifying expert." *Id.* at 1074–75.

Similarly, in Doerr's case, Drs. Blackwood and Walters were provided with Dr. Tatro's test results as well as background information from several sources, including medical records, DCFS records, jail records, and information from Doerr's family members and friends about his social history. Based on that information, Doerr's experts testified that he suffered from brain damage, identified the potential causes of the damage, and explained the effects of the damage on Doerr's behavior, including its impact on his conduct in committing the murder.

Like the petitioner in *Roybal*, Doerr argues that counsel should have "retain[ed] an expert to conduct additional testing that would have solidified and strengthened the evidence of organic brain damage." *Id.* at 1075. In *Roybal* the court rejected this argument, noting that "Dr. Friedman conducted an extensive battery of tests over three days and found organic brain damage, which counsel presented through the penalty phase testimony of Dr. Cermak." The court continued: "Although Petitioner now asserts that had additional records been obtained, and had additional tests been performed, the expert testimony would have been stronger and would have withstood cross-examination and rebuttal testimony, that is not the standard" under *Strickland*. *Id.* (citing S*trickland*, 466 U.S. at 689). In fact, the court noted, Roybal's post-conviction experts "concur[red] with the results of trial counsels' investigation, . . . conclud[ing] that Petitioner suffers from organic brain damage, just as Dr. Cermak testified to at trial." *Id.*

Like counsel in *Roybal*, Doerr's attorneys did not ignore evidence of potential brain damage. Instead, the experts they retained detected and affirmed the presence of brain damage and described its effect on Doerr's behavior. Experts retained during the habeas proceedings have confirmed that finding and offered additional, more detailed diagnoses, including that Doerr suffers from epileptic episodes and parasomnia.

Even if these new diagnoses were inconsistent with the findings of Drs. Tatro, Blackwood, and Walters, that would not establish that counsel performed deficiently in

choosing the experts they did and relying on their opinions. "An expert's failure to diagnose a mental condition does not constitute ineffective assistance of *counsel*, and [the petitioner] has no constitutional guarantee of effective assistance of experts." *Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010) (italics in original). "Later disagreement by other experts as to the conclusions does not demonstrate a violation of *Strickland*." *Fairbank v. Ayers*, 650 F.3d 1243, 1252 (9th Cir. 2011); *see Crittenden*, 624 F.3d at 965–66 (explaining that expert's "singular diagnosis of an organic mood disorder with bipolar features amounts to a difference in medical opinion, not a failure to investigate") (citing *Fields v. Brown*, 431 F.3d 1186, 1205–06 (9th Cir. 2005)).

Doerr argues that counsel performed deficiently by failing to prepare the expert witnesses to testify. (Doc. 167 at 78–84.) The Court disagrees. This is not a case where lack of preparation or access to information prevented the experts from reaching a definitive diagnosis. *See Bean v. Calderon*, 163 F.3d 1073, 1078–79 (9th Cir. 1998) (finding counsel incompetent for failing to provide necessary information to two experts as a result of which "the experts were unable to definitively opine as to whether Bean suffered from organic brain damage and other mental disorders"); *see also Bloom v. Calderon*, 132 F.3d 1267, 1277–78 (9th Cir. 1997) (finding deficient performance where counsel failed to obtain a psychiatric expert until days before trial and then failed to prepare the expert); *Clabourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995) (finding deficient performance where defense expert was "wholly unprepared to testify as to Clabourne's mental state at the time of the offense; not having interviewed Clabourne, and having less than two days to prepare his testimony").

As described above, Dr. Blackwood, who was retained prior to trial, was provided with Dr. Tatro's evaluation, a psychological evaluation conducted in 1976, DCFS records, records from correctional health services, and letters written by Doerr. (RT 10/21/96 at 6-7.) Dr. Walter, who was retained a month before the sentencing hearing, was able to review Doerr's prior neuropsychological exam and raw data, psychological histories from the DCFS, hospital records, and the social history prepared by Holly Wake. (*Id.* at 33–34,

70–71.) Based on this information, Drs. Blackwood and Walter were able to diagnose Doerr with brain damage.

Doerr cites *Hinton v. Alabama*, 571 U.S. 263 (2014), to support his assertion that counsel performed ineffectively because Drs. Blackwood and Walter were discredited by the State. (Doc. 167 at 84.) In *Hinton* counsel performed ineffectively as the result of an "inexcusable mistake of law." 571 U.S. at 275. Incorrectly believing that funding for expert witnesses was capped under state law, counsel retained the only expert he believed he could afford. *Id.* at 266–67. The expert was unqualified to testify about the ballistics evidence, which was the key issue in the case, and was "badly discredited" on cross-examination. *Id.* at 269.

*Hinton* is inapposite. First, the case does not address Doerr's argument. Counsel there did not perform deficiently by failing to prepare the expert but by retaining him in the first place under the mistaken belief that funding for a qualified expert was not available. Doerr does not argue that Drs. Blackwood and Walter were unqualified to offer expert testimony, and the Court finds that counsel did not perform ineffectively in retaining them. Next, unlike the expert in *Hinton*, Drs. Blackwood and Walter were not "badly discredited" as a result of lack of preparation for their testimony. At the presentencing hearing, Dr. Blackwood was not, as Doerr suggests, unaware of the negative PET scan result or reports of Doerr's intact motor skills. His admissions on cross-examination did not help Doerr's case, but they were not the result of being left unprepared by counsel. *Cf. Mickey v. Ayers*, 606 F.3d 1223, 1246 (9th Cir. 2010) (explaining that counsel did not perform deficiently in failing to "better coordinate" experts' testimony).

Doerr further argues that a "red flag" should have been raised when Dr. Walter, in an interview with the State a few days prior to the presentencing hearing, explained that an EEG could also be used to detect brain damage. (Doc. 167 at 80.) In fact, Dr. Walter indicated that while an EEG may be more sensitive than a CAT scan or MRI, a PET scan is more sensitive than an EEG. (Doc. 167-3, Ex. 24 at 7.)

Doerr contends that another red flag should have been raised by Dr. Walter's statement during the interview that Doerr told him he had been sexually abused at the boys' home. (Doc. 167 at 80; *see* Doc. 167-3, Ex. 24 at 6.) Doerr asserts that "no further information appears to have been developed regarding Mr. Doerr's sexual abuse." (*Id.*) Doerr's contention that counsel conducted no further investigation is conclusory and not sufficient to meet his burden of establishing deficient performance under *Strickland*. Apart from Dr. Walter's statement in the interview, there is no evidence in the state court record that Doerr was sexually abused as a child or reported such abuse to the defense team. Moreover, the various reports of sexual abuse offered during these habeas proceedings are unrelated to Doerr's purported statement to Dr. Walter that he was abused at the boys' home.[18] And there is no evidence that any of this information was conveyed to trial counsel. *See Benson v. Chappell*, 958 F.3d 801, 829 (9th Cir. 2020) (finding counsel did not perform deficiently by failing to present evidence that petitioner was tortured and sexually assaulted where petitioner "provided no evidence that trial counsel was ever informed [petitioner] was seriously abused"); *Schurz v. Ryan*, 730 F.3d 812, 815 (9th Cir. 2013) (rejecting argument that counsel performed ineffectively by failing to present evidence that petitioner was "likely sexually abused by a priest" where evidence of abuse "relie[d] on such tentative statements from family members" and petitioner "present[ed] no medical reports or even a declaration from Schurz himself").

---

[18] In his supplemental *Martinez* brief, Doerr indicates that he has reported being sexually abused. (Doc. 167 at 43 n.29.) He cites the report of Dr. Lewis and the declaration of Hallie Terry, both of which were produced during the habeas proceedings. Dr. Lewis writes that Doerr's father "sexually abused Lucy and is believed by relatives to have sexually abused Eugene as well." (Doc. 167-1, Ex. 2 at 5.) According to Dr. Lewis, Doerr "recalled that his father would come into his bedroom at night and shock his genitals with a cattle prod when he thought Eugene was masturbating." (*Id.* at 5–6.) Lucy is also reported to have told Dr. Lewis that "she and Eugene were left in the care of several older neighborhood children who also sexually abused them." (*Id.* at 6.) Finally, Dr. Lewis writes that Doerr's aunt Hallie reported being told by Doerr that "his father abused him sexually" and that Hallie believed Doerr's father "dressed Eugene as a girl in order to take sexual advantage of him. . . . " (*Id.* at 10.) In her declaration, Hallie Terry states that Doerr told her that both he and his sister were sexually abused by their father. (Doc. 167-3, ¶ 6.) In her 2014 declaration, investigator Kasieta states that Doerr had confided in her that his mother performed oral sex on him and his father "did things to him that weren't right." (Doc. 167-4, Ex. 59, ¶ 10.)

Doerr also contends that counsel performed deficiently by providing Dr. Blackwood with a copy of Dr. Tatro's report and then designating Dr. Blackwood an expert. (Doc. 167 at 78.) According to Doerr, this allowed the State to gain access to the reports of Drs. Tatro and Blackwood, which contained damaging information, such as prior violent acts Doerr reported to Dr. Tatro, Dr. Tatro's opinion that Doerr may have better recall of the murder than he let on, and the experts' opinion that Doerr was "quite dangerous." (*Id.*) The Court finds that counsel did not mishandle their experts in this manner. Doerr's dangerousness was obvious from the brutality of the crime itself, and because Dr. Tatro did not testify, the State had no opportunity to use the damaging information contained in his report.

Finally, Doerr's contention that counsel did not attempt to rebut Dr. Youngjohn's testimony is simply incorrect. As noted above, counsel submitted letters from Drs. Blackwood, Walter, and Heiserman challenging Dr. Youngjohn's opinion that Doerr malingered and that a negative PET scan conclusively demonstrated the absence of brain damage. (Doc. 168, Ex. 63.) Counsel's failure to call those witnesses to testify in rebuttal did not constitute deficient performance. In *Mickey*, 606 F.3d at 1246, for example, the court rejected the petitioner's claim that "counsel should have deployed the penalty phase experts in surrebuttal of the prosecution's expert." The court explained that "it is not deficient to refuse to join a battle royale of experts." *Id.* In any event, counsel was able to present his experts' responses to Dr. Youngjohn's testimony without subjecting their opinions to cross-examination. *See id.*

e.      *Advocacy*

Doerr argues that counsel performed deficiently by failing to advocate for a life sentence—specifically, by failing to submit a sentencing memorandum and failing to argue orally on Doerr's behalf. (Doc. 167 at 86–87.) As discussed above, counsel submitted a list of mitigating circumstances along with mitigation specialist Wake's social history report and a supplemental memorandum with additional information about Doerr's dysfunctional family background. Doerr cites no authority holding that under these circumstances the

1  failure to engage in additional written advocacy or oral advocacy before a judge constitutes

2  deficient performance.

3          *f.*      *Rebutting aggravating factor*

4        The trial court found one aggravating factor, that the murder was especially cruel,

5  heinous, or depraved under A.R.S. § 13–703(F)(6). (Doc. 174-3, Ex. F.) Because the (F)(6)

6  factor is phrased in the disjunctive, it is "established by the existence of any of these

7  elements." *Doerr*, 193 Ariz. at 68, 969 P.2d at 1180. The court found that all three elements

8  existed. (Doc. 174-3, Ex. G.) In ruling that the murder was heinous and depraved, the court

9  found that Doerr inflicted gratuitous violence and mutilation and that the murder was

10  "senseless, shockingly evil, and perverse." (*Id.* at 5.) The court also found that Doerr

11  "relished" the murder. (*Id.* at 5–6.) The latter finding was based on Rosales's testimony

12  that Doerr told him about "playing with" the victim's blood. (*Id.* at 6.)

13        Doerr argues that counsel performed ineffectively by failing to rebut this

14  aggravating evidence by attacking Rosales's credibility with, among other evidence,

15  testimony that he had never been, as he claimed, Doerr's cellmate. (Doc. 167 at 87.) While

16  it is true that Rosales's credibility was vulnerable to attack, even if counsel had thoroughly

17  discredited his testimony it would not have affected the trial court's determination that the

18  (F)(6) factor existed. Although "relishment" would have been removed as one of the

19  grounds for finding the murder especially heinous and depraved, other grounds remained,

20  including gratuitous violence, mutilation, and senselessness. More importantly, the

21  element of cruelty, which alone is sufficient to satisfy the (F)(6) factor, was established

22  without any reference to Rosales's testimony.

23        Counsel did not perform ineffectively by failing to attack Rosales's credibility.

24          *g.*     *Conclusion*

25        In determining whether counsel's performance was deficient, "the relevant inquiry

26  . . . is not what defense counsel could have pursued, but rather whether the choices made

27  by defense counsel were reasonable." *Murray (Robert)*, 745 F.3d at 1011; *see Roybal*, 148

28  F.Supp.3d at 1074. *Strickland* requires a "highly deferential" assessment of counsel's

performance. 466 U.S. at 689. Under that standard, Doerr's counsel performed reasonably in their selection of experts and their investigation of Doerr's social history.

Trial counsel's "duty to investigate . . . does not necessarily require that every conceivable witness be interviewed." *Crittenden*, 624 F.3d at 967 (quoting *Douglas v. Woodford*, 316 F.3d 1079, 1088 (9th Cir. 2003)) (additional quotation omitted); *see also Van Hook*, 558 U.S. at 11–12 (explaining that "counsel's 'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.'") (quoting *Strickland*, 466 U.S. at 699).

In *Van Hook,* the Supreme Court reversed the Sixth Circuit's grant of habeas relief on a claim of ineffective assistance of sentencing counsel. Defense counsel had spoken with the defendant's parents, an aunt, and a family friend; met with two expert witnesses; reviewed military and medical records; and considered retaining a mitigation specialist. 558 U.S. at 9–10. The Court rejected the argument that counsel performed deficiently by failing to interview other family members who "could have helped his counsel narrate the true story of Van Hook's childhood experience." *Id.* at 11. The Court characterized as a "gross distortion" Van Hook's assertion that counsel "found only a little information about his traumatic childhood experience." *Id.* at 10 (interior quotation omitted). The Court held that the scope of counsel's investigation was reasonable, explaining that "given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents." *Id.* at 11.

Doerr's defense team, which included investigators and a mitigation specialist, spoke with Doerr's only sibling, his parents, his ex-wives, other relatives, his employer, a co-worker, and a friend. They gathered records from the institution where Doerr was placed as a youth. Counsel also retained three experts, two of whom testified at the presentencing hearing. As in *Van Hook*, Doerr's counsel presented evidence about the petitioner's

traumatic childhood and his history of alcohol abuse. 558 U.S. at 10. It would be a "distortion" to say that Doerr's counsel presented only a little information about his troubled life history, and it would be unreasonable to find, given the information the defense team unearthed from those closest to Doerr during his childhood and the experts who evaluated him and reviewed his background, that counsel erred by not expanding their investigation beyond the relatives, professionals, and institutions already contacted. Doerr's attorneys "conscientiously and extensively investigated" possible mitigating evidence. *See Cox v. Ayers*, 613 F.3d 883, 892, 897 (9th Cir. 2010) (rejecting argument that counsel's performance was deficient where he failed "to obtain all public records regarding his family; did not interview additional family members, counselor, friends, or teachers; and decided not to present retained experts as witnesses").

In *Crittenden* the Ninth Circuit rejected the petitioner's claim that counsel performed deficiently by inadequately investigating his "history of childhood abuse and behavioral difficulties." 624 F.3d at 966. Although reports that Crittenden was badly abused by his mother surfaced during post-conviction proceedings, the court found that counsel's penalty-phase investigation was thorough. *Id.* at 967. "[T]rial counsel's investigators spoke with family members and friends who had information about Crittenden's childhood and relationship with his family, but none of them reported anything that would have placed counsel on notice to investigate further." *Id.* The court found that under these circumstances, where the defense team had contacted those closest to the petitioner, including his "entire immediate family," counsel's performance was not unreasonable. *Id.*

In Doerr's case, the defense team gathered information from Doerr's entire immediate family, including his parents, his sister, his aunt, and his cousins; from a close friend, an employer, and co-worker; from Doerr's ex-wives; and from the institution he was placed in as a youth. The information from these sources thoroughly documented Doerr's traumatic childhood and his difficulties as an adult. Counsel had no reason to believe that "questioning a few more family members," if indeed there were more family

members to question, would have produced additional information. *Crittenden*, 624 F.3d at 967 (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)).

The court in *Crittenden* also rejected the petitioner's argument that counsel performed deficiently because they failed to "present[] the import of his brain dysfunction more clearly" and failed to emphasize that it "affected his 'impulse' control." *Id.* at 967-68. The court noted that two experts testified at sentencing about Crittenden's "brain abnormalities" and frontal lobe damage and the "practical effect of frontal lobe damage on a person's ability to control himself." *Id.* at 968.

Likewise in Doerr's case, Drs. Tatro, Blackwood, and Walter all provided information about his brain damage and its effect on his ability to control his behavior. Dr. Tatro wrote in his report that "the role brain damage" played in the commission of the crime "should not be underestimated." (ROA 134, Wake Social History, Ex. A at 13.) Dr. Blackwood, in his report and during his testimony at the presentencing hearing, discussed Doerr's "brain dysfunction and impaired brain" and the "specific disturbance in the right spheral hemisphere." (RT 10/21/96 at 8.) He testified that the impairment impacted Doerr's "emotional reactions and behavioral controls" and "disrupted" his ability to control his behavior. (*Id.* at 12–13, 28–29.) Dr. Blackwood "believe[d] it is quite likely that Mr. Doerr's brain dysfunction contributed to the actions resulting in the current charges." (ROA 134, Wake's Social History, Ex. L at 6.) Dr. Walter also testified that Doerr's right spheral brain damage was a "contributing factor" in the victim's death. (RT 10/21/96 at 70.) Counsel did not perform ineffectively in presenting evidence of Doerr's brain damage, its effect on his behavior, and its connection to the crime.

The Ninth Circuit has observed that "it is not enough just to present 'extensive mitigating evidence' where particularly persuasive evidence—especially evidence in the form of expert testimony—was omitted." *Bemore v. Chappell*, 788 F.3d 1151, 1172 (9th Cir. 2015) (quoting *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)). The court elaborated that "it is not enough that some of the defense witnesses informed the jury of the facts that might *underlie* a mental health mitigation defense; 'expert testimony to

explain the ramifications of those experiences on [petitioner's] behavior . . . is necessary.'" *Id.* (quoting *Caro*, 165 F.3d at 1227). As just discussed, in Doerr's case, counsel presented extensive mitigating information, including evidence "in the form of expert testimony." Counsel presented not only the evidence underlying Doerr's mitigation defenses, but expert opinions and testimony explaining the "ramifications" of such evidence on Doerr's behavior.

Doerr's counsel performed reasonably. They interviewed those most familiar with Doerr's upbringing and presented evidence of his traumatic childhood experiences. *See Van Hook*, 558 U.S. at 10–11. They offered expert evidence of his brain damage. *Id.* at 11. In sum, counsel did not, in presenting their case in mitigation, make errors so serious that they were "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Doerr has not met "the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw*, 255 F.3d at 939. Counsel did not perform deficiently at sentencing.

### 2. Doerr was not prejudiced by counsel's performance

Doerr contends that he was prejudiced by the alleged deficiencies discussed above. He argues that:

> The mitigating case that trial counsel should have presented would have told the true story of Eugene Doerr—a man who comes from a family with generations of significant mental illness, including mood disorders; a man who has significant brain damage that causes uncontrollable impulses and epileptic episodes; a man who has intellectual disability, making it impossible for him to function in society without the substantial assistance of others; and a man who suffers from decades of alcohol abuse that began as a coping mechanism to deal with the severe trauma from his childhood.

(Doc. 167 at 98.)

Doerr asserts that "the trial court discounted his brain damage because trial counsel failed to present the necessary facts to allow the court to reach the correct conclusion." (*Id.* at 96.) Doerr argues there was a reasonable probability that presenting additional support for a finding of brain damage would have caused the trial court, which had characterized such evidence as "speculative," to conclude that brain damage had been established and

thereby reach a different sentencing decision. (*See* Doc. 167 at 96–97.) Doerr also contends that he was prejudiced by the omission of additional evidence of his abusive family background. (*Id.* at 98–99.)

To determine if there was prejudice from counsel's performance at sentencing, the reviewing court "reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. The totality of mitigating evidence includes the evidence introduced at trial and evidence brought forward in subsequent proceedings. *Id.* at 536.

Doerr argues that counsel should have presented additional expert testimony at sentencing. The experts Doerr retained during these habeas proceedings have offered a variety of diagnoses. For example, Dr. Lewis found that Doerr experienced symptoms consistent with epileptic traits, including electrical abnormalities of the brain that caused aberrant behavior, especially while Doerr was sleeping. (Doc. 167-1, Ex. 2 at 21.) She diagnosed Doerr with parasomnia and opined that he was in an altered state of consciousness at the time of the offense. (*Id.* at 3, 23, 28.) Dr. Lewis also opined that Doerr should have been examined by a neurologist and a psychiatrist and that an EEG would have been more helpful diagnostically than a PET scan. (*Id.* at 31.)

Dr. Woods likewise opined that Doerr has electrical abnormalities of the brain and a history of mental states consistent with seizure activity, including sleep walking and sleep eating, inappropriate laughter, unexplained rage reactions, and periods of unresponsiveness while appearing to be awake. (Doc. 167-1, Ex. 4.)

Dr. Riley found "multiple indications of brain dysfunction," determined that Doerr's IQ was at the low end of average, and noted that several members of his family suffered from mental retardation, learning disabilities, and psychiatric illness, indicating a "genetic contribution" to Doerr's deficits. (Doc. 167-2, Ex. 5 at 12, 16.)

While these diagnoses offer more detail than the evidence presented at the presentencing hearing, they do not alter the picture of Doerr's neuropsychological status, particularly as it relates to his conduct surrounding the murder. Dr. Tatro, for example,

found that while committing the crime Doerr was "both seriously out of touch with that part of the personality that normally considers consequences and out of control of his impulses." (ROA 134, Wake Social History, Ex. A at 13.) Dr. Blackwood testified that Doerr had damage to the right hemisphere of his brain that impeded his ability to control his behavior and respond appropriately. (RT 10/21/96 at 12–13.) Dr. Walter, agreeing with that finding, also opined that Doerr's brain damage might have caused him to experience a "rage reaction" and then to disassociate once he attacked the victim. (*Id.* at 37–38, 43–45.) He explained that people with Doerr's type of brain damage have a "higher degree of interpersonal violence" and "great difficulty starting and stopping their behavior." (*Id.* at 38, 42.) The right hemisphere damage, combined with alcohol use, impaired Doerr's ability to control his behavior. (*Id.* at 39.)

Both sets of experts, those retained by trial counsel and those retained by habeas counsel, agree that Doerr had brain damage that affected his ability to control his conduct, such that he acted out of impulse in attacking the victim and may have disassociated while committing the offenses.[19] The largely cumulative nature of the new expert opinions diminishes the likelihood of prejudice. *See Leavitt v. Arave*, 646 F.3d 605, 615 (9th Cir. 2011) ("[C]umulative evidence is given less weight because it is not as likely to have affected the outcome of the sentencing."); *Rhoades*, 638 F.3d at 1051 (finding no prejudice despite the fact that new expert evidence "exceed[ed] what was uncovered and presented by trial counsel" in part because "much of the newly adduced evidence is cumulative"); *Bible v. Ryan*, 571 F.3d 860, 871–72 (9th Cir. 2009) (finding no prejudice where further evidence of brain damage would have been cumulative to evidence presented at sentencing of petitioner's potential brain damage due to drug and alcohol abuse).

In *Leavitt*, the Ninth Circuit found that the petitioner was not prejudiced by resentencing counsel's failure to obtain an MRI. 646 F.3d at 613–16. At the original

---

[19] To the extent the diagnosis of parasomnia is not cumulative of the evidence presented at sentencing, the Court is not convinced that attributing the crimes to that condition— essentially, arguing that Doerr involuntarily murdered, sexually assaulted, and mutilated the victim while asleep—would have been more convincing to the sentencer than the evidence of a "rage reaction" and dissociation that was presented.

sentencing, counsel had presented evidence of a CT scan showing slight cortical atrophy, which possibly affected the petitioner's cognitive function. *Id.* at 607. The trial judge denied a defense motion for an MRI. *Id.* During subsequent habeas proceedings an MRI was performed. *Id.* at 608. It showed the presence of white matter hyperintensities ("WMH"), which could indicate an organic cause for the petitioner's personality disorder. *Id.* In finding that no prejudice resulted from the failure to obtain an MRI at sentencing, the Ninth Circuit explained that the new evidence from the MRI "is less weighty . . . because it merely adds to what had already been presented." *Id.* at 615. Because the judge at sentencing was aware of the "physiological problem" with the petitioner's brain—the cortical atrophy—the WMHs constituted "additional, cumulative evidence of the brain disorder the sentencing judge already knew Leavitt had." *Id.*

Similarly, in Doerr's case, the evidence of electrical abnormalities in Doerr's brain is cumulative of the evidence the trial judge had of Doerr's organic brain damage, which impaired his impulse control and possibly caused him to dissociate during the crime. *See Smith v. Ryan*, 823 F.3d 1270, 1296 (9th Cir. 2016) (finding no prejudice from sentencing counsel's failure to obtain PET scan and another imaging study, which revealed evidence of organic brain damage, where such evidence was cumulative of neuropsychological testing that showed "moderate brain impairment").

Also cumulative is evidence of Doerr's low IQ and reading difficulties. These issues were presented at sentencing through the testimony of the witnesses, the experts' reports, and the DCFS records.

Even if the new evidence of Doerr's brain abnormalities is not cumulative, its mitigating value is subject to question. In *Leavitt* the court noted that the presence of "a biological mental impairment" is not necessarily mitigating. 646 F.3d at 615. Evidence of "organic personality" and "brain damage" is "by no means clearly mitigating, as the jury might have concluded that [the defendant] was simply beyond rehabilitation." *Id.* (quoting *Pinholster*, 563 U.S. at 201); *see Smith v. Duckworth*, 824 F.3d 1233, 1254–55 (10th Cir. 2016) (explaining that it is permissible for courts to consider the double-edged quality of

mental health evidence); *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1328 (11th Cir. 2013) (finding that evidence petitioner "suffered from an uncontrollable rage reaction or impulse disorder as a result of the brain damage" would likely lead the jury to find he was beyond rehabilitation). In Doerr's case as in *Leavitt*, "there's no way of knowing which way evidence of a biological mental impairment would have cut; it very well may have counted against [Doerr]." 646 F.3d at 615.

Doerr is correct that counsel did not present evidence of a "multigenerational family history of cognitive impairment and severe mental illness demonstrating the hereditability of neuropsychiatric illnesses." (Doc. 167 at 29.) The trial court was aware, however, through the reports and testimony of Drs. Tatro, Blackwood, and Walter, of Doerr's mental illness, organic brain damage, alcoholism, and low IQ. In addition, the record documented the bizarre and dysfunctional behavior of Doerr's parents, including his father's uncontrollable rage and descriptions of his mother as "slow" and his maternal aunt as "afflicted" and "retarded." Establishing a genetic basis for Doerr's conditions would not have appreciably strengthened their mitigating value given the evidence that was presented. *See Clark v. Chappell*, 936 F.3d 944 (9th Cir. 2019).

In *Clark*, the petitioner argued that counsel performed ineffectively by failing to present additional evidence of his life history, including evidence of a genetic predisposition for depression and substance abuse. *Id.* at 987–89. The court disagreed, noting that counsel did present "substantial life history" evidence as well as evidence of Clark's "longstanding mental health issues." *Id.* at 988. Although counsel did not present "*all* of Clark's life history evidence," he did "proffer[] extensive evidence to illustrate that Clark suffered a traumatic, abusive childhood and experienced its effects on his development, mental health, and substance abuse." *Id.* at 988–89. The court found, therefore, that much of the omitted evidence was cumulative to the evidence that was presented. *Id.* at 989. The court concluded that counsel's performance was "adequate" under prevailing standards and "not objectively unreasonable." *Id.* Like counsel in *Clark*, Doerr's attorneys presented extensive evidence of his life history as well as evidence of his

psychological and neuropsychological conditions and the effects of those conditions on his behavior. Doerr was not prejudiced by counsel's failure to offer additional evidence of a family history documenting the same conditions.

Doerr's argument that he was prejudiced by counsel's failure to produce additional social history evidence suffers from the same weaknesses as the proffered expert evidence. Much of the new information about Doerr's background, character, and behavior is cumulative to what was presented at sentencing, reducing the likelihood of prejudice from its omission. *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("[T]o establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing."). Trial counsel offered detailed evidence of the extreme abuse and neglect Doerr suffered as a child. They also presented evidence of his slowness and odd behavior. The new evidence from family members, ex-wives, and DFCS case-workers is not substantially different, in strength and subject matter, from the evidence produced at sentencing. *Hill*, 400 F.3d at 319; *see Benson*, 958 F.3d at 833 (finding no prejudice where new evidence of torture and sexual abuse was "cumulative" to evidence of petitioner's "horrendous childhood"); *Schurz*, 730 F.3d at 815 (rejecting claim that counsel performed ineffectively by failing to present mitigating evidence of petitioner's "drug abuse and dysfunctional family life" where counsel "extensively covered those areas in his sentencing memorandum, complete with an attached psychological evaluation"); *Cunningham v. Wong*, 704 F.3d 1143, 1161 (9th Cir. 2013) (explaining that the "primary mitigation value" of testimony that petitioner was loved by his family "was adequately presented at the penalty phase" so additional evidence was cumulative); *Babbitt*, 151 F.3d at 1176 (finding no prejudice where evidence omitted at sentencing was "largely cumulative of the evidence actually presented"); *Woratzeck v. Stewart*, 97 F.3d 329, 336–37 (9th Cir. 1996) (finding no prejudice from counsel's failure to investigate or call additional witnesses at sentencing because all the information the witnesses would have presented was contained in the presentence report). Presentation of additional evidence of Doerr's traumatic childhood,

educational struggles, and behavioral difficulties "would barely have altered the sentencing profile presented to the sentencing judge." *Strickland*, 466 U.S. at 699–700; *see Pinholster*, 563 U.S. at 200 (finding no prejudice where the "'new' evidence largely duplicated the mitigation evidence at trial").

Moreover, to the extent the information produced during these habeas proceedings is not cumulative, much of it tends to have, like the expert evidence just discussed, a "double-edged" nature. The declarations of Doerr's ex-wives, for example, depict Doerr both as a victim of his background and brain dysfunction and as a sexually violent and sadistic individual with a record of attacking women. Again, courts have consistently recognized that the failure to present such double-edged evidence is neither deficient nor prejudicial. In *Burger v. Kemp*, the Supreme Court found that counsel was not ineffective for failing to present mitigating evidence of the petitioner's troubled family background where such evidence would have led to the introduction of damaging facts and suggested that the petitioner had "violent tendencies." 483 U.S. 776, 793–95 (1987); *see Pinholster*, 563 U.S. at 201; *Benson*, 958 F.3d at 833 (explaining that evidence of childhood sexual abuse "might have made Benson more sympathetic to the jury, but it also might have made him seem less likely to be rehabilitated"); *Cunningham*, 704 F.3d at 1161–62 (finding that wife's testimony that petitioner was a good husband would have opened the door to evidence that she had recently filed a police report against him); *Mickey*, 606 F.3d at 1243–44 (finding counsel not ineffective for failing to introduce evidence of childhood abuse where such evidence would have opened the door to rebuttal evidence of sexual deviancy).

Doerr cites a number of cases where courts have found ineffective assistance of counsel at the sentencing stage of capital trials. Quoting *Wiggins*, 539 U.S. at 524, for example, Doerr argues that he was prejudiced because his attorneys "abandoned their investigation of [his] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." (Doc. 167 at 75.) The record shows otherwise.

In *Wiggins*, where "counsel introduced no evidence of Wiggins's life history" during the sentencing proceedings, 539 U.S. at 515, the Court examined counsel's

mitigation investigation and found that it drew from three sources, *id.* at 523. Counsel retained a psychologist who determined that Wiggins had an IQ of 79, had difficulty coping with demanding situations, and exhibited features of a personality disorder. *Id.* Counsel also obtained a presentence investigation, which included a one-page account of Wiggins's "disgusting" life history, and social service records documenting Wiggins's placements in foster care. *Id.* at 523–24. Counsel did not retain a "forensic social worker" or prepare a social history report, which were standard practices at the time, nor did they follow up on leads that were present in the record. *Id.* The Court found that counsel performed unreasonably in failing to expand the scope of their investigation. *Id.* at 524. As a result of their deficient investigation, counsel failed to present powerful mitigating evidence, including evidence that Wiggins's mother was an alcoholic who abused Wiggins and his siblings, that Wiggins entered foster care at age six, that two foster mothers physically abused him, that his second foster father repeatedly raped and molested him, that he was homeless at times, and that he was mentally retarded. *Id.* at 525.

In Doerr's case, by contrast, counsel did investigate and present a case in mitigation based on Doerr's troubled life history and mental status. Counsel retained a mitigation specialist. She and the defense investigators obtained information about Doerr's social history from several sources, including Doerr, his only sibling, his parents, an aunt, cousins, and friends and others who knew him; from the reports of mental health experts; and from DCFS and medical records. This evidence was presented through witnesses at the presentencing hearing and in Wake's social history report. In sentencing Doerr, the trial court agreed "that defendant has proven by a preponderance of the evidence that he had an abusive family history" and came from "a seriously dysfunctional unloving family and had a very abusive father." (Doc. 174-3, Ex. G at 10.) Doerr was not prejudiced because, in contrast to *Wiggins*, counsel's investigation produced a thorough case in mitigation.

The remaining cases Doerr relies on are equally distinguishable. In each, the petitioner was prejudiced by counsel's failure to investigate, identify, and present key mitigating evidence. In *Sears v. Upton*, 561 U.S. 945 (2010), counsel's mitigation

presentation portrayed Sears as the product of a stable, loving, middle-class background and focused on the effects of his execution on his family and loved ones. *Id.* at 947. "[T]he strategy backfired" when the prosecutor used Sears's supposedly privileged background against him in closing argument. *Id.* Among the mitigating circumstances omitted by counsel's strategy was evidence that Sears was sexually abused by a male cousin, verbally abused by his parents, and inappropriately disciplined; that he performed poorly in school, exhibited behavioral problems, and was labelled "learning disabled" and "behaviorally handicapped"; and that he had "significant frontal lobe abnormalities" and "pronounced frontal lobe pathology" as a result of multiple head trauma, substance abuse, and traumatic experiences, with a "grossly impaired" ability to regulate his impulses and control his behavior. *Id.* at 947–50.

In Doerr's case, counsel did not engage in a counterproductive strategy at sentencing. Instead, they presented classic mitigating evidence of Doerr's abusive childhood, learning disabilities, behavioral difficulties, and brain damage. Counsel presented exactly the type of evidence the Supreme Court found counsel in *Sears* was ineffective for failing to present.

In *Porter v. McCollum*, 558 U.S. 30 (2009), the Court found counsel performed ineffectively at sentencing where "[t]he sum total of the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." *Id.* at 32. Although counsel told the jury that Porter "has other handicaps that weren't apparent during the trial" and was not "mentally healthy," he failed to present any evidence about Porter's mental condition. *Id.* The evidence counsel could have presented included the fact that Porter had been abused as a child by his violent father, who once shot at him and who beat his mother in front of him; attended classes for "slow learners"; suffered from cognitive defects and "brain damage that could manifest in impulsive, violent behavior"; and was a decorated veteran who served on the front lines in two battles of the Korean War and now suffered from PTSD. *Id.* at 33–36.

In Doerr's case, counsel did present expert testimony about Doerr's mental health, with the principal diagnoses being that he suffered from brain damage, which affected his ability to control his conduct, and had a low IQ. Counsel also presented detailed evidence of Doerr's dysfunctional family background, which the sentencing court accepted as a mitigating circumstance. In contrast to *Porter*, counsel's performance in Doerr did not result in the wholesale omission of significant mitigating evidence.

In *Jefferson v. Upton*, 560 U.S. 284 (2010), counsel "presented only testimony from two prison guards, who stated that Jefferson was an unproblematic inmate, and from three members of Jefferson's family," who offered positive testimony about his character. *Id.* at 286. Prior to trial, Jefferson was examined by a psychologist who found he had mental deficiencies that affected his judgment and decision-making ability. *Id.* The psychologist had been unable to explore pathologies related to a head injury Jefferson suffered during childhood and believed it would be worthwhile to perform a neurological examination. *Id.* During subsequent habeas proceedings, evidence was developed showing that Jefferson was injured at two years old when a car ran over the top of his head. *Id.* at 285. As a result of this injury, he had "permanent brain damage" that "causes abnormal behavior" over which he "has no or substantially limited control." *Id.* The condition resulted in diminished impulse control, impaired social judgment, and outbursts of rage. *Id.*

In Doerr's case, counsel retained three mental health experts, including two neuropsychologists who testified at the presentencing hearing. A psychologist and a neuropsychologist conducted tests to determine if brain damage was present. Based on the information provided by the experts, counsel arranged for a PET scan. The experts agreed that Doerr suffered from brain damage, notwithstanding the negative scan results, and that the damage affected his ability to control his behavior. Doerr's counsel investigated and produced the type of evidence that was omitted in *Jefferson*.

In *Rompilla*, the only evidence counsel presented in mitigation consisted of the relatively brief testimony of five family members who argued for residual doubt and pleaded for mercy, stating that they believed Rompilla was innocent and a good man.

545 U.S. at 378. His son testified that he loved his father and would visit him in prison. *Id.* The mitigating evidence counsel failed to uncover showed that Rompilla was beaten by his father with fists, straps, belts, and sticks; that his father locked him and his brother in a dog pen filled with excrement; and that he grew up in a home with no indoor plumbing and was not given proper clothing by his parents. *Id.* at 391–92.

In Doerr's case, the defense team uncovered and presented extensive information about Doerr's traumatic life history. Doerr's aunt testified about the extreme abuse and neglect Doerr suffered while being raised in a filthy home by an indifferent mother and a sadistic father who devised cruel punishments for his children. She described the effects the emotional and physical abuse had on Doerr. Doerr himself recounted, in Dr. Tatro's report, the details of his abusive and deprived childhood, indicating that he and his sister were treated like slaves, beaten, and starved. Doerr's sister and a cousin provided additional information about the dysfunctional Doerr household, in particular Charles's brutal treatment of his son. Doerr's counsel, in sum, offered just the kind of mitigating evidence Rompilla's counsel failed to produce.

The Ninth Circuit cases Doerr cites offer little support for his assertion that he was prejudiced by trial counsel's performance. In each of those cases, counsel's deficient performance resulted in the omission of significant mitigating evidence and prejudiced the defendant. For example, in *Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007), the Ninth Circuit found ineffective assistance where counsel spent only five and a half hours obtaining evidence and preparing for the penalty phase, and "[t]he sum total of the mitigating evidence offered at sentencing required less than three pages of a double-spaced transcript and relate[d] only to Lambright's behavior in jail." *Id.* at 1119. Counsel failed to present any psychiatric testimony and did not call any family members or friends to testify. *Id.* He presented one witness, a guard at the jail who testified that Lambright was respectful and cooperative, and submitted a short memorandum listing various potentially mitigating circumstances.

The evidence omitted due to counsel's deficient performance showed that as a child Lambright was subjected to daily abuse by his mother, who "hit, kicked, or whipped him." *Id.* at 1123. She was also a hypochondriac who was addicted to valium and spent the majority of her time in bed. *Id.* She forced Lambright to take valium or sleeping pills when he acted up. *Id.* Lambright's family moved frequently, and he never attended school in any one place for more than a year, so he was unable to develop stable social relationships. *Id.* Also omitted was evidence of the extent and effect of Lambright's long-term drug abuse, including his substantial use of methamphetamine. *Id.* at 1124. Finally, no medical records or testimony substantiated Lambright's mental health problems, including depression, suicide attempts and psychiatric hospitalizations, and antisocial personality disorder. *Id.* at 1125.

The mitigating case presented by Doerr's counsel contrasts sharply with that offered by counsel in *Lambright*. The investigation carried out by Doerr's defense team far exceeded the five and a half hours spent by Lambright's counsel in preparation for the penalty phase, and the quantity and quality of the mitigating evidence resulting from that investigation and presented at Doerr's sentencing bears no relationship to the limited information offered in Lambright's case. Doerr's counsel presented six witnesses over two days, including four lay witnesses who offered humanizing testimony and two experts who testified about Doerr's mental health conditions, low IQ, and brain damage. In support of their proposed mitigating circumstances, counsel also submitted a twenty-two-page social history with accompanying exhibits, including the experts' reports, notes from an interview with Doerr's sister, a letter from Doerr's cousin, DCFS records, and medical records. This is precisely the type of evidence whose omission was found prejudicial in *Lambright*.

In *Correll*, the Ninth Circuit found ineffective assistance where counsel did not investigate Correll's mental health disorders, psychiatric commitments, drug abuse history, brain injury, and family dysfunction. 539 F.3d at 944. Counsel interviewed witnesses, but only with respect to the guilt phase of trial, and failed to gather records from Correll's schools, psychiatric institutions, or placement with the California Youth Authority. *Id.* at

1245. "As anemic as the defense counsel's investigation was, his presentation of mitigating evidence . . . was worse." *Id.* at 946. Counsel "did not call a single witness to testify" or "introduce any evidence." *Id.* His "only proactive effort . . . was to write a short response to the presentence report." *Id.* Counsel's deficient performance prejudiced Correll because it resulted in the omission of "classic" mitigation, including evidence of an "abusive childhood" and "incest in the family"; a head injury Correll sustained at age seven when a brick wall collapsed on his head; a history of drug use starting at age ten; beatings by his parents; becoming a ward of the state at age fourteen, with placements in cruel and inhumane institutions; addiction to heroin; commitments to psychiatric facilities as a teenager; suicide attempts; and methamphetamine use. *Id.* at 952–53.

Again, in contrast to the "anemic" performance of counsel in *Correll*, Doerr's attorneys took "proactive" steps to uncover and present mitigating evidence. Counsel retained three mental health experts who evaluated Doerr and investigators and a mitigation specialist who interviewed witnesses and researched Doerr's background. During the presentencing hearing, counsel presented six witnesses over two days, including lay witnesses who offered humanizing testimony about Doerr's upbringing and positive characteristics and experts who presented their diagnoses that Doerr suffered from brain damage and had a low IQ. Counsel also submitted a social history and accompanying exhibits, including records from Doerr's placement in the ISSCS. The mitigating case offered by Doerr's counsel is easily distinguishable from the case presented by Correll's counsel.

In *Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004), counsel presented "minimal" mitigating evidence, "consisting of testimony from six witnesses (only four of whom were actually in court) and covering only approximately 50 pages in the transcript." *Id.* at 716. Stankewitz's sister-in-law testified in general terms about the deprivations of life on an Indian reservation, and a juvenile probation officer "summarized Stankewitz's life chronology . . . [but] did not provide the sort of detailed information that Stankewitz now alleges." *Id.* at 717. Counsel failed to "hire[] an investigator or interview[] Stankewitz's teachers, foster parents, psychiatrists, psychologists, or anyone else who may

have examined or spent significant time with him during his childhood and youth." *Id.* at 719. Counsel did not procure a psychological examination or obtain any records related to Stankewitz's background, and he was unaware of Stankewitz's history of drug and alcohol abuse. *Id.* at 719–20.

As a result of counsel's failures, significant mitigating information was not presented. That evidence showed that Stankewitz was born into a poverty-stricken household where there was not enough food to feed the 10 children. *Id.* at 717. The house was dirty, filled with vermin, and without running water or electricity. *Id.* By age five, Stankewitz had started sniffing paint. *Id.* He was physically and mentally abused by both parents. *Id.* His mother drank excessively while pregnant with Stankewitz and was abused by Stankewitz's father, who struck her repeatedly in the abdomen. *Id.* Stankewitz's mother beat him so badly that she was jailed and he was placed in the care of the state. *Id.* Once removed from his home, Stankewitz was "shuffled from one state institution to another." *Id.* at 718. During these placements "he was massively and unnecessarily drugged, tied to beds, beaten, sexually molested, neglected, deliberately tortured, and otherwise abused by staff." *Id.*

Experts retained during Stankewitz's habeas proceedings found that he was brain-damaged, borderline retarded, and suffered from significant brain dysfunction which would cause problems with impulse control and judgment. *Id.* Stankewitz also "had intense mood shifts, profound depressions with suicidal tendencies, psychotic thinking, an inability to relate to reality in a rational manner, and paranoid delusional thinking." *Id.* He also had a "very severe" substance abuse problem dating back to as early as age 10. *Id.*

In contrast to counsel's performance in *Stankewitz*, which resulted in prejudice through the omission of key categories of mitigating evidence, Doerr's attorneys did not fail to investigate and present a case in mitigation. Instead, they retained appropriate experts as well as investigators and a mitigation specialist. As opposed to the "cursory" manner in which mitigation evidence was presented in *Stankewitz*, 365 F.3d at 724, Doerr's counsel offered testimony from both lay and expert witnesses who provided powerful

evidence about Doerr's deprived and abusive background and his mental health difficulties, including his brain damage, low IQ, learning disabilities, and alcohol abuse. Counsel also presented a social history and exhibits in support of several mitigating circumstances. The bulk of the mitigating details of Doerr's social history and mental status were not left completely unexplored as they were in *Stankewitz.*

In *Douglas v. Woodford*, counsel failed to locate a psychological report in the file pertaining to an earlier crime. 316 F.3d at 1086. In that report, a psychologist had concluded that Douglas suffered from "serious and outstanding mental illness and possible organic impairment" and "was confused, his thought processes chaotic, and . . . suffered from severe paranoia." *Id.* Test results indicated "some level of pre-existing neurological deficit," which may have interacted with damage from Douglas's chronic alcoholism, daily exposure to toxic solvents, and a serious head injury. *Id.* In the absence of the report, the mitigation evidence counsel presented was minimal. *Id.* at 1087. Witnesses testified that Douglas had a nonviolent nature and an aversion to the sight of blood. *Id.* Family members testified "in very general terms" that Douglas was orphaned, had a difficult childhood, and ran away from home at fifteen to join the Marines. *Id.* Counsel made "no attempt to contact persons who might have had more detailed information about Douglas's past." *Id.* at 1088. The omitted evidence showed that "Douglas was abandoned as a child and raised by foster parents, including an abusive alcoholic foster father who locked him in a closet for long periods of time." *Id.* at 1088. He grew up in an extremely poor neighborhood. *Id.* After running away at age fifteen, he was arrested and put in a jail where he was beaten and gang-raped by other inmates. *Id.* He had possible brain damage from exposure to solvents, from an auto accident where he suffered damage to his left temporal lobe, and from daily consumption of large amounts of alcohol. *Id.* Character evidence also could have been introduced showing that he had earned medals and commendations as a Marine and had helped rescue two drowning sailors. *Id.*

Doerr's counsel presented more than a "minimal" case in mitigation. They retained appropriate experts, as well as investigators and a mitigation specialist, and the defense

team reached out to those who knew the most about Doerr. Their investigation produced mitigating information from Doerr's sister, an aunt, cousins, as well as a friend, an employer, and a coworker. The evidence presented at sentencing included specific information about Doerr's abusive and deprived childhood, his brain damage, low IQ, behavioral difficulties, and redeeming qualities. In contrast to *Douglas*, counsel's performance at Doerr's sentencing did not result in prejudice through the omission of key mitigation evidence.

In *Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002), the Ninth Circuit held that counsel's failure to investigate potential brain damage constituted ineffective assistance. Although counsel was aware of Caro's "extraordinary history of exposure to pesticides and toxic chemicals," he failed to adequately investigate that history and did not seek an expert to assess the effect of the poisoning on Caro's brain. *Id.* at 1255. He ordered a blood test, which indicated that Caro had been exposed to a fungicide, but did not pursue the possibility that Caro was brain damaged. *Id.* "The only expert testimony presented relating to Caro's mental health did not shed light on his brain damage." *Id.* at 1257. Counsel also failed to present testimony explaining the effects of the severe physical, emotional, and psychological abuse Caro suffered as a child. *Id.* at 1255. Caro was prejudiced by the omission of this evidence which could have shown a "physiological cause" for his "impulse discontrol." *Id.* at 1258.

In Doerr's case, counsel retained qualified experts who examined Doerr, performed appropriate testing, including a PET scan, and determined that he had brain damage and a low IQ. The experts also testified about the effects Doerr's brain damage and troubled background had on his behavior. In making their diagnoses, the experts were in possession of information about the possible causes of the brain damage, including head injuries, alcohol abuse, and the abuse and deprivation Doerr suffered as a child. In contrast to counsel's performance in *Caro*, Doerr's counsel did not withhold any information necessary for the experts to render their diagnoses.

As these cases demonstrate, prejudice is found where the omission of mitigating evidence results in an inaccurate sentencing profile. *See Strickland*, 466 U.S. at 699–700; *Porter*, 558 U.S. at 41 (finding prejudice where the judge and jury "heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability"); *Ramirez*, 937 F.3d at 1246 ("The mitigation evidence presented during sentencing did not consistently or accurately describe the circumstances of Ramirez's life.").

Like the petitioners in *Williams*, *Wiggins*, and *Rompilla*, Doerr's life history was "nightmarish." *Williams*, 529 U.S. at 363. Unlike them, Doerr's counsel presented detailed evidence of that nightmarish life to the sentencer. *See Brown*, 530 F.3d at 1033 ("Brown's lawyers presented significant mitigating evidence, unlike other cases where counsel were deficient for presenting hardly any mitigation case at all.").

The trial court was aware that Doerr was raised in a filthy home; that his father abused him and his sister physically and mentally, sexually abused his sister, subjected both children to sadistic punishments, and even starved them; that their indifferent mother did nothing to protect them; and that Doerr repeatedly ran away from home to escape the abuse until he was placed in a state-run orphanage as a teenager. The court was aware that Doerr had a low IQ, was found to be Educable Mentally Handicapped, was placed in special education classes, and was barely literate. The court was aware that Doerr abused alcohol. Finally, the court was aware that Doerr suffered from mental and behavioral problems and that two neuropsychologists had diagnosed him with brain damage that impaired his ability to control his conduct and likely caused him to disassociate when committing the murder. This evidence comprised an accurate depiction of Doerr's life history and mental condition. He was not prejudiced by counsel's failure to present additional details that support but do not alter the profile offered at sentencing. *See Strickland*, 466 U.S. at 699–700.

Finally, the circumstances surrounding the murder in this case render a showing of prejudice particularly difficult. The Ninth Circuit has noted that "the facts of the crime play an important role in the prejudice inquiry." *Mickey*, 606 F.3d at 1245 (citing *Belmontes*,

558 U.S. at 26–27, and *Van Hook*, 558 U.S. at 13). In *Belmontes* the Supreme Court overruled the Ninth Circuit's grant of habeas relief. In doing so the Court emphasized the brutality of the crime:

> The jury saw autopsy photographs showing [the victim's] mangled head, her skull crushed by 15 to 20 blows from a steel dumbbell bar the jury found to have been wielded by Belmontes. [Her] corpse showed numerous defensive bruises and contusions on [her] hands, arms, and feet, which plainly evidenced a desperate struggle for life at [Belmontes'] hands.

558 U.S. at 27 (internal quotations omitted). The Court explained that "[i]t is hard to imagine expert testimony and *additional* facts about Belmontes' difficult childhood outweighing the facts of [the] murder." *Id.* at 27–28 (emphasis in original); *see Leavitt*, 646 F.3d at 616 ("Given the exceptional depravity of this murder, it is unlikely that additional evidence of a brain abnormality would have made a difference.").

In *Van Hook* the Court noted that it is the weight of aggravating factors, not the number, that must be taken into account when assessing prejudice. 558 U.S. at 13. In Doerr's case, one aggravating factor was proved, but it was entitled to great weight. *See State v. Poyson*, 250 Ariz. 48, 475 P.3d 293, 302 (2020) (finding the cruelty aggravator was "entitled to great weight" given the "prolonged and brutal" way the murders were committed) (quoting *State v. McKinney*, 245 Ariz. 225, 228, 426 P.3d 1204, 1207 (2018)).

In Doerr's case the trial court found that the murder was especially heinous, cruel, or depraved. The Arizona Supreme Court affirmed, reciting the following facts:

> While the medical examiners could neither pinpoint the sequence of Karen Bohl's injuries nor determine precisely when she lost consciousness, the physical evidence indicated that she experienced pain and extreme mental anguish. The doctors found bruising and swelling on her hands and arms consistent with defensive actions, and hair was clenched in her fist. Her nasal bones were fractured. She had cuts under her lip. Extensive bleeding from the vaginal and rectal wounds indicated that they occurred prior to or during death. In addition, she had twenty-six other injuries to various parts of her body. These must have been inflicted over a period of time.
>
> Even more persuasive is the crime scene evidence. Bohl's bloody footprint was found on the bathtub, and bloody hair swipes consistent with her PGM subtype were found on walls and other surfaces. Similar findings throughout the apartment suggested a pursuit and struggle. A neighbor testified that she heard "blood-curdling" screams of "No, no!" from a female at about 3:30 that morning, but did not call the police. Bohl's body was found in the hallway, sprawled partially through the opening into a bedroom. Such evidence of a violent, moving confrontation leaves little doubt that the victim

feared for her life during the attack. Sufficient proof exists to conclude, beyond a reasonable doubt, that she suffered pain and extreme mental anguish. . . .

*Doerr*, 193 Ariz. at 67, 969 P.2d at 1179.

Given those facts, there is not a reasonable probability that presenting additional expert testimony and more evidence about Doerr's traumatic upbringing would have convinced the sentencer to exercise leniency. *See Wiggins*, 539 U.S. at 534 (holding that prejudice is measured by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence").

For the reasons stated above, trial counsel's performance was neither deficient nor prejudicial.

### 3.    PCR counsel did not perform ineffectively

Although the Court has determined that "prejudice" exists because Claim 28 satisfies the low threshold for being "substantial" as that term is defined by *Martinez*, Doerr must also establish "cause" for the claim's default by showing that PCR counsel performed at a constitutionally ineffective level in failing to raise the claim. *See Ramirez*, 937 F.3d at 1241–42 (explaining that a finding of "prejudice" for purposes of the "cause and prejudice" analysis is distinct from the requirement that a petitioner satisfy *Strickland*'s deficient performance and prejudice prongs with respect to PCR counsel's performance). In making a determination as to "cause," the Court necessarily considers the merits of Claim 28, which are relevant to the *Strickland* analysis of PCR counsel's performance. *See Ramirez*, 937 F.3d at 1241–42; *Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Clabourne*, 745 F.3d at 377; *Sexton*, 679 F.3d at 1157.

In considering whether PCR counsel's performance was ineffective, the Court focuses on the prejudice prong. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."). The Court makes no determination as to whether PCR counsel performed deficiently in failing to raise a claim of ineffective assistance of counsel at sentencing.

Doerr "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen*, 395 F.3d at 1000. He must affirmatively prove prejudice by showing there is a reasonable probability that if PCR counsel had raised a claim of ineffective assistance of counsel at sentencing, the result of the PCR proceedings would have been different. *Ramirez*, 937 F.3d at 1241 (citing *Strickland*, 466 U.S. at 694); *Runningeagle*, 825 F.3d at 982. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Murray (Roger)*, 882 F.3d at 816.

Doer cannot meet his heavy burden of establishing prejudice from PCR counsel's performance because the underlying ineffective assistance claim "lacks merit." *Atwood*, 870 F.3d at 1060. First, trial counsel performed reasonably at sentencing. To find otherwise would be to ignore the highly deferential standard of *Strickland* and Supreme Court and Ninth Circuit cases applying that standard. It simply cannot be said that trial counsel were "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Second, Doerr was not prejudiced by counsel's performance at sentencing because his attorneys presented a range of "classic" mitigating evidence, *Correll*, 539 F.3d at 952, including lay testimony detailing his traumatic childhood and expert testimony identifying his mental impairment and its effects on his conduct. Comparing the evidence that was presented at sentencing with the new evidence Doerr argues should have been presented does not result in an altered sentencing profile. *Strickland*, 466 U.S. at 699–700. The mitigating evidence gathered and presented at sentencing depicted Doerr as the victim of horrendous childhood abuse and a damaged brain that impaired his ability to control his conduct. The new evidence paints the same picture, with only minor details added.

Because Claim 28 "lacks merit," PCR counsel's failure to raise it "would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised." *Atwood*, 870 F.3d at 1060. Because there was not "a reasonable probability that [Claim 28] would have succeeded had it been raised," there was not "a reasonable

probability that PCR counsel prejudiced [Doerr] by failing" to raise it. *Runningeagle*, 825 F.3d at 982. Because "trial counsel . . . was not constitutionally ineffective" in their performance at sentencing, PCR counsel was not ineffective for failing to raise such a claim. *Sexton*, 679 F.3d at 1157.

Doerr has not met his heavy burden of establishing that he was prejudiced by PCR counsel's performance. He has failed, therefore, to establish that PCR counsel's performance was constitutionally ineffective under *Strickland*. Accordingly, pursuant to *Martinez*, "cause" does not exist to excuse the procedural default of Claim 28. The claim remains barred from federal review.

## D. Evidentiary Development

As noted above, a petitioner may present evidence in support of his argument that "cause" and "prejudice" exist under *Martinez* to excuse the default of a claim of ineffective assistance of trial counsel. *Dickens*, 740 F.3d at 1321; *see Woods*, 764 F.3d at 1138 n.16.

Doerr asks the Court to expand the record to include the exhibits attached to his supplemental *Martinez* brief. (Doc. 167 at 123.) The Court will grant that request and expand the record to include Exhibits 1–68 (Doc. 167-1 to Doc. 167-6; Docs 168, 173, 179-1, and 182-1).

Doerr also seeks an evidentiary hearing "to prove his claim." (Doc. 167 at 23.) The Court will deny that request. Expansion of the record provides sufficient evidence for the Court to undertake its analysis under *Martinez*. *See Phillips v. Ornoski*, 673 F.3d 1168, 1179 (9th Cir. 2012) (explaining that a court has the discretion to deny an evidentiary hearing where the documentary evidence is sufficient to decide the issue).

The expanded record includes declarations and reports from the witnesses who would testify at a hearing, and the Court has accepted as truthful the contents of those documents, including the expert's diagnoses. Doerr has not alleged that the testimony of any live witness would differ from the contents of their declarations. *See Hooper*, 985 F.3d at 632–33; *Runningeagle*, 825 F.3d at 990 (concluding that the district court did not abuse its discretion in denying an evidentiary hearing where "[t]he expanded record included the

declarations of witnesses who would testify at a live hearing, and [the petitioner] made no showing that their testimony would differ materially from their declarations"); *Williams v. Woodford*, 384 F.3d 567, 591 (9th Cir. 2004) (explaining that "oral testimony and cross-examination were not necessary because the documentary evidence submitted fully presented the relevant facts").

## CONCLUSION

In *Ramirez* the Ninth Circuit described the proper analysis under *Martinez* as a "two-step process." 937 F.3d at 1242 n.7. The first step is determining whether the procedural default of the underlying claim of ineffective assistance of trial counsel is excused. *Id.* That determination is made by evaluating whether "cause" and "prejudice" exist. *Id.* at 1241. The analysis of both "cause" and "prejudice" encompasses an assessment of the strength of the underlying claim. *Id.* at 1241–42; *Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Clabourne*, 745 F.3d at 377; *Sexton*, 679 F.3d at 1157. If the default is excused, the second step is to "address the claim squarely, after allowing a chance for any necessary record or evidentiary development." *Ramirez*, 937 F.3d at 1242, n.7.

The court in *Ramirez* faulted the district court for collapsing the two steps by "conducting a full merits review of Ramirez's underlying ineffective assistance of trial counsel claim on an undeveloped record."[20] 937 F.3d at 1242. The distinction between a "full merits review" and the type or types of review necessary to make determinations about the existence of "cause" and "prejudice" is less than clear, however, and any such review necessarily takes place on the record before the court.[21] In this case that record

---

[20] It is unclear what constitutes an "undeveloped record." The court in *Ramirez* cited *Apelt v. Ryan*, 878 F.3d 800 (9th Cir. 2017), as an example of the district court properly carrying out the second step of the "two-step" process, 937 F.3d at 1242 n.7, even though that court's review took place on the record without further evidentiary development. In *Runningeagle*, the Ninth Circuit found that the record was complete even while affirming the district court's denial of an evidentiary hearing. 825 F.3d at 982 n.13, 990–91; *see also Hooper*, 985 F.3d at 632–33 (making cause determination based on expanded record while affirming district court's denial of an evidentiary hearing).

[21] As noted above, in *Ramirez* the court held that determining if the underlying claim is "substantial," thereby establishing "prejudice" under *Martinez*, is accomplished by conducting a "general assessment" of the claim's merits. 937 F.3d at 1241. A "general assessment" appears to fall at one end of a spectrum which extends, at the other end, to an impermissible "full merits review." It is not clear what standard of review is required, or allowed, to evaluate "cause"—that is, to determine whether PCR counsel's performance

includes, in addition to the state court record, 2000 pages of documents offered by counsel in support of Claim 28. The new evidence includes reports from half a dozen mental health experts from around the country, Doerr's school records and the full record from his placement in a state-run institution, and declarations from witnesses who had first-hand knowledge of Doerr's troubled life both before and after that placement. The Court has accepted that the new diagnoses are accurate and the lay evidence is truthful.

The Court believes it has properly completed the first step of the "two-step process" by examining whether the default of Claim 28 is excused. *Cf. Apelt v. Ryan*, 878 F.3d 800, 824 (9th Cir. 2017) (finding, where the district court granted relief on the merits of an ineffective assistance claim, that the court had "implicitly" found the default excused); *Runningeagle*, 825 F.3d at 982 n.13. The Court has found that "prejudice" exists but "cause" does not. Therefore, the claim's default is not excused. If the Court has stepped over the line drawn in *Ramirez* by performing an impermissible "full merits review" of Claim 28, it did so only because a complete review of the claim seemed necessary to carry out the Court's assigned task of assessing whether "cause," in the form of ineffective assistance of PCR counsel, exists to excuse the claim's default.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

---

was ineffective. What is clear is that an estimation of the merits of the underlying claim must somehow be reached to carry out the *Martinez* analysis. The courts in *Ramirez* and *Clabourne* explained that the "cause" and "prejudice" analyses remain distinct and that "prejudice" under *Martinez* requires "*only*" a finding that the claim is "substantial." This implies that something more than a "general assessment" of the underlying claim is involved in the determination of "cause." *Ramirez*, 937 F.3d at 1242; *Clabourne*, 745 F.3d at 377.

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate whether the Court correctly applied *Martinez* in finding that the default of Claim 28 was not excused.

For the reasons stated above, the default of Claim 28 is not excused under *Martinez*. The claim remains defaulted and barred from federal review.

Accordingly,

**IT IS HEREBY ORDERED** that Claim 28 is denied as procedurally defaulted and barred from federal review.

**IT IS FURTHER ORDERED** granting Doerr's request to expand the record. The record is expanded to include Exhibits 1–68 (Doc. 167-1 to Doc. 167-6; Docs 168, 173, 179-1, and 182-1). Doerr's request for an evidentiary hearing is denied.

**IT IS FURTHER ORDERED** denying Doerr's request for a stay and abeyance to pursue an *Atkins* claim in state court.

**IT IS FURTHER ORDERED** granting a Certificate of Appealability as to Claim 28.

Dated this 7th day of July, 2021.

Honorable John J. Tuchi
United States District Judge